IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In the Matter of:

|                                    |     |                    |
|------------------------------------|-----|--------------------|
|                                    | )   |                    |
| FONTROY et. al.                    | )   |                    |
|                                    | )   |                    |
|            Plaintiffs              | )   |                    |
|                                    | )   |                    |
|            v.                      | )   | Action No: 02-2949 |
|                                    | )   |                    |
|                                    | )   |                    |
| SCHWEIKER et. al.                  | )   |                    |
|            Defendants              | )   |                    |

**PLAINTIFFS' SUPPLIMENTAL MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR ENTRY OF JUDGMENT ON BEHALF OF THE PLAINTIFFS.**

Currently before the Court is Defendants' Motion for Summary Judgment and Plaintiffs' Cross Motion for Summary Judgment. With the Court's permission, the parties conducted depositions of the Plaintiffs, Kim Ulisny, the SCI Graterford Mail Room Supervisor, John Murray, the SCI Graterford Deputy Superintendent for Facility Management, and Jeffrey Beard, Secretary for the Pennsylvania Department of Corrections. As a result, Plaintiffs, by and through court appointed counsel, Teri B. Himebaugh, Esquire, are hereby supplementing their prior submissions and are requesting that judgment be entered on their behalf.

**ARGUMENT**

I.  **Plaintiffs' Constitutional rights were, and continue to be, violated by the DOC legal mail policy**

It has long been established that prisoners have a constitutional right to both freedom of speech and access to the courts. Bounds v. Smith, 430 U.S. 817, 828, 52 L. Ed. 2d 72, 97 S. Ct. 1491 (1977), 430 U.S. at 821. The access must be "adequate, effective, and meaningful" in order to comport with the Constitution. Bounds, 430 U.S. at 822.  The Supreme Court did not define the term 'adequate' with specificity. Abdul-Akbar v. Watson, 4 F.3d 195, 202 (3d Cir. 1993).

Plaintiffs assert that the Defendants' current mail policy (DC-ADM 803) chills and substantially interferes with their right to confidential communications with and access to the courts and counsel in violation of their rights under the Constitution of the United States.

In pertinent part, the current DOC mail policy, as amended effective July 15, 2004, provides separate procedures for handling incoming mail from attorneys (hereafter "attorney mail") and incoming mail from courts (hereafter "court mail"). [1]

---

[1]   Secretary Beard admitted that the exact procedure by which attorney and court mail is handled, varies somewhat

In summary, the current policy provides that attorney mail received at the institution through any of the postal services, which does _not_ bear on the face of the envelope an attorney control number obtained by counsel from the DOC, will be considered non-privileged mail.[2] It will be opened and inspected in the mailroom, outside the inmate's presence.[3] It will then be stapled or taped shut and delivered to the inmate on the block along with other non-

---

from facility to facility within the DOC. (P27, Beard dep. Pgs. 61-63). Secretary Beard however stated that in his opinion, SCI Graterford's application of the mail handling policy was acceptable. (P27, Beard dep. Pg.64). Therefore, Plaintiffs shall use the procedures for mail delivery at SCI Graterford for illustrative purposes herein.

[2]    The implementation of the attorney control number system was due to a negotiated agreement with the DOC and a group of attorneys (Petitioner's counsel included) who, based on their own standing and grounds asserted that the policy was an undue burden on attorneys and impacted on Commerce. The current DOC mail policy requires both attorneys and courts to affirmatively obtain and regularly use control numbers in order to protect the inmates' constitutional right to free speech and access to the courts. Plaintiffs contend that they alone have standing to evoke the constitutional privileges raised herein.

[3]    At all times material Ms. Ulisny was aware that prisoners had complained that their legal mail was being read and/or delayed in delivery. (P28, Ulisny dep. pgs. 63,119,125). Ms. Ulisny's mailroom office is a cubicle positioned such that she cannot view all of her mail inspectors while she is at her desk. She is also out of the mailroom entirely approximately 5% of the shift. During these periods, no one else is designated to supervise mailroom staff. (P28, Ulisny dep. pgs. 96-98). While apparently there is a camera located inside the doorway of the mailroom, it was not being used to monitor and help supervise mailroom inspectors handling of the mail. (P28, Ulisny dep. pg. 97-98; P27, Beard dep. Pgs. 32, 55).

privileged mail. (P26, Murray dep. pgs. 31-34).

Only attorney mail, which bears a valid control number on the envelope, will be considered privileged mail. This mail is sorted by the mailroom and the attorney control number checked against a list of authorized control numbers provided to the facility by DOC Central Office. (Exhibit P13; P28, Ulisny dep. pgs. 16-18)[4].

The privileged attorney mail for the general population is taken, unopened, to a room off the Maintenance Corridor with a window, outside of which the inmates line up.[5]  Their letter is then opened and inspected for contraband in front of them at the window by a trained mailroom inspector. (Exhibit P1, §(VI)B2(b)).

Inmates who, due to housing, custody or other restrictions, cannot come to the window to pick up their attorney mail, have it opened and inspected by Lieutenants,

---

[4]    According to this list, as of October 2004, only approximately 350 attorneys and/or firms throughout the entire state of Pennsylvania have requested and received approved attorney control numbers. Thus, the vast majority of attorneys on both state and federal levels, have no idea that mail that they are currently sending to state inmates without a control number on it, is not considered by the DOC to be privileged. (P23, Fontroy dep. pgs. 86-88).

[5]    Each institution has a similar window or location.(Exhibit P ,Beard dep. Pg. 78). This same window is used at different times of the day for pick up by inmates of outside approved package deliveries, obtaining medication or for obtaining notary services. (P26, Murray dep. pg. 53; P28, Ulisny dep. pg. 109-110).

Sergeants or Unit Managers in front of them on their respective housing units. (P26, Murray dep. Pgs. 28-29, 39,45).

With regard to court mail, §3 of the DOC mail policy as amended in July, 2004 further provides that:

> (m)ail that appears to be from a court, but bears no control number, shall be opened and inspected for contraband by the facility mailroom staff in accordance with §VI(D)1 of this policy. If no contraband is found, the contents shall be placed back in the envelope, which shall then be taped or stapled shut. Staff shall then deliver this court mail to the inmate . . . ensuring that a staff member hands the mail directly to the inmate. However, the delivering staff member need not re-open and re-inspect this court mail.

This revised policy was implemented as a result of concerns expressed to the DOC by courts that inmates were complaining that they were not receiving their court mail. (P27, Beard dep. pgs 27,72). Theoretically, the policy now mandates that court mail may not be dropped or simply left inside an inmate's cell. Rather, inmates are to go to the unit manager's office to get their court mail. Plaintiffs however, assert that court mail still is either handed to them in their cells or dropped in theirs or someone else's unattended cell. (P26, Murray dep. pg. 37-38; P25, Savage dep. pg. 72-73; P24, Wheeler dep. pgs. 63-64).

A.    **The DOC legal mail policy is not reasonably related to legitimate penological interests.**

The Supreme Court has held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89, 96 L. Ed. 2d 64, 107 S. Ct. 2254 (1987). The Court has stressed that Turner's "reasonableness standard is not toothless." Thornburgh v. Abbott, 490 U.S. 401, 414, 104 L. Ed. 2d 459, 109 S. Ct. 1874 (1989). The Turner Court reviewed four factors that are relevant in determining the reasonableness of a challenged prison regulation.

"First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." Id. If not, the regulation is unconstitutional, and the other factors do not matter. Id. at 89-90. It is up to Defendants to advance a legitimate and neutral governmental interest to which DOC's policy is rationally connected.

Unlike the first Turner factor, the remaining factors are considerations that must be balanced together: (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact that accommodation of the asserted constitutional right

will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether there are "ready alternatives" available "that fully accommodate the prisoner's rights at de minimis cost to valid penological interests." Id. at 90-91.

Defendants in the case at bar, have asserted essentially two general penological interests that they consider the current mail policy to serve: prison safety/security and efficiency of prison operation.

### 1.    Prison Safety/Security

### A.    Contraband

Defendants have alleged that incoming attorney and court mail could conceivably contain contraband, such as drugs, hazardous material or implements of escape. (P27, Beard dep. Pgs. 9-14). Therefore, as a general proposition, it is safer to open and inspect it, along with all other mail, in the facility mailroom, outside of the inmate's presence, rather than somewhere inside the prison in front of the inmate. (P27, Beard dep. Pgs. 9,13-14). However, the evidence of record establishes that there is no valid, rational, non-speculative connection between the DOC regulation and the governmental interest asserted by the Defendants.

In response to deposition questions posed by

Plaintiff's counsel to Secretary Beard as to the factual
basis for the above contentions, the Defendants provided a
report titled "Privileged Correspondence Inspection and
Contraband". The report was prepared in 1999 by an
administrative officer with the Security Division of the
Bureau of Standards, Practices and Security in the DOC
Central Office. This has been the only study done and
documentation obtained by the Central Office since 1999
pertaining to the mail policy. (P27, Beard dep. Pg.48).
This obviously predates the implementation of the current
legal mail procedures and therefore does not address the
effect, if any, that the implementation of the legal mail
policy in 2002 or its amendment in 2004 had on contraband
getting into the facilities.

According to Secretary Beard, the primary impetus
behind the drafting of the above report and the
implementation of the current legal mail policy was an
incident which occurred in 1999.[6] (P27, Beard dep. pg. 46).
An inmate named Norman Johnston escaped from a Restricted
Housing Unit, ostensibly using hacksaw blades. The DOC
apparently blames this incident on the somewhat looser

---

[6]    While the alleged security breach was discovered in
1999, and was, according to the Secretary, on ongoing
concern, the DOC did not implement any change in policy
until October 2002. (P27, Beard dep. pg. 17).

privileged legal mail policy in effect at the time.[7] (P27,
Beard dep. pg. 19). Secretary Beard asserted during his
deposition that the DOC investigation had concluded that
the hacksaw blades were mailed to the inmate concealed in
the hollowed out binding of an inch thick legal brief that
was later found in Johnston's cell. (P27, Beard dep. pg.
19).

     However, on cross-examination, Secretary Beard
admitted that the DOC investigation had found no evidence
that this legal brief had in fact even been mailed into the
institution by any attorney, court, governmental agency or
for that matter by any other source. They didn't recover an
envelope so they had no return address to link it to. (P27,
Beard dep. pgs. 36, 44). Moreover, one would reasonably
assume that if the hollowed out binding, which  was
allegedly filled with hacksaw blades, had been mailed into
the facility as the DOC asserts, the x-ray equipment that
is used on all mail, along with the inspection by trained
mailroom staff should have uncovered it long before it got

---

[7]    Prior to 10/02 mail from courts and from attorneys was
considered privileged mail, which had to be opened in front
of the inmate. The privileged mail would be sorted by the
mailroom staff and delivered to each cell block. A
correctional officer from the block would open and inspect
the mail in front of the inmate at either a correctional
bubble or the inmate's cell. (P27, Beard dep. pgs. 15-16;
P28, Ulisny dep. pg. 22).

into the inmate's hands. (P28, Ulisny dep. pg. 12-13).

Nor did the DOC find any hacksaw blades in the hollowed out binding. It was empty. Thus, they couldn't definitively determine what, if anything, had actually been held there. (P27, Beard dep. pg.43).

Nor could the DOC exclude the possibility that Johnston himself hollowed out the binding of a brief that he already had in his cell, in order to hide something else entirely.(P27, Beard dep. pgs. 36, 44-45).

It is clear that this incident can not be realistically attributed to a security defect in the then legal mail policy. Similarly, there is no rational relationship between the security problems uncovered as a result of this incident and the current legal mail policy.

The report also cited a few instances where an envelope mailed to one of the facilities, labeled either 'legal mail' or bearing the return address of the Defender Association of Philadelphia, was found to contain drugs. (P2; See also P6). On one such occasion, heroine was found under stamps affixed to a document bearing an attorney's return address. (P27, Beard dep. pg. 54-55).

Neither the use of control numbers nor the current method of inspecting legal mail (opening the mail, fanning it out and reinserting it in the envelope it came in) would

prevent the inmate from gaining access to drugs that were affixed to the underside of a stamp since the inmates are given back the envelope with the stamps on it. (P27, Beard dep. pgs. 54-55).

The Defendants assert that it is better to intercept the drugs before they get into the main areas of the prison. (P27, Beard dep. pg. 9, 13-14). While this is indeed a legitimate security objective, the Defendants fail to consider that the DOC has various alternative means at their disposal already, other than opening and inspecting legal and court mail outside of the inmates' presence, to determine, *while the mail is still in the mailroom,* if it contains many types of illegal contraband that should not get inside the prison walls.

For example, every piece of mail that comes into the facility is x-rayed to detect explosives, weapons and implements of escape contained in sealed envelopes or hidden in notebooks, transcripts, etc. (P28, Ulisny dep. pg. 12). K9 officers are used to detect, through smell, illegal drugs that could potentially be contained in sealed incoming attorney or court mail or even under stamps. (P5 and P6). Furthermore, on those rare occasions when alleged legal mail was opened outside the mailroom, inspected in front of the inmate and drugs were found, there has not been a related

inmate disturbance or incident. (P26, Murray dep. Pg.  and
P7; P28, Ulisny dep. pg. 132).

### B.    <u>Non-privileged documents</u>

The report and Secretary Beard also cite instances
where attorney mail was found to contain documents that
were not inherently attorney work product and/or privileged
in nature. For example, Defendants refer to an incident in
1998 where an ex-inmate who was a paralegal at a
Philadelphia law office sent personal items to an inmate in
an envelope, which was designated as containing 'legal
mail'. The envelope contained several photos and a personal
letter from the paralegal. (P4 and P5). Often attorneys
send inmates birthday or holiday cards that are not
inherently privileged. (P27, Beard dep. Pg. 21).

Defendants, however, failed to consider that it makes
no practical security difference whether these types of
documents are opened in the mailroom or in front of the
inmate, elsewhere in the prison. The contraband – photos,
personal letters, holiday greeting cards, etc. is not
inherently dangerous. There is no greater risk to the
security of the institution by the mere fact that this mail
is opened in front of the inmate. This type of contraband
would also easily be detected regardless of where it was
opened and inspected.

The Defendants have also asserted concern that escape plans or documents which contain directions for making weapons or drugs could be sent into the institution in the guise of legal mail. In as much as the mailroom personnel are purportedly forbidden from reading so much as even the headings and titles of purported legal mail documents that they inspect, there is no basis for assuming that having control numbers on legal mail would catch and prevent this type of information from getting to the inmate. (P27, Beard dep. pgs. 10-11,15, 80-81; Exhibit P ,Ulisny dep. 34).

### C.    **Forged documents**

The report and the Secretary also cite instances where forged releases and/or pardon documents have been found to have been mailed into the institution in envelopes bearing returns of addresses from courts or attorneys. (P3; P27, Beard dep. Pgs. 33-34). However, the report and the DOC fail to draw the obvious and reasonable conclusion: no degree of mailroom inspection, short of having mailroom inspectors who are cross trained as forgery experts and who are given carte blanch to read every incoming document, could prevent this type of document from getting out of the mailroom and into the main prison. (Exhibit P, Beard dep. Pg. 15).

In fact, Secretary Beard admitted that when they

receive documents related to such things as sentencing
changes for an inmate, prison (not mailroom) staff normally
investigate the authenticity of the document by calling the
court for confirmation for just this reason. (P27, Beard
dep. Pg. 33,66). Opening and inspecting (fanning the
document to ensure that there is no contraband hidden
inside) this type of document in the mailroom would
therefore have no greater security value than opening and
inspecting it using the same means in front of the inmate.

### D. __Hazardous materials__

Defendants have also not presented any evidence
that the current mail policy is necessary to prevent the
potential spread of any biological, chemical or other
hazardous material. Secretary Beard admits that there have
*never* been any reported instances where attorney or court
mail was found to contain any suspect powder or other
similar hazardous material. (P27, Beard dep. Pg. 49). In
fact, Secretary Beard could only remember two occasions
throughout his entire 32 year tenure with the DOC where
suspicious powder was found to be contained in regular,
non-legal mail, which was sent to the DOC Central Office.
(Exhibit P ,Beard dep. Pg. 25,49).

Furthermore, Secretary Beard can not recall any
occasions when inmates and/or staff had to be evacuated

from a cell block of any state facility due to a suspicious
substance being received through even the regular mail,
much less attorney and/or court mail. (P27, Beard dep. pg.
71).

Apparently there was one incident where the medical
department at SCI Graterford received an envelope
containing suspicious material which made medical staff
dizzy, causing them to evacuate the area and call in an
outside hazmat team. However, it must be noted that the
suspicious envelope was mailed through *interdepartmental*
mail, which did not originate from outside the facility.
(P26, Murray dep. pg. 56-57). Thus, none of the mailroom
inspection procedures at issue herein would have applied to
this mail. (P28, Ulisny dep. pg. 39).

However, even assuming arguendo that some attorney or
court mail received by the facility could sometime in the
future contain some type of hazardous material, the
Defendants cannot prove that opening it in the mailroom
would prevent contamination of mailroom personnel and/or
the rest of the facility.

The prison mailrooms are not designed or built to
prevent spread of this type of contamination to other
portions of the prison facility. At SCI Graterford, the
mailroom is located on the lower floor of the prison

administration building. It shares that floor with the
employee waiting room, locker room, mechanical rooms, a
classroom and a telephone room. (P28, Ulisny dep. pg. 7).
In addition to mailroom staff, inmate janitors have access
to the mailroom. (P28, Ulisny dep. pg. 8).

The mailroom is a rectangle, measuring 53 feet by 23
feet. It is not equipped with a reverse or closed
ventilation system to prevent airborne contamination from
the mailroom to the rest of the administration building
and/or facility. (P28, Ulisny dep. pg.99).

Adjacent to the mailroom is a small closet area, which
contains a biohazard box and sink to permit the opening and
disposing of known hazardous material. This biohazard box,
however is only used on very rare occasions when the
mailroom staff happens to visually identify a package or
envelope as being suspicious due to irregularities or
damage to the packaging or labeling. (P28, Ulisny dep. pgs.
42-43).

For example, it was used when mailroom personnel
visually identified a suspicious package bearing the stamp
'legal mail', which had what appeared to be a tube of
something (which turned out to be hydrocortisone cream)
protruding from it. (Exhibit P14). There is no evidence
that other attorney and court mail which may possibly

contain potentially hazardous material, but which is not as
obvious as the above example, would be visually identified
as suspicious, thereby triggering mailroom personnels' use
of these precautions.[8]  In fact, the biohazard box has only
been used *twice* at SCI Graterford in all the years the
facility has had it. (P28, Ulisny dep. pg.42).

Nor are mailroom personnel required to wear any type
of mask or air filtration system. (P28, Ulisny dep. 99).[9]
There is no mailroom evacuation protocol, nor have there
ever been any mailroom evacuation drills conducted. (P26,
Murray dep. pg. 56). Thus, in reality, it is no safer to
open mail in the mailroom than it is elsewhere in the
prison.

**E.    Opening and inspecting legal mail at
a window.**

Prior to October 2002, all mail for the general
population sent by attorneys, courts and governmental
agencies was considered privileged. It was opened and
inspected in front of the inmate at a window located in the

---

[8]    Nor is it likely that the DOC would mandate that all
attorney and court mail be opened using the box because it
would be very time consuming and burdensome.
[9]    While some mailroom personnel choose to wear gloves to
open regular mail, they apparently do not to open attorney
mail. (P28, Ulisny dep. pg. 101-102). Nor do officers on
the unit who open and inspect mail wear gloves. (P26,
Murray dep. pg. 57).

Maintenance corridor of the facility.[10] (P28, Ulisny dep. pg. 59). However, since October 2002, only attorney mail for general population inmates, which contained an attorney control number, has been opened and inspected in front of the inmate during a specified time period at this window. (P8, P9).

Plaintiffs contend that it would be equally safe to open and inspect all court mail at this window as well. This window opens/backs onto into a correctional 'bubble', which is continually manned with 2-5 corrections officers. (P10; P28, Ulisny dep. pg. 108). Were there to be some type of a problem, help would be on hand and immediate. (P28, Ulisny dep. pg.141) Furthermore, the area inside the window/correctional control bubble, is even more self contained than the much larger and more accessible mailroom. If a contaminant were found, only the officers manning the bubble and the one mailroom inspector manning the window would have to be potentially evacuated. There would not have to be any mass evacuations of inmates and staff from cell blocks or other portions of the prison as portended by Secretary Beard. (P27, Beard dep. pgs. 25, 27).

---

[10]     Each facility has a similar window where medication, packages and/or notorial services are available to inmates. (P27, Beard dep. pg. 78).

Notably, Defendants were unable to cite to *any* reported instances of safety/security problems related to use of this window inspection/pick up procedure. (P27, Beard dep. pg. 78). In fact, Secretary Beard admitted that SCI Graterford's method of opening and inspecting attorney mail at this window does not violate DOC policy and does not present any security concerns. It still allows for a trained mailroom inspector to be the one to open and inspect the mail. (P27, Beard dep. pgs. 30, 64).

**F. <u>Issuance of attorney and court control numbers does not ensure or significantly increase prison security.</u>**

Requiring attorneys and courts to obtain and use control numbers, does not remedy any security problem raised by the Defendants. Tellingly, Secretary Beard admitted that he is aware that the use of control numbers only affords the DOC a very small measure of peace of mind in that the control number system is based entirely on trust. The DOC has to trust that the mail in fact came from the attorney or court as opposed to someone who may have simply worked in the attorney or court offices or who pilfered or reproduced attorney or court envelopes. (P27, Beard dep. Pg.22). As set forth above, the attorney and court number control system does not itself prevent any

contraband from entering the institutions. (P27, Beard dep. pg. 35-36).

Finally, Plaintiffs contend that this Court does not have jurisdiction to compel any other Court to use control numbers. It would impose an additional administrative burden on them. Furthermore, arbitrary and capricious compliance by various courts in using court control numbers presents the significant potential of sparking due process and equal protection litigation.

As argued above, the Defendants have presented nothing more than mere speculation that their general penological interest in maintaining security could conceivably be implicated. Mere speculation is insufficient to carry Defendants' burden of proof. Prison Legal News v. Cook, 238 F.3d 1145 (9th Cir. 2001).

### 2.    Efficiency of Prison Operation

Defendants have also generally asserted that it is generally more efficient for mailroom staff to open and inspect legal mail in the mailroom – outside of the inmates' presence. While this may be nominally true, it is insufficient penological justification to withstand the gross infringement of Plaintiffs' constitutional rights.

### A.    The amount of privileged mail received by the institution has decreased.

According to Mr. Murray, the inmate population at SCI Graterford has remained between 3100 and 3300. (P26, Murray dep. pg. 10-11). Ms. Ulisny who has worked in the mailroom at SCI Graterford for approximately 25 years, testified that Tuesday thru Thursday, the mailroom receives on average, between 2000 and 3000 pieces of mail each day for both inmates and staff. This includes regular and legal mail. On Mondays and holidays the amount of mail received increases from 5000 to 6000 pieces. (P28, Ulisny dep. Pgs. 11, 103). The amount of mail that is from attorneys or courts is, however, a very, very small percentage of the overall amount of mail processed by the mailroom staff. (P28, Ulisny dep. pg. 104).

Ms. Ulisny provided statistics that she had collected during the month of September 2002- the month prior to the effective date of the revised DC-ADM 803 mandating the use of attorney control numbers. Those statistics showed that SCI Graterford received on average each day that month, 38 pieces of court mail and 37 pieces of attorney mail (a total of 75 pieces of privileged mail). (Exhibit P11).

Ms. Ulisny further testified that the amount of court and attorney mail has not increased since September 2002 but instead, has *decreased*. (P28, Ulisny dep. Pg). Ms. Ulisny provided her handwritten notes for the month of

October 2004, to illustrate the average amount of attorney and court mail currently received at SCI Graterford. According to these figures, the facility received an average of 14 pieces of attorney mail and 37 pieces of court mail each day that month (total of 51 pieces of mail). (Exhibit P12). Thus, the burden on the mailroom or other staff has *decreased*.[11]

    **B.**    **<u>Current policy already requires that attorney mail be either opened and inspected in front of the inmate at the Maintenance corridor window or opened and inspected in their presence, on their individual housing blocks.</u>**

As set forth above, pursuant to the current procedures at SCI Graterford, attorney mail which contains an attorney control number and which is destined for inmates in general population, is opened and inspected in front of the inmate by mailroom staff at the window located in the Maintenance corridor. The inmates receive a pass indicating that they have attorney mail and at approximately 1:00 p.m. they line up at the window to receive the mail. (P26, Murray dep. pg. 31). There have been no complaints that this method of inspection and mail delivery has caused or will cause any significant operational concerns. According to Ms. Ulisny,

---

[11]    In fact, while the mailroom is supposed to be staffed with seven mail inspectors, two inspectors positions have been eliminated, with no indication that there will be a need for them to be refilled.

approximately 20-25 inmates currently pick up attorney mail at this window each day. (P28, Ulisny dep. pg. 57-58).

Ms. Ulisny estimated that prior to October 2002, when all attorney, court and government agency mail was considered privileged, approximately 60-100 pieces of mail were processed each day at this window. (P28, Ulisny dep. pg. 61). While Ms. Ulisny estimates that it only takes trained mail inspectors approximately 15 seconds to open and inspect mail, she recalls that in the past it took inspectors 45 to 60 minutes to open and inspect 60-100 pieces of mail each day. (P28, Ulisny dep. pg. 144).

In as much as the institution now receives only an average of 51 pieces of attorney and court letters each day, it should take approximately only 30 to 35 minutes to open and inspect this mail.

Furthermore, inmates who are not in general population receive *all* their mail, whether it is privileged or not, on their unit and/or at their cell. (P26, Murray dep. pg. 28-29). In Mr. Murray's opinion, it is more operationally efficient to hand deliver mail to the units where the population has restricted movement. (P26, Murray dep. pgs. 28-29,30,45). This would apply to well over 1200 of the approximately 3200 inmates incarcerated at SCI Graterford. (P26, Murray dep. pgs. 17-23).

Attorney mail for these inmates who have restricted movement, is opened and inspected on the housing unit in front of the inmate by the unit officers. The unit officers are provided training in identifying contraband when they are initially hired.(P26, Murray dep. pg. 48). Mr. Murray admitted that opening and inspecting this mail in front of the inmate does not, in his opinion, present any security concerns so long as the officer doesn't get distracted. (P26, Murray dep. pg. 46-47). Nor have the Defendants asserted that it is unduly burdensome for the unit officers to do this. (P26, Murray dep. 46).

     **C.**    **Current policy already provides that all court mail be hand delivered to each inmate on the block; It is not unduly burdensome to require that it be opened and inspected in front of the inmate at the same time or at the window where attorney mail is currently opened.**

Pursuant to the current policy, all court mail regardless of where the inmate is housed is opened and inspected in the mailroom, stapled or taped shut and then placed in a specially marked bag for delivery to the various blocks in the prison. (P28, Ulisny dep. Pg.). According to the July 2004 amendment to DC ADM 893, the Lieutenant, Sergeant or Unit Manager on each block is then responsible for personally handing the pre-opened court mail directly to the inmate it is addressed to. (P26,

Murray dep. Pgs. 37-38).

There is a very limited amount of court mail that is delivered to each of the 16 units within the prison each day. It only takes 15 seconds to a minute or two at most for staff to open and inspect this mail. Therefore, it would not be unduly burdensome operationally to require the Lieutenant, Sergeant or Unit Manager to also inspect the court mail in front of the inmate on his housing block. (P26, Murray dep. 46; P28, Ulisny dep. pg. 113).[12]

Alternatively, at least with regard to general population inmates (approximately 1970 inmates), court mail could be opened and inspected at the same window off of the Maintenance corridor that currently performs this task with regard to attorney mail. Inmates are permitted (with passes) access to this area at various points during the day. (P26, Murray dep. pgs. 15-17). Secretary Beard confirmed that this was indeed feasible. (P27, Beard dep. pg. 64). The window is currently available for approximately an hour or more in the early afternoon when attorney mail is already being picked up. Therefore, there is sufficient time to permit opening and distribution of

---

[12]    Requiring the court mail to be opened and inspected by the Lieutenant, Sergeant or Unit Manager when they hand it to the inmate would actually additionally decrease the amount of work that the mailroom staff has. They would no longer have to open and inspect any court mail.

court mail at this same time as well.

In a factually similar case involving the opening of legal mail from a State Attorney General's Office, the 9th Circuit found that there was insufficient evidence to support the defendants' claim that opening and inspecting the mail in front of the prisoners would be unduly burdensome. "(I)n the absence of any evidence to the contrary, we conclude that, if treating mail from the Attorney General as legal mail would cost anything at all, the difference would only be de minimis. Therefore, the government's legitimate interest in not wasting resources is not rationally related to the policy at issue." Rodriguez v. Hall, 19 F.3d 29 (9th Cir. 01/05/1994)

Thus, Defendants have not met their burden of proving that there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it. The prison mail regulation therefore is, without further inquiry into the remaining Turner factors, unconstitutional. Turner, at 89-90. However, even assuming arguendo that the other Turner factors needed to be considered, this court must find that the prison mail regulation violates the Plaintiffs' constitutional rights.

It is undisputed that there are no other alternative means by which the Plaintiffs may receive this critical attorney, court or other potentially privileged mail confidentially. Most attorneys do not have the time or resources to personally visit all their clients housed in jails throughout the state every time they wish to relay or obtain information to them. Unless there is a bona fide emergency, the only phone calls that an inmate can regularly have with his attorney are not confidential and can be recorded by the DOC. Thus, ensuring that Plaintiffs right to confidential written communication to and from counsel in order for them to have meaningful access the courts is essential.

Similarly, courts and governmental agencies often send inmates non-public documents containing confidential information such as the inmate's social security number and date of birth. (P15, P16). Under the current mail policy, not only theoretically can mailroom staff can see this confidential information when they open these letters in the mailroom, but court mail can be miss-delivered to the wrong inmate. There have been instances of which the Defendants are aware, where inmates other than the inmate to whom the letter is addressed have received documents containing this confidential information. This information

in the wrong hands could have been used to commit crimes. (P15, P16).

If court mail were opened and inspected in front of the inmate it was addressed to and then immediately handed to him, this problem would be eliminated. Opening and inspecting legal mail in front of the inmate permits the inmate a significant degree of confidence in the privacy of his legal mail, in that it could not have been previously opened, read and/or photocopied by prison staff.

Moreover, as we have already set forth above in section A(2) above, the potential impact that the accommodation of the asserted constitutional right will have on the correctional staff, other inmates and on the allocation of prison resources generally is negligible at most. The case at bar is similar to Rodriguez v. Hall, supra. In that case, the court held that:

> . . . there are no alternatives available to protect Plaintiff's rights other than simply abandoning the policy and treating mail from the (Attorney General's office) as legal mail. This is, of course, the alternative that Plaintiff seeks, and it is indeed a ready alternative, available at de minimis cost, that fully accommodates Plaintiff's rights. 'If an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.'

Rodriguez quoting Turner, 482 U.S. at 91. See also, Bieregu
v. Reno, 59 F.3d 1445 (3d Cir. 07/11/1995)

**B.    Plaintiffs need not establish that they suffered actual
injury**

The law is settled that a pattern and practice of
opening plaintiff's properly marked incoming court mail
outside his presence impinges upon his constitutional
rights to free speech and court access regardless of
whether or not the plaintiffs can establish an actual
injury.

In Bieregu v. Reno, 59 F.3d 1445 (7/11/1995), the
Third Circuit Court of Appeals held that:

> . . . repeated violations of the confidentiality
> of a prisoner's incoming court mail is more
> central than ancillary to the right of court
> access, and thus no showing of actual injury is
> necessary for plaintiff to establish that the
> right has been infringed. We are satisfied that a
> practice of opening court mail outside an
> inmate's presence implicates a core aspect of the
> right. Such conduct inhibits an inmate's ability
> to protect his legal rights in court and
> frustrates the principles of Bounds. Unlike free
> pens or slight delays in notarizing documents,
> interference with such mail threatens the
> primary, often sole means by which a prisoner can
> exercise his constitutional rights. Without
> assurances that legal correspondence, including
> both attorney and court mail, is confidential and
> secure, court access can hardly be effective,
> adequate and meaningful.

In so holding, the Third Circuit specifically
distinguished between a single inadvertent instance of an

inmate's court mail being opened outside his presence, and a pattern and practice of such conduct. While ". . . no actual injury need be shown in the face of a pattern and practice of opening such mail outside the inmate's presence, we do not necessarily rule out the need to show such injury where the opening is isolated and inadvertent." Bieregu, supra.  See also, Washington, 782 F.2d at 1139 (distinguishing allegation that two pieces of legal mail were opened outside of inmate's presence, which would indicate 'continuing activity' and therefore constitutional violation, from 'single isolated instance,' which would not); Morgan v, Montayne, 516 F.2d 1367, 1370-72 (2nd Cir. 1975).

It is undisputed that the Pennsylvania Department of Corrections has a policy, pattern and practice of opening court mail outside the presence of the inmate to whom it is addressed. Furthermore, the DOC has a policy, practice and custom of opening outside of the inmate's presence, attorney mail that does not bear an attorney control number on its' envelope. Therefore, no actual injury must be established by the Plaintiffs.

**C.    Assuming _arguendo_ that the court determines that Plaintiffs must establish actual injury, Plaintiffs have presented sufficient evidence of said injury to withstand Defendants' Motion for Summary Judgment.**

Plaintiff, Theodore Savage testified at his deposition that he suffered actual injury as a direct and proximate result of the current legal mail policy.

Specifically, Mr. Savage testified about an incident where mail from the Third Circuit Court of Appeals, properly addressed to him, was opened, inspected and miss-delivered to another inmate by the name of Frank Veneziale.[13] When Mr. Savage finally received the envelope, it was missing what Mr. Savage surmised had to have been enclosed -the decision of the Court. This ultimately resulted in Mr. Savage's being unable to timely seek certiorari in the U.S. Supreme Court. (P25, Savage dep. pgs.75-70,88-89). Had this mail been opened, inspected and handed to Mr. Savage as Plaintiffs propose, this would not have occurred. Mr. Savage estimates that he had received envelopes from courts three to four times that were missing documents, including a letter from the Third Circuit pertaining to the instant case. (P25, Savage dep. pg. 97,99).

Plaintiff, Aaron Wheeler testified that on two separate occasions his court mail has been delivered to the wrong cell. (P24, Wheeler dep. pgs. 65-67). Plaintiff,

---

[13]    Mr. Veneziale previously submitted an affidavit to the Court pertaining to this incident.

Derrick Dale Fontroy attested that on at least four occasions his court mail has been miss-delivered to the wrong inmate. Twice, court mail that Mr. Fontroy received was missing pages. (Exhibit P20). Plaintiff, James S. Mr. Pavlichko, testified that he too received documents from courts that were either miss-delivered or missing pages. (P22, Pavlichko dep. pgs. 50-54; Exhibit P21).

An inmate's ability to effectively pursue access to the court depends upon his confidence that mail from courts and attorneys will be delivered to him in a timely fashion, unopened and unaltered. Repeated instances of miss-delivered mail, delayed mail or mail that is thrown on the floor of a cell where other inmates have access to it, does not instill confidence.

All the plaintiffs have also expressed a general chilling effect that the legal mail policy has had on them. They have described multiple instances of retaliation, which they attribute to prison staff having obtained information about litigation they have brought against the prison and its' staff. (P25, Savage dep. pgs. 51-52, 63-67; P24, Wheeler dep. pgs. 57-59, 67; Exhibit P , Fontroy dep. pgs. 54-55,58-59; P22, Pavlichko dep. pg. 36). Based upon comments made to them by various people who otherwise would not know, they believe that the

correctional staff obtained this information from letters from courts and attorneys. (P25, Savage dep. pg. 50 57).

For example, a court document referring to another person came in the mail addressed to Mr. Savage from the Berks or Bucks County Solicitor's office. Ms. Ulisny had to have read this document because according to Internal Security, she notified them that this document referred to a person other than Mr. Savage, to whom the envelope had been addressed. Mr. Savage was questioned by Internal Security about this at which time they acknowledged that the document had to have been read, against DOC policy. (P25, Savage dep., pgs. 57-61).

The Ninth Circuit in Rodriguez v. Hall, supra, recognized that the potential for retaliation on inmates caused by the opening of confidential legal mail (in this case, mail from the Attorney General's Office) was sufficient to cause actual injury to the plaintiff. The court held that it did not matter whether the specific envelope that was opened was of any intrinsic importance. "It is well-settled that a chilling effect on one's constitutional rights constitutes a present injury in fact." Rodriguez quoting G & V Lounge v. Michigan Liquor Control Commission, 23 F.3d 1071, 1076 (6th Cir. 1994);

accord <u>NAACP v. Button</u>, 371 U.S. 415, 433, 9 L. Ed. 2d 405, 83 S. Ct. 328 (1963) ("The threat of sanctions may deter [the exercise of First Amendment freedoms] almost as potently as the actual application of sanctions.").

**D.**    **The Definition of 'legal/privileged' mail includes mail coming from attorneys, courts and governmental agencies.**

The question of what constitutes 'legal mail' is a question of law. <u>Sallier v. Brooks,</u> 343 F.3d 868, 2003 Fed. App. 0332 (6th Cir. 2003). It is Plaintiffs contention that mail from attorneys, courts and governmental agencies can contain, as argued above, confidential information. Even if the document does not contain on its face, confidential information, dissemination of the contents of the mail could have a chilling effect on the inmate's constitutional rights. The <u>Sallier</u> court explained that:

> Indeed, we can imagine a situation in which a court corresponds with a prisoner before filing the prisoner's complaint because some administrative requirement, such as submitting an in forma pauperis affidavit, paying the filing fee, or signing the complaint, has not been met. In that situation, the complaint is not yet a public record, and prison officials have no legitimate penological interest in reading the correspondence before it is. . . . In order to guard against the possibility of a chilling effect on a prisoner's exercise of his or her First Amendment rights and to protect the right of access to the courts, we hold that mail from a court constitutes 'legal mail'. Id.

Furthermore, Plaintiffs review of prison legal mail handling procedures reveals that the federal prison system and most of the other circuits treat more than just mail coming from attorneys as privileged legal mail which must be opened and inspected in front of the inmate it is addressed to.

For example, the Federal Bureau of Prisons mandates that Department of Justice mail to federal prisoners, including mail from U.S. attorneys, is to be treated as special legal mail, unless the mail is from the Bureau of Prisons itself. 28 C.F.R. § 540.2. Special mail, which also includes mail from attorneys, courts, and other public officials can only be opened in the presence of the inmate and checked for contraband; it may not be read or copied. 28 C.F.R. § 540.18(a). For mail to qualify as special mail under BOP rules, the sender must be adequately identified on the envelope, and the phrase "Special Mail -- Open only in the presence of the inmate" must be on the front of the envelope. A 1988 operations memorandum clarified the regulations so that mail from a Judge's chambers or a member of the U.S. Congress automatically qualified as special mail without the need to so designate it. Other Congressional mail, mail from the clerk of court, and mail

from attorneys, however, still required the special mail phrase or similar language on the envelope.

The Ninth Circuit considers privileged mail to include correspondence from the Attorney General's Office. Rodriguez v. Hall, supra. In that case, the Defendants argued that even if Plaintiff's mail to the state Attorney General's Office is entitled to legal mail status, mail coming back from that office was not. They contended that most of the documents sent from the Attorney General's Office were public documents available to anyone. The Ninth Circuit found this argument is meritless. The Court stated that:

> It takes very little imagination to realize that any response from the Attorney General to a confidential inquiry may well be sensitive and confidential itself. The Conclusion that mail from an attorney general to an inmate may be confidential should not be surprising, for courts have consistently recognized that "legal mail" includes correspondence from elected officials and government agencies, including the offices of prosecuting officials such as state attorneys general.

See also the following cases which set forth this same principle in other circuits including our own: Jensen v. Klecker, 648 F.2d 1179, 1183 (8th Cir. 1981)(finding that a letter from the National Prison Project was legal mail);

Ramos v. Lamm, 639 F.2d 559, 582 (10th Cir. 1980), cert.
denied, 450 U.S. 1041, 68 L. Ed. 2d 239, 101 S. Ct. 1759
(1981); Guajardo v. Estelle, 580 F.2d 748, 758 (5th Cir.
1978); Taylor v Sterrett, 532 F.2d 462, 475 (5th Cir.
1976)(holding that an inmate's right of access to the
courts required that incoming prisoner mail from courts,
attorneys, prosecuting attorneys and probation and parole
officers to be opened only in the presence of the inmate);
Faulkner v. McLocklin, 727 F. Supp. 486, 490 (N.D. Ind.
1989); Thornley v. Edwards, 671 F. Supp. 339, 341 (M.D. Pa.
1987); Carty v. Fenton, 440 F. Supp. 1161, 1163 (M.D. Pa.
1977); Laaman v. Helgemoe, 437 F. Supp. 269, 322 (D.N.H.
1977); Stover v. Carlson, 413 F. Supp. 718, 723 (D. Conn.
1976); Preston v. Cowan, 369 F. Supp. 14, 23 (W.D. Ky.
1973), aff'd in part and vacated in part on other grounds,
506 F.2d 288 (6th Cir. 1974); Muhammad v. Pitcher, 35 F.3d
1081 (6th Cir. 09/21/1994)(mail from omnibudsman is
privileged); Sallier v. Brooks, 343 F.3d 868 (6th Cir.
2003)(mail from state and federal courts considered legal
mail).

**E.    The necessity of maintaining a legal mail log**

       For years prior to the adoption of DC-ADM 803, it was
the practice at SCI Graterford for the mailroom staff to keep
a detailed log of all incoming legal (attorney and court)

mail despite the fact that the mail policy itself did not require maintenance of such a log book. (P28, Ulisny dep. pgs, 87-89, 121). Defendants provided Plaintiffs with copies of these logs for August 2001 through October 2002 for the housing units where legal mail has to be delivered directly to the inmate and logs for May 2002 through May 2003 for the general population. A sample page from these logs is provided at Exhibit P17. These logs included the following information: the date, the inmate number/name who received the letter, the name of the attorney or court from which the mail was sent and the signature of the inmate verifying that he received the letter.

The maintenance of these logs was important to the prison population in that it was the only means by which the inmates could prove that critical letters that attorneys, government agencies and courts contended were sent to the inmate were not received. Undue delay in the processing of the mail is also an issue which the keeping of log books could document.

In <u>Wheeler v. Kane</u>, another matter before this Court, Mr. Wheeler received an Order dated May 28, 2004 granting Defendants' Motion for Summary Judgment. He received this on June 4, 2003 and on that same date he filed a request

for reconsideration. This was denied on July 3, 2004.  He did not however, receive this Order until July 11, 2004. When he filed the appeal it was deemed technically deficient and was returned to him by the court. He filed an amended appeal on July 23, 2004, however, it was by that time determined to be untimely. (P24, Wheeler dep. pg. 45; Exhibit P19). Nor is there any reason why the Defendants cannot also be required to time stamp legal documents when they are first received by the institution mailroom to ensure that they are being timely delivered to the inmates. Ms. Ulisny testified that at one time she had suggested that the mailroom obtain an automatic stapler that also had a date stamper but that this request had been refused.

Being able to prove that a document was not received or was delayed in delivery to the inmate often means the difference between being able to timely pursue an appeal or respond to motions in both criminal and civil cases. (P25, Savage dep. pg. 71; P24, Wheeler dep. pgs. 75-77). Ms. Ulisny reported that she receives requests that she is now unable to grant from inmates 3 to 4 times each year for some documentation to establish a legal letter was received. (P28, Ulisny dep. pg.119-120). While the log books were in

existence, she would simply make a copy of the relevant page and forward it to the inmate. (P28, Ulisny dep. pg. 120).

Inexplicably, the Defendants discontinued use of the log books when they implemented the new legal mail policy. (P28, Ulisny dep. pg. 123). There was no security reason for their being discontinued and there is absolutely no reason given by the Defendants why this log book cannot continue to be maintained. (P27, Beard dep. pg. 61).

The mailroom already maintains multiple other types of records and logs to document receipt and delivery of other types of mail. For example, if an inmate receives an approved package delivery, a log is maintained which documents where the package came from, what the package contained and the date it was picked up by the inmate. The log is signed by the inmate when he gets the package. (P28, Ulisny dep. pgs. 110, 119). The mailroom also keeps a running log that documents the number of free envelopes every prisoner housed in the facility has used each month. (P28, Ulisny dep. pg.139-140). A log is kept and a receipt given to an inmate when he receives money orders. (P28, Ulisny dep. pg. 84). Receipt of certified and express mail by the mailroom is documented in a logbook with the date, inmate number, where the letter originates from and the certified or express mail number.

(P28, Ulisny dep. pgs. 39, 41, 137) The inmate does not, however sign anything to indicate that he personally received this letter. Interestingly, when an inmate in general population receives attorney mail at the window, the mail inspector puts her initials on the inmate's pass and writes down the time, but does not document inmate receipt of the mail. (P28, Ulisny dep. pg. 51). It would only take perhaps a few seconds more to allow the inmate to sign for the letter in order to provide this potentially critical documentation.

Furthermore, it is important to note that the DOC already requires when an inmate enters the system that he sign a Power of Attorney to the DOC in order to receive any mail. The Power of Attorney form specifically provides that the inmate gives the facility the power to ". . .receive and *document* receipt of mail on (the inmates) behalf." (Exhibit P18). Plaintiffs argue that, by the DOC's not only demanding execution of this power of attorney as a condition of inmate mail receipt, but also by accepting the inherent legal, ethical and fiduciary duties that this position embodies, the DOC *must* document receipt of mail on an inmate's behalf.

The Defendants have presented no credible testimony or evidence that would lead the court to conclude that the maintenance of these log books would be any more difficult

than it was before implementation of the new mail policy or
that it would be unduly burdensome on the prison staff. In
fact, Mr. Murray and Secretary Beard testified that there was
no security or other reason that the logbooks could not be
maintained.  (P27, Beard dep. pg. 61).

**F.**   **Damages and Prayer for Relief**

Plaintiffs herein respectfully move this honorable court
to deny Defendants' Motion for Summary Judgment. Plaintiffs
simultaneously request that Judgment be entered in their
favor. Plaintiffs are seeking substantially more than merely
nominal compensatory damages for the actual violation of
their constitutional rights. Plaintiffs are also seeking
attorney fees and costs associated with this suit. Finally,
Plaintiffs are seeking injunctive relief declaring the
current legal mail policy unconstitutional and barring the
Defendants from enforcing it.

Specifically, Plaintiffs are requesting that the use of
attorney and court control numbers by the DOC be
barred/discontinued and that all mail with a return address
ostensibly from an attorney, law firm and/or court to be
considered privileged, to be opened and inspected only in
front of the inmate to whom it is addressed at either the
window or on the inmate's unit.  As the Supreme Court noted,

the only way to ensure that legal/privileged mail is not read when opened, and thus to vindicate the inmates' right to access to the courts, is to require that it be opened in the presence of the inmate to whom it is addressed. <u>Wolff v. McDonnell</u>, 418 U.S. 539 (1974) at 576-77.

Plaintiffs are also asking that the Court mandate the use of log books to document inmate receipt of attorney and court mail.

While most courts are reluctant to intervene and impose a particular practice or policy on prisons, as former Chief Judge Higginbotham has written, "'courts have learned from repeated investigation and bitter experience that judicial intervention is indispensable if constitutional dictates-- not to mention considerations of basic humanity--are to be observed in the prisons.'" <u>Peterkin v. Jeffes</u>, 855 F.2d 1021, 1033 (3d Cir. 1988) (quoting <u>Rhodes v. Chapman</u>, 452 U.S. 337, 354, 69 L. Ed. 2d 59, 101 S. Ct. 2392 (1981) (Brennan, J. Concurring)). Court intervention in the instant matter is not only appropriate but necessary as well. Absent court intervention, the power that the DOC holds over incoming legal mail is absolute.

Respectfully submitted,

TH1123
Teri B. Himebaugh, Esq.
Attorney for the Plaintiffs

**CERTIFICATE OF SERVICE**


      The undersigned counsel hereby certifies that a true and correct copy of the attached Plaintiffs Supplemental Memorandum to the cross Motions for Summary Judgment and Exhibits has been filed electronically with the U.S. District Court with copies, mailed, first class, postage prepaid on the following, this 6th day of December , 2004 to:

John Shellenberger, Esq.
Office of the Attorney General
21 S. 12th St. 3rd Fl.
Philadelphia, PA 19107

United States District Court
for the Eastern District of Pennsylvania
6th and Market Sts. 2nd Floor
Philadelphia, PA 19102


All Plaintiffs
SCI Graterford
P.O. Box 244
Graterford, PA 19426

                    _____TH1123_____
                    Teri B. Himebaugh, Esq.
                    220 Stallion Lane
                    Schwenksville, PA 19473

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

In the Matter of:

FONTROY et. al.                        )
                                       )
            Plaintiffs                 )
            v.                         )    Action No: 02-2949
                                       )
SCHWEIKER et. al.                      )
            Defendants                 )

**PLAINTIFFS' EXHIBITS IN SUPPORT OF THEIR**
**SUPPLIMENTAL MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR**
**ENTRY OF JUDGMENT ON BEHALF OF THE PLAINTIFFS.**

P1   DC ADM 803
P2   6/17/86 memo to R.C. Smith from George Matthews
     Security Advisory Defenders Association 11/14/97
     11/10/97 Memo to Roy Johnson from Thomas McConnell
P3   4/11/97 Security Advisory on Forged Release Forms
     4/2/97 Memo from Roy Johnson to Captain Carey
P4   3/23/96 memo from Roy Johnson re: Stephen Rines
     3/11/98 Memo re: George Jones
P5   12/14/98 memo from Dan Nagy
     4/21/92 letter to A. Reggis, Esq.
     7/19/96 memo to Peter Kociolek
P6   9/13/99 Memo and attachments re: Legal Mail with
     Contraband
P7   Extraordinary Occurrence Report re: Lewis Maye
P8   Photo of Maintenance Corridor
P9   SCI Graterford site map
P10  Photo of main corridor SCI Graterford; correctional
     Bubble
P11  September 2002 Court and Attorney mail statistics
P12  Handwritten tallies of October 2004 Court and Attorney
     mail
P13  Central Office Master Attorney Control list
P14  Photocopy of contraband envelope and related documents
P15  Supplemental affidavit of William Meyer 11/5/04
P16  Affidavit of Theodore Savage 11/5/04
P17  Photocopy of Legal Mail log
P18  Power of Attorney form signed by Plaintiff
P19  Declaration of Aaron Wheeler 9/30/03

```
P20   Declaration of Derrick Fontroy 1/26/03
P21   Declaration of James Pavlichko 5/21/03
      5/29/03 Order of the Court
      Affidavit of James Pavlichko 10/10/02
P22   Deposition of James Pavlichko
P23   Deposition of Derrick Fontroy
P24   Deposition of Aaron Wheeler
P25   Deposition of Theodore Savage
P26   Deposition of John Murray
P27   Deposition of Jeffrey Beard
P28   Deposition of Kim Ulisny
```