IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DERRICK DALE FONTROY, et al., | : | CIVIL ACTION |
| Plaintiffs | : | |
| v. | : | |
| GOVERNOR MARK SCHWEIKER, et al., | : | |
| Defendants | : | NO.  02-CV-2949 |

**DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

STATEMENT OF THE CASE ............................................................. 1

STATEMENT OF THE FACTS ......................................................... 3

ARGUMENT ............................................................................. 11

I.     THE CURRENT PENNSYLVANIA DEPARTMENT OF CORRECTIONS
       PROCEDURES FOR HANDLING MAIL SENT TO INMATES BY
       ATTORNEYS AND COURTS DO NOT ADVERSELY AFFECT ANY OF
       PLAINTIFFS' CONSTITUTIONALLY BASED INTERESTS TO ANY
       SIGNIFICANT DEGREE...................................................... 11

II.    EVEN IF THE INCOMING MAIL PROCEDURES DO AFFECT PLAINTIFFS'
       CONSTITUTIONALLY BASED INTERESTS, THE PROCEDURES DO NOT
       VIOLATE THE CONSTITUTION BECAUSE THEY ARE RATIONALLY
       RELATED TO LEGITIMATE GOVERNMENTAL INTERESTS,
       PARTICULARLY INTERESTS IN PRISON SECURITY, SAFETY OF STAFF
       AND INMATES, AND EFFICIENT PRISON ADMINISTRATION............... 28

III.   PLAINTIFFS CANNOT PURSUE COMPENSATORY DAMAGES BECAUSE
       THEY ALLEGE NO PHYSICAL INJURY................................................. 38

IV.    DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES HAVE QUALIFIED
       IMMUNITY FROM PLAINTIFFS' DAMAGE CLAIMS.............................. 39

CONCLUSION ............................................................................. 42

SOMERSET INMATE'S SCHEME BACKFIRES, Tribune-Democrat, Oct. 28,
2004

CERTIFICATE OF SERVICE

## STATEMENT OF THE CASE

Defendants moved to dismiss the original and Amended Complaints. Since then, the parties have filed many documents and supplements. The Motion to Dismiss is now a motion for summary judgment. However, the record in many ways has not been clear or complete. Defendants recently took depositions of the plaintiffs and Department of Corrections officials and are supplementing the record with those depositions and other related materials.[1] They are submitting the following:

Deposition of Kimberly J. Ulisny;

Deposition of John K. Murray;

Deposition of Jeffrey A. Beard;

Deposition of Theodore Savage;

Deposition of Derrick Dale Fontroy;

Deposition of James Pavlichko;

Deposition of Aaron Christopher Wheeler;

Dockets and Documents for Some of Plaintiffs' Recent and Pending Cases;[2]

Declaration of Kimberly J. Ulisny;

Declaration of John K. Murray;

Declaration of Edward Martin;

---

[1] Exhibits used at each deposition follow each respective deposition transcript.

[2] These documents follow the Plaintiffs' depositions and are paginated for easier reference.

1

Declaration of Charles J. McKeown, with Privileged Correspondence Inspection and Contraband Report, September 20, 1999;

Declaration of Jeffrey A. Beard, with Escape Report, Huntingdon, November 1999;

Recent Unreported Decisions.

Defendants submit this Brief to integrate the new material with their legal arguments. They contend that judgment should be entered in their favor because:

1. The current Pennsylvania Department of Corrections procedures for handling mail sent to inmates by attorneys and courts do not adversely affect any of Plaintiffs' constitutionally based interests to any significant degree. The procedures do not, to any significant degree, adversely affect Plaintiffs' free speech, privacy, or access to the courts interests.

2. To whatever extent the procedures do affect those interests, they do not violate the Constitution because they are rationally related to legitimate governmental interests, particularly interests in prison security, safety of staff and inmates, and efficient prison administration.

Defendants note that the Court of Appeals has before it one case from Delaware and two cases from New Jersey raising issues similar to those presented here: *Taylor v. Oney,* No. 04-2062; *Jones v. Brown,* No. 03-3823; and *Allah v. Brown,* No. 04-4426.

## STATEMENT OF THE FACTS

The expanded record describes fully how the Department of Corrections policy on inmate mail, DC-ADM 803, is applied at Plaintiffs' present prison, the State Correctional Institution at Graterford.  The record also makes some relevant references to other Department of Corrections prisons.

For over 20 years the Pennsylvania Department of Corrections has had a written policy on Inmate Mail and Incoming Publications, identified as DC-ADM 803. Beard Dep. p. 17.  It has been revised from time to time.  The current version became effective July 15, 2004. Ulisny Dep. pp. 9, 10, Exhibit D-2.

The current DC-ADM 803 provides that "An inmate shall be permitted to correspond with the public, his/her attorney, and public officials." § VI.A.1.  It provides that in general the facility's mail room staff will open all incoming correspondence in the mail room, inspect it for contraband, then have it delivered to the inmate addressees. §§ VI.D.1.a.; VI.E.2, 3.  Mail room staff may not read the mail. § VI.D.1.a.  No staff may read incoming inmate mail except upon the written order of the Regional Deputy Secretary "only when there is reason to believe that the security of the facility may be threatened, that this directive is being violated, or there is evidence of criminal activity or of a misconduct offense." § VI.D.1.c.

The policy provides a different procedure for what it defines as "Incoming Privileged Correspondence." § VI.B.2.  This mail is unsealed for the first time in the prison only in the presence of the addressee inmate.  It may fall into either of two categories.  First, it may be material that has been hand delivered by an

attorney or court to a Department of Corrections facility and searched in the presence of the person making the delivery.  This mail is then to be sealed, delivered to the inmate, and unsealed only in the inmate's presence. §§ VI.B.2.a(8); VI.D.1.  Second, privileged correspondence may be material mailed by an attorney or a court that has obtained a "control number" from the Department of Corrections. § VI.B.2.b(1)-(4).  If the attorney or court places that control number on the envelope mailed through the Postal Service to an inmate, that mail will be considered "incoming privileged correspondence" and will be unsealed and inspected only in the presence of the inmate. §§ VI.B.2.b(5)-(7); VI.D.1.

The current DC-ADM 803 also contains a specific provision for delivery of mail with an apparent court return address, but without a control number. This mail is to be unsealed and inspected in the mail room, taped or stapled shut, and sent to the inmate's housing location.  There, a staff member is to hand it directly to the inmate. § VI.B.3.

At Graterford, a staff person picks up all mail for the prison from the local U.S. post office between 8:15 and 9:00 a.m. each week-day morning and delivers it to the prison mail room. Ulisny Dep. pp. 10, 11.  The mail room is in an administrative building outside the inmate housing and activity area. Ulisny Dep. pp. 6-9, Exhibit D-1.  It is staffed by a mail inspector supervisor (defendant Ulisny) and five mail inspectors. Ulisny Dep. pp. 5, 6.

In the mail room, the mail inspectors sort the incoming mail several ways: regular inmate mail (regular size envelopes and large envelopes), mail

with control numbers, mail that appears to be from courts without control numbers, certified mail, inmates' magazines and newspapers, staff mail (regular size and large), mail without identifiable inmate numbers, packages. Ulisny Dep. pp. 14-16.  The staff then sort the regular inmate mail by housing unit. Ulisny Dep. pp. 27, 28.

Once the regular inmate mail is sorted out, the mail inspectors unseal and open the envelopes by hand, inspect the contents for contraband (items inmates are not allowed to possess), remove any contraband, and replace the actual mail in the envelopes. Ulisny Dep. pp. 28, 29.  They then staple or tape the envelopes shut.  If they find non-serious contraband, they remove it and send the inmate a confiscation slip with the mail item.  If they find serious contraband, they send the entire piece of mail to Graterford's internal security officers. Ulisny Dep. pp. 31, 32.  Otherwise, they do not remove anything from the mail. *Id.*  They do not read the mail. Ulisny Dep. pp. 34, 36.

If an item of mail appears suspicious, the mail inspectors may open it in inside a bio-hazard box, which itself is in a closet off the mail room. Ulisny Dep. pp. 41, 42.

Once they have inspected and re-closed the regular mail, the inspectors place it in bags according to the inmates' housing units, one bag for each housing unit. Ulisny Dep. pp. 42, 43, 45.  Graterford has 16 inmate housing units. Murray Dep. p. 11.  The mail inspectors also inspect the inmates' newspapers and magazines and put them in the bags. Ulisny Dep. p. 44.  A mail inspector takes the bags to the main corridor of the secured prison about

1:30 p.m. where the corrections officers reporting for the 2:00 p.m. to 10:00 p.m. shift stand for roll call. After the 2:00 p.m. roll call, an officer assigned to each housing unit picks up that unit's bag and takes it to the unit. Ulisny Dep. pp. 45-48; Murray Dep. pp. 25, 26.

The mail inspectors identify inmate mail that appears to be from courts (but has no control number) solely by the return addresses on the envelopes. Ulisny Dep. pp. 19, 20. One mail inspector sorts this mail by housing unit. Ulisny Dep. pp. 33, 34. She opens each piece and inspects it for contraband, without reading it. *Id.* She replaces it in its envelope and staples or tapes the envelope shut. *Id.* She then puts it in folders, one for each housing unit, labeled "court mail" and bearing the instructions: "Unit manager/lieutenant/sergeant. Mail must be hand delivered to inmates." Ulisny Dep. pp. 43, 44. A mail inspector takes these folders to the 2:00 p.m. roll call with the mail bags, and officers from the housing units pick them up there and take them to the housing units. Ulisny Dep. pp. 45-48.

As to the regular mail, the corrections officer who receives the mail bag for his housing unit after roll call takes it to the unit. Murray Dep. pp. 25-28. There, an officer further sorts the mail by inmate. Murray Dep. pp. 31, 32. The officer does not open the mail. *Id.* at 33. If an inmate addressee no longer is housed on the unit, the officer so notes on the envelope and sends it back to the mail room, which re-delivers it to the proper location the next day. Murray Dep. p. 40; Ulisny Dep. pp. 66, 67.

After the sorting officer finishes sorting the unit's mail, an officer takes the mail to each receiving inmate's cell and hands it to him. Murray Dep. pp. 32-34.  General population inmates are allowed out of their cells from about 1:15 p.m. to 3:30 p.m. Murray Dep. pp. 15, 34.  If the inmate is not at his cell when the officer with the mail arrives, the officer may leave the mail in his cell. Murray Dep. p. 34.  However, all inmates, with few exceptions, must be in their cells by 3:30 p.m. for afternoon count, and they remain there until about 4:30 p.m. Murray Dep. pp. 16, 34, 35; Savage Dep. 49, 113.  Inmates may lock their cells with their own locks when they are away from their cells, and most, including the plaintiffs here, do so. Murray Dep. pp. 35, 36; Savage Dep. p. 114; Fontroy Dep. p. 48; Pavlichko Dep. p. 35; Wheeler Dep. p. 44.

As to the court mail, the officers take the folders to the unit manager of each housing unit.  The unit manager is the supervisor of the unit. Murray Dep. pp. 9, 10.  Since July 2004, the unit managers have been instructed either to hand each piece of court mail directly to the receiving inmate or to have the unit lieutenant or, in his absence, the sergeant, hand it directly to the inmate. Murray Dep. pp. 36-40.  They are not to leave it in the inmate's cell unattended. *Id.*  Between July and November 2004, they generally complied with these instructions. *Id.*; Savage Dep. pp. 46, 47, 72; Fontroy Dep. pp. 49, 50; Pavlichko Dep. p. 36; Wheeler Dep. pp. 38-40.

The mail inspectors do not unseal the control number mail in the mail room, and, at Graterford, they take much of it on a different path. Ulisny Dep. pp. 49-59.  After they sort it out in the mail room, an inspector makes sure

7

that the control numbers are valid, using a list provided by the Department of Corrections legal office. Ulisny Dep. pp. 16, 17, 49.  The inspector deletes the control number.  She then calls the general population housing units and gives them the inmate numbers of the inmates to whom the items are addressed. Ulisny Dep. pp. 49, 56.  Based on this information, officers on the housing units give the inmates passes to go to a window on a corridor just off the prison's main corridor after mid-day count clears, about 1:15 p.m.  At that time, a mail inspector takes the items to a room behind that window. Ulisny Dep. pp. 51-55, Exhibits D-1, D-4, D-5.  Each inmate waits in line until he reaches the window.  The mail inspector, in sight of the inmate, unseals the envelope, opens it, inspects the contents, and, if no contraband is present, hands the item to the inmate. Ulisny Dep. pp. 57-59.  The window, and the room behind it, are inside the secure area of the prison, near an officers' control center, the prison laundry, maintenance offices, inmate commissary, and property room. Ulisny Dep. pp. 52, 53, 55; Murray Dep. pp. 30, 31; Fontroy Dep. pp. 33, 34.

Inmates housed in some housing units, or in restricted status in a general population unit, cannot come to the window off the main corridor. Ulisny Dep. pp. 50, 64, 65, 142, 143; Murray Dep. pp. 28-30, 44, 45.  If the mail room receives control number mail for any of those inmates, a mail inspector places it in smaller bags, one bag for each relevant housing unit. Ulisny Dep. pp. 50, 65, 66.  A mail inspector takes these bags to the 2:00 p.m. roll call where officers assigned to the relevant housing units take them. *Id.;*

Murray Dep. pp. 27, 28.  The officers take this control number mail to the housing units where officers take it to each inmate recipient, unseal it in his presence, inspect it for contraband, and, if free of contraband, give it to the inmate. Murray Dep. pp. 38, 39; Savage Dep. p. 118; Fontroy Dep. pp. 26-29; Wheeler Dep. p. 35.

The Graterford mail inspectors also must open, inspect and distribute the packages for inmates and the incoming mail for staff. Ulisny Dep. pp. 38, 67-70.  They must forward mail to inmates who have been transferred to other institutions. Ulisny Dep. p. 84.  They must also receive inmates' outgoing mail from the housing units, check and weigh it for postage, complete the necessary paperwork to charge postage to inmate accounts, apply proper postage, and place the envelopes in containers. Ulisny Dep. pp. 76-81; Murray Dep. pp. 41, 42.  They must also receive and apply postage to outgoing staff mail and packages. Ulisny Dep. pp. 81, 82.  The Postal Service picks up the outgoing mail each week-day in the early afternoon. Ulisny Dep. pp. 79, 85. The mail inspectors must also receive and distribute mail inmates are sending to locations inside the prison. Ulisny Dep. p. 83.

Graterford is a maximum security prison. Murray Dep. p. 5.  It's daily population currently runs between 3,100 and 3,300 inmates. Murray Dep. p. 10.  The population has consistently been at this level for the last seven years and is not likely to drop significantly at any time in the foreseeable future. *Id.* at 11.  The four large general population housing units (including D Unit where the Plaintiffs all reside) presently house about 500 inmates each.  Murray Dep.

pp. 17, 19.  Their corrections officer staffs consist of one lieutenant, one sergeant, and five corrections officers on each unit. Declaration of John K. Murray.

While the amount of daily incoming mail varies, it generally runs about 2,000 to 3,000 pieces per day, but on Mondays and around holidays goes higher. Ulisny Dep. p. 11.  Just incoming regular size envelope mail for inmates runs about 1,500 to 1,800 pieces per day. Ulisny Dep. p. 25.  Mail for staff runs 300 to 500 pieces. *Id.* at 38.  Outgoing mail runs about 1,500 to 1,600 pieces per day. Ulisny Dep. pp. 82, 139 (see errata sheet).  Although the numbers vary daily, incoming mail with court return addresses presently runs about 40 pieces per day. Ulisny Dep. pp. 25, 26, 86-89, Exhibit D-7.  Incoming control number mail runs about 15 pieces per day. *Id.*  Before October 2002, mail with attorney return addresses ran about 40 pieces per day, as did mail with court return addresses. Ulisny Dep. pp. 26, 27, Exhibit D-8.

As of November 3, 2004, the Department of Corrections listed 350 valid control numbers. Ulisny Dep. pp. 17-19, Exhibit D-3.  One hundred twenty-six of them were group numbers that could be used by any attorney in the group (law firm, defender association, etc.). *Id.*

Before October 2002, the DC-ADM 803 defined privileged mail (open only in the presence of the inmate) more broadly.  It included all mail that appeared from the return address to be from an attorney, court, or some government officials. Ulisny Dep. pp. 21-24.  At Graterford, it was distributed in essentially

10

the same manner as the control number mail is distributed now, although at varying locations and times. Ulisny Dep. pp. 59, 60.

The Department of Corrections presently operates 26 prisons. Beard Dep. p. 5.  At most of them, all privileged mail has been and is opened by corrections officers in the presence of the inmates on the inmates' housing units. Beard Dep. pp. 16, 17, 29; Savage Dep. pp. 37-43; Fontroy Dep. pp. 40, 41; Wheeler Dep. p. 38.

## ARGUMENT

### I.    THE CURRENT PENNSYLVANIA DEPARTMENT OF CORRECTIONS PROCEDURES FOR HANDLING MAIL SENT TO INMATES BY ATTORNEYS AND COURTS DO NOT ADVERSELY AFFECT ANY OF PLAINTIFFS' CONSTITUTIONALLY BASED INTERESTS TO ANY SIGNIFICANT DEGREE.

Plaintiffs have argued that they have an absolute First Amendment free speech right to have any mail where the envelope has a return address that appears to be an attorney or court opened only in their presence.  They rely on *Bieregu v. Reno,* 59 F.3d 1445 (3d Cir. 1995).  But the language in *Bieregu* upon which Plaintiffs rely focuses on "the inmate's ability to speak, protest, and complain openly, directly, and without reservation with the court." 59 F.3d at 1452.  This is the language of the "access to the courts" right, a right that is based, in part, on the First Amendment.  After the Supreme Court held that prisoners could not assert an access to courts claim without a showing of actual injury (*Lewis v. Casey,* 518 U.S. 343 (1996)), the Third Circuit overruled *Bieregu,* an overruling that left no actionable claim regarding mail from attorneys or courts without pleading and proof that the inmate suffered actual

injury. *Oliver v. Fauver,* 118 F.3d 175, 178 (3d Cir. 1997). The court read *Bieregu* as holding that "in cases involving a prisoner's legal mail being repeatedly opened outside of his presence, a showing of actual injury was not required," 118 F.3d at 177, and then held that, "[i]t is clear, then, that *Casey* has effectively overruled *Bieregu.*" *Id.* at 178. The court affirmed entry of judgment against the inmate even though the mail in question was the inmate's outgoing mail, which more likely has First Amendment protection than incoming mail. The Delaware District Court has recently held that *Oliver* completely overruled *Bieregu,* entering summary judgment against an inmate who claimed that his mail from attorneys was opened outside his presence. *Taylor v. Oney,* 2004 WL 609335 (March 24, 2004).[3]

But whether or not Plaintiffs must show "actual injury," the Department of Corrections policy and procedures do not adversely affect Plaintiffs' free speech, privacy, or access to court interests to any significant degree. At the outset, incoming mail is not the inmates' speech, not the inmates' recitations, not the inmates' attempts to reach the courts. The way prison staff handle it will not likely infringe upon those interests. In *Wolff v. McDonnell,* 418 U.S. 539, 575, 576 (1974), the Court specifically stated that it had not recognized a First Amendment right of prisoners to receive correspondence, and it has not yet done so.

---

[3] The plaintiff appealed, and the case is pending in the Court of Appeals at No. 04-2062. Appellant's brief is due December 14, 2004.

Even if inmates have a free speech right to receive speech, the policy and procedures do not prevent the inmates from receiving anything; indeed, the policies and procedures provide for mail receipt and delivery.  Certainly, courts are not going to "self-censor" their mail because it is opened and inspected by mail inspectors outside the inmates' presence.  Almost all documents sent to inmates by courts are publicly available documents (even if they contain social security numbers).  They are either case documents such as orders, decisions, and notices filed on the public record or publicly available forms or instructions. Fontroy Dep. pp. 19, 20; Pavlichko Dep. p. 17; Wheeler Dep. p. 19.  Most are accessible on the Internet.  Many are published by commercial publishers.  Case filings are sent to other parties in the particular case, who are likely to be prison officials, or their attorneys, or prosecutors. Courts do not correspond privately with litigants.  Courts will not hesitate to send documents to inmates just because prison mail inspectors will open the envelopes outside the inmates' presence.  Courts will not edit their documents out of fear that prison staff might read them.

For the same reasons, opening and inspecting mail from the courts outside the inmates' presence does not cause court self censorship or refusal to send mail to the inmates that might adversely affect inmates' ability to access the courts.   And, opening court mail outside the inmates' presence does not adversely affect inmates' privacy interests.  Court mail generally isn't private. Both the Seventh and Ninth Circuits have said that the Constitution does not give mail sent from courts to inmates any privileged status, and it need not be

opened in the inmate's presence. *Martin v. Brewer,* 830 F.2d 76, 78 (7th Cir. 1987); *Keenan v. Hall,* 83 F.3d 1083, 1094 (9th Cir. 1996). The District of Columbia District Court and the Northern District of California have held the same. *McCain v. Reno,* 98 F.Supp. 2d 5, 7, 8 (D.D.C. 2000); *Dung v. Alameda County Sheriff Department,* 2003 WL 21982659 (N.D.Cal. 2003). The Fifth Circuit has held that no "legal" mail need be opened in the presence of the inmate. *Brewer v. Wilkenson,* 3 F.3d 816, 825 (5th Cir. 1993) (abandoning *Taylor v. Sterrett,* 532 F.2d 462 (5th Cir. 1976) upon which Plaintiffs rely).[4]

In the rare event that a court should need to send truly confidential mail to an inmate that it would not send if it is opened and inspected outside the inmate's presence, the DC-ADM 803 provides that the court (either a judge or a chief non-judicial officer) can get a control number that when placed on the envelope will insure that it will be opened only in the inmate's presence. § VI.B.2.b.

Although some mail from attorneys to their clients will be of a more sensitive, private nature, attorneys are not likely to self-censor their mail to Pennsylvania inmates just because mail inspectors unseal the envelopes and inspect the contents outside the inmates' presence.[5] The Department policy

---

[4] Plaintiff Savage says that his trial court sent him a copy of his pre-sentence report for use in his appeals, and it was not a public record. Savage Dep. pp. 17-19. However, once the court unsealed it and sent it to Savage for use in court proceedings, it became a public record. By asking to use the report in court, Savage waived whatever confidentiality interests he had in it.

[5] Certainly, attorneys *opposing* the inmate will not self-censor their correspondence just because it will be unsealed by mail inspectors outside the

only authorizes the inspectors to inspect the incoming mail for contraband.  It instructs them not to read the mail. DC-ADM 803 § VI.D.1.a.  Attorneys must understand that given the large numbers of inmates, the large volume of mail, and the time staff have to move it, staff realistically could not read it.  The courts have recognized that opening and inspecting mail pose little risk of self-censorship by the senders. *Wolff v. McDonnell,* 418 U.S. 539, 576 (1974)("freedom from censorship is not freedom from inspection or perusal").  The Fifth Circuit found opening and inspection of incoming attorney mail outside the inmate's presence constitutional. *Brewer v. Wilkenson,* 3 F.3d 816, 825 (5th Cir. 1993).

Despite the low risk of restraint of attorneys' speech, or invasion of privacy, or interference with court access, the Department of Corrections provides attorneys with control numbers, and Graterford recognizes them.  If the number is placed on the envelope, the mail is unsealed for the first time in the presence of the receiving inmate. DC-ADM 803 § VI.B.2.b.  The control number procedure gives attorneys whatever additional assurance is necessary that staff will not read incoming mail from attorneys.  Attorneys can easily get and use control numbers.  They can make the request on their own, they do not have to identify a particular case or particular inmate.  Three hundred and fifty attorneys, law firms, and other groups had control numbers as of November 3, 2004. Ulisny Dep. Exhibit D-3.  All attorneys in a firm or group

---

inmates' presence.  Also, their mail will not contain confidential information about the inmate.  These opponents already have the information that they put in their mail.

can use the group number.  The Court can see that the list includes many public defenders and attorneys who specialize in prisoners' rights.  All of the attorneys who have recently represented Plaintiffs have control numbers. Savage Dep. p. 119; Pavlichko Dep. p. 63; Wheeler Dep. pp. 70, 73.[6]

Plaintiffs argue that the availability of control numbers does not obviate their constitutional claim because the attorney decides whether to get and use a control number. Savage Dep. p. 123; Fontroy Dep. p. 90.  They claim that by deciding not to use a control number, attorneys who represent them are violating the ethical rule that an attorney shall not reveal information relating to representation of a client without the client's consent. *See* Pennsylvania Rule of Professional Conduct 1.6.  First, when an attorney sends mail under a policy that states that the inspectors shall not read it, as DC-ADM 803 states (§ VI.D.1.a), the attorney is not revealing anything.  Second, an attorney's refusal to use a control number is not the fault of the Department's policy; it is not even "state action" subject to constitutional controls.  Third, the ethical rule imposed on attorneys is not itself a constitutional right of the attorneys' clients, and is certainly not a right of persons who are not clients.

If Plaintiffs contend that the Constitution specially protects mail from government agencies or officials other than courts, cases do not support them.

---

[6] Mr. Wheeler identified an attorney named Newman who represented him but did not use a control number.  However, he said that Newman's representation ended at the time that Wheeler filed an appeal in the U.S. Court of Appeals, No. 02-1052, seeking to re-open an earlier habeas corpus case. Wheeler Dep. pp. 74, 75.  According to the Court of Appeals docket, the appeal in No. 02-1052 was filed January 8, 2002, nine months before the control number procedure came into being. Dockets and Documents from Some of Plaintiffs' Cases, pp. 35, 36

*See Mann v. Adams,* 846 F.2d 589, 590, 591 (9th Cir. 1988) (inmate need not be present when prison officials open mail from public agencies, public officials, civil rights groups); *Martin v. Brewer,* 830 F.2d at 78 ("... much institutional mail is junk mail – not a personal communication"). Even *Sallier v. Brooks,* 343 F.3d 868 (6th Cir. 2003), upon which Plaintiffs rely, holds that mail from legal organizations not representing the inmates and mail from county clerks has no special protection. Miscellaneous governmental mail is generally not important, not confidential, and not relevant to accessing the courts.

Plaintiffs also cite *Rodriguez v. Hall,* 19 F.3d 29 (9th Cir 1994)(table) for the argument that mail from state attorneys general has special protection, as well as for other arguments. However, that unpublished decision, available in full at 1994 WL 2775, contains none of the quotations found in Plaintiffs' Supplemental Memorandum. As to protection for attorney general and also court mail, it said, "[t]his circuit has not yet addressed this issue." It remanded for district court consideration of the prison's policy of opening that mail outside the inmates' presence. Two years later, the Ninth Circuit did address the issue and said that "[m]ail from the courts, as contrasted to mail from a prisoner's lawyer, is not legal mail," and need not be opened in the prisoner's presence. *Keenan v. Hall,* 83 F.3d 1083, 1094 (9th Cir. 1996).

Plaintiffs argue that the Department of Corrections and Graterford procedures for incoming court and attorney mail adversely affect their First Amendment access to court rights because the procedures "chill" *Plaintiffs'* desire to initiate litigation or, perhaps, communicate with attorneys regarding

17

pending or prospective litigation. Their argument is premised on their accusation that mail room staff read their incoming court and attorney mail that bears no control number and then tell other prison employees what they read. They also claim that their court or attorney mail might be given to another inmate who might read it. They have fabricated this "chill" argument. If they really feel chilled by the mail procedures, the feeling is so irrational that the Court should give it no consideration. Government action does not create an actionable speech chilling effect unless it fairly clearly dissuades speech. *O'Keefe v. Van Boening,* 82 F.3d 322, 325 (9th Cir. 1996).

First, even if mail room staff did read mail sent to inmates by courts and attorneys, that reading would not in any logically clear way disuade the *recipient* from communicating with the court or attorney. Plaintiffs appear to claim that what they say will be reflected back in whatever the courts or attorneys send to them. But if any reflections can be found, they will be inconsistent and vague, such that a reader other than the inmate will not comprehend them.

However, Plaintiffs have no evidence that the mail inspectors read their incoming mail, and the time pressures under which the inspectors work show that they couldn't read it. The only instances of staff reading any of the Plaintiffs' mail were under special security authorizations specified by DC-ADM 803, § VI.D.1.c. *See* Ulisny Dep. pp. 36, 37. Thus, Mr. Pavlichko's mail was being read by internal security officers under special authorization for 60 days while he was at the State Correctional Institution at Mahanoy. Declaration of

Edward Martin.[7]  Mr. Wheeler's mail was monitored by internal security

officers at SCI-Frackville from January 18 to April 4, 2000. Wheeler Dep. pp.

57, 58.[8]  A piece of Mr. Savage's incoming mail was read by an internal security

officer in June 2003 with special permission because it appeared, without

reading, to violate DC-ADM 803. Savage Dep. pp. 58, 59; Ulisny Dep. pp. 36,

37, 133-136, 145.[9]  Mr. Fontroy claimed that Graterford security officers were

reading his mail at the time of his deposition. Fontroy Dep. pp. 54-57. Beyond

these limited specially authorized security situations, Plaintiffs have no

evidence of staff mail reading.  Plaintiffs agree that the mail inspectors staple or

tape the regular mail, and court mail, shut and it has come to Plaintiffs stapled

or taped shut. Savage Dep. pp. 44, 49, 81; Fontroy Dep. pp. 42, 43, 46, 47;

Pavlichko Dep. pp. 35, 36; Wheeler Dep. pp. 39, 40, 89, 90.  Therefore,

Plaintiffs focus their reading allegation on the mail room staff.  But they do not

have sufficient evidence to create a genuine fact issue.

　　　Plaintiffs "evidence" is that they have suffered various adverse actions

since they filed this lawsuit. Savage Dep. pp. 53-70.  Indeed, they have filed

---

[7]  See also the Defendants' Answer to Plaintiff Pavlichko's Motion for
Preliminary Injunction, Document No. 63.

[8]  Mr. Wheeler attached a copy of the authorizing memo as Exhibit B to the
Motion for Emergency Restraining Order filed with the initial complaint in this
case in May 2002.  Defendants have included a copy at the end of his
deposition exhibits.

[9] At that time, the DC-ADM 803 provided that the superintendent of the facility
could give permission to read non-privileged mail. Ulisny Dep. pp. 35, 36.  The
provision for reading inmate mail under special authorization has long been
part of the Department of Corrections policy. Ulisny Dep. p. 86; Fontroy Dep.
pp. 56, 57.

another lengthy lawsuit in this court against many people that alleges "retaliation" for filing this action. Civil Action No. 03-4826. The Department of Corrections defendants there deny the allegations. Many deny that they even knew of this lawsuit at all. But Plaintiffs' allegations in No. 03-4826, most recently set forth at length in their Second Amended Complaint (Document No. 176), which the Court can judicially notice, do not even suggest that mail room staff learned of this lawsuit by reading Plaintiffs' incoming court mail and then spread that information around the prison. Indeed, many of the alleged acts of retaliation allegedly happened before the September 30, 2002 effective date of the changes in DC-ADM 803 that removed the open-only-in presence privilege from most court and attorney mail. Second Amended Complaint, Wheeler Claims ¶¶ 1-14; Pavlichko Claims ¶ 2; Fontroy Claims ¶¶ 1-45.

More importantly, information about the present case has been readily available. The Complaint and all the other many papers Plaintiffs have filed in the case are public documents. The Complaint and many other documents were served on the defendants: the Secretary of Corrections, the Graterford Superintendent, the Graterford Grievance Coordinator, and the Graterford mail room supervisor. Plaintiffs allege in No. 03-4826 that these defendants told other staff about this case. Mr. Savage claims that the information flows *down* the chain of command. Savage Dep. p. 54. Furthermore, Plaintiffs have often written or sent copies of writings to people at Graterford about this case, including their alleged need to be housed together or to meet to discuss it, etc. *See* Second Amended Complaint in No. 03-4826, Savage Claims ¶¶ 89-127;

Pavlichko Dep. pp. 42, 43.  In sum, Plaintiffs have no admissible evidence that Graterford mail inspectors ever read their incoming court or attorney mail or ever will.  If Plaintiffs fear such reading, the fear has no rational basis.

The evidence about the mail room staff duties and work load conclusively precludes any rational fear that the mail room staff read the mail.  Of course, the DC-ADM 803 explicitly states that they are not to read the mail, but only inspect it for contraband. § VI.D.1.a.  The Court should presume that the mail inspectors follow their employer's policy.  The mail room supervisor says they don't read the mail. Ulisny Dep. p. 34.  They would not have time to read it if they wanted to.  Even if all mail room staff are present, only six people must handle some 3,000 pieces of incoming mail and 1,500 pieces of outgoing mail between 7:30 a.m. and 2:00 p.m. each day.  This includes mail to and from inmates and mail to and from staff.  It includes small and large envelope mail, newspapers and magazines, packages.  By 1:30 p.m., the staff must sort, inspect, separate, and bag the incoming inmate mail, and then take it to the 2:00 p.m. officer roll call.  They must inspect staff mail and take it to staff mail boxes.  Between 7:30 a.m. and early afternoon, staff must check the outgoing mail for proper postage, apply the proper postage, and have it ready when the Postal Service arrives.  They must also route mail that inmates are sending inside the prison.  Given the huge volume of mail, the many steps needed to handle it, and the small amount of time, no mail room staff could even think about reading inmates' mail. Ulisny Dep. p. 85.

Of course, if Plaintiffs' attorneys want to send them something sensitive, they will surely use control numbers. Plaintiffs have to assume that they will do so, and certainly will do so if the inmates ask the attorneys to use control numbers. Plaintiffs accept that staff do not read the control number mail, which is opened in Plaintiffs' presence.

Parenthetically, the possibility of other inmates reading Plaintiffs' mail from courts or attorneys of any sensitivity also is very remote under current procedures. Even according to Plaintiffs, their mail has been misdelivered to other inmates on only a few occasions. Savage Dep. p. 106; Pavlichko Dep. pp. 52-55. Any sensitive mail from attorneys will surely be sent with control numbers. Mail from the courts, almost always public documents, would tell another inmate nothing that could harm one of the Plaintiffs. However, under the current procedure, other inmates will never see court mail because responsible staff are supposed to, and generally do, hand it directly to the inmate to whom it is addressed.

Finally, these Plaintiffs' litigation activities show that they have not been "chilled." One need only peruse the lengthy docket for No. 03-4826 to see how hot the Plaintiffs are to litigate. And that is not the only litigation they have pursued since the definition of privileged mail was narrowed in October 2002. Three of them have pursued habeas corpus petitions. Dockets and Documents, pp. 6-14, 21-28; Fontroy Dep. p 9. Wheeler pursued corrections staff and contractors in Schuylkill County. Wheeler Dep. pp. 15, 16, Exhibits W-1, W-2,

W-3.  Pavlichko sued Bucks County prison officials.  Dockets and Documents
pp. 15-20.  Fontroy pursued various claims.  Fontroy Dep. pp. 9-12.

Plaintiffs Savage and Pavlichko claim that they have been chilled out of
requesting *in forma pauperis* status in another action that Fontroy filed in May
2004, Civil Action No. 04-1966.  Savage Dep. pp. 49-53; Pavlichko Dep. pp. 39,
40.  However, as late as June 2004, they signed and filed in that action a
Motion to Compel Prison Officials to Comply with Requirements of the Prison
Litigation Reform Act, and they directly notified the Graterford Superintendent
by sending him a copy.  *See* Dockets and Documents, pp. 44-46.  The real
reason Savage, Pavlichko, and Wheeler have not filed for *in forma pauperis* in
that case is that they, understandably, don't want to pay (through the
installment payment system applied to prisoners) for an action that asserts
claims personal only to Fontroy (indeed, all of the signatures on the Complaint
(in the Court's file for No. 04-1966) appear to be in Fontroy's hand).  At any
rate, ten of the defendants in Fontroy's case are Graterford staff, from
corrections officer through superintendent, who would learn about the case
through service of the complaint, not by anyone reading mail sent to Plaintiffs.

Certainly, the vague notion of  "chill" through imagined mail reading does
not make "actual injury" sufficient to support an access to courts claim for
either retrospective or prospective relief.  Defendants do assert that the only
constitutional claim that Plaintiffs could even theoretically pursue is an access
to courts claim.  However, to present such a claim, Plaintiffs must allege and
prove that the policy and procedures they challenge have caused, or are

imminently likely to cause, them actual injury to a non-frivolous claim. *Lewis v. Casey,* 518 U.S. 343 (1996); *Christopher v. Harbury,* 536 U.S. 403, 414-417 (2002); *Oliver v. Fauver,* 118 F.3d 175 (3d Cir. 1998). They have no evidence of such an injury, past or future, largely for the reasons already argued. They do argue too that certain elements of the incoming mail delivery procedure have caused and will cause delays in their receipt of court mail because the mail or portions of it may not reach them. Of course, this is a problem common to everyone, whether or not in prison. Although Plaintiffs allege missing pages, or misdeliveries, on a few occasions, they were very few. Savage Dep. pp. 95-97, 106. Plaintiffs do not know where or how pages became missing. Other inmates who received their mail returned it promptly. Savage Dep. pp. 81, 82, 107; Fontroy Dep. pp. 67, 68; Pavlichko Dep. pp. 56, 57. In only two instances do they allege any injury, and they are wrong in both.

Plaintiff Savage claims that in March 2003, he received a piece of mail from the Court of Appeals that contained only the address sheet. He claims that it was supposed to contain an order denying him a certificate of appealability in connection with his attempt to appeal the denial of a petition for writ of habeas corpus challenging one of his convictions. He says that he wrote to the Clerk of the Court of Appeals four times requesting another copy of the contents, but received no response to the first three requests. By the time he received a response, 90 days had passed. He thought he was out of time to file a petition for certiorari in the U.S. Supreme Court, and he never tried. Savage Dep. pp. 74-79, 91, 92. Defendants doubt that this incident happened

at all.  The Court of Appeals file does not contain any of the letters Savage claims he wrote.  But even if the order was not in the March envelope, Savage does not know why. Savage Dep. pp. 82, 83.  Also, he could have filed his certiorari petition either using the date he actually received the decision as the date from which the time ran or requesting an extension based on late receipt of the decision. *U.S. v. Fiorelli,* 337 F.3d 282, 289, 290 (3d Cir. 2003).  In the end, however, he suffered no actual injury because a certiorari petition would have been frivolous. Savage Dep. Exhibit S-5 (district court decision). The Court of Appeals would not even let the appeal proceed, stating that Savage's principal claim was so lacking in merit that it was "not debatable." Court of Appeals Order, March 20, 2003 (copy in Dockets and Documents, pp. 4, 5); Savage Dep. pp. 92, 93.

Plaintiff Wheeler claims that in a civil case he is prosecuting in Schuylkill County, he received a court order dated July 3, 2003 on July 11, 2003, that July 3 to July 11 was a "delay," and it caused him to miss the deadline to appeal an earlier May 28 order. Wheeler Dep. pp. 44-55.  However, even if July 3 to July 11 is a "delay," he cannot connect the delay to the incoming mail handling procedure.  Moreover, the time to appeal the May 28 order had already expired by July 3, as the Commonwealth Court Order dismissing the appeal explicitly states. Wheeler Dep. Exhibit W-3, attachment A.

Plaintiff Pavlichko complains that in a federal case against Bucks County officials, Civil Action No. 02-8095, he did not receive the brief accompanying the defendants' motion to dismiss. Pavlichko Dep. pp. 47-50, 78, Exhibit Pav.-

1.  But he requested additional time to respond, and the court granted the motion and ordered the defendants' attorney to send Pavlichko another copy. Pavlichko Dep. Exhibit Pav.-2.  Pavlichko received that copy and responded to the motion.  The case was not dismissed. Court Docket, Civil Action No. 02-8095 (copy in Dockets and Documents from Some of Plaintiffs Cases, pp. 15-18).  Ultimately, Pavlichko received a settlement. Pavlichko Dep. pp. 49, 50.  Of course, the mail that omitted the brief did not come from a court or Pavlichko's attorney.  He does not know why the brief was missing. Pavlichko Dep. p. 48. And, he suffered no injury.

Plaintiffs are not at any significant risk of future injury as a result of the incoming attorney and court mail procedures.  The DC-ADM 803 provides that the mail must be delivered to the inmate within twenty-four hours after receipt. DC-ADM 803 § VI.E.2.e.  The Graterford delivery procedure reasonably assures delivery.  The mail inspectors re-close and fasten all envelopes.  They then deliver the mail to housing unit officers who, after sorting, hand it to the inmates or leave it in their cells the same day it comes into the prison. Plaintiffs lock their cells when they are away from them.  For court mail, specific responsible staff hand it directly to the inmates; they do not leave it in the cells.  Mail with control numbers is unsealed in the inmates' presence and handed to them at that time.

No delivery system, even outside of prison, is perfectly safe.  The Third Circuit has approved a system where inmates delivered mail to other inmates, even though the delivering inmates sometimes delayed the mail. *Bryan v.*

*Werner,* 516 F.2d 233, 238 (3d Cir. 1975).  Mail can get lost or delayed even if it is supposed to be opened in the presence of the inmate. *See* Wheeler Dep. pp. 37, 54, 76.  It might never get to the opening ceremony.  It can get mislaid or delayed in the process of separating it out and carrying it unopened to a place to be opened in the inmate's presence.  Indeed, the whole process of getting the inmate and a staff person and the unopened mail together in the same place can at least cause delay.  At Graterford, inmates have had to leave their housing units or afternoon activities and go to a specific place at a specific time to get "privileged" mail.  Otherwise, they must wait until the next week-day, at least. Savage Dep. pp. 25, 29, 30; Fontroy Dep. p. 36.

Plaintiffs also complain that Graterford staff do not maintain a "log book" or other written record recording the dates upon which they receive mail from courts and attorneys.  Indeed, that really seems to be their main complaint. Savage Dep. pp. 105, 106; Fontroy Dep. p. 38; Pavlichko Dep. p. 64; Wheeler Dep. pp. 54, 55, 76.  They cite no case holding that the Constitution requires prisons to keep such a log book or record, and defendants have not found any such case.  Certainly, persons outside of prison have no constitutional right to an independent record of the dates they receive mail from courts.  Recipients of mail must record dates of receipt themselves.  Prisoners can do it too. Savage Dep. p. 106.

Even if prison mail delivery causes an inmate to receive court mail, or portions of the courts' mail, later than normally expected, the inmate will suffer no real harm.  The courts generally give parties additional time when they have

27

not timely received mail that requires a response to the court, as in Mr. Pavlichko's case against Bucks County.  Indeed, in the federal courts of the Third Circuit, where a *pro se* prisoner alleges that the prison delayed receipt of mail, the time to respond does not start to run until he receives the mail requiring the response, and, where the date is in dispute, the burden is on the prison to prove the date. *U.S. v. Fiorelli,* 337 F.3d 282, 289, 290 (3d Cir. 2003). If the prison can't, the inmate's word controls.[10]  The Pennsylvania courts would surely apply the same rule.  They have adopted the analogous rule that *pro se* prisoners are deemed to have filed documents with the courts on the dates that they deposit them in the prison mail (the "mailbox rule"). *Smith v. Pa. Board of Probation & Parole,* 546 Pa. 115, 683 A.2d 278 (1996); *Thomas v. Elash,* 781 A.2d 170 (Pa.Super.2001).  Thus, the absence of a log book or other prison record of receipt actually helps the inmates.

**II.    EVEN IF THE INCOMING MAIL PROCEDURES DO AFFECT PLAINTIFFS' CONSTITUTIONALLY BASED INTERESTS, THE PROCEDURES DO NOT VIOLATE THE CONSTITUTION BECAUSE THEY ARE RATIONALLY RELATED TO LEGITIMATE GOVERNMENTAL INTERESTS, PARTICULARLY INTERESTS IN PRISON SECURITY, SAFETY OF STAFF AND INMATES, AND EFFICIENT PRISON ADMINISTRATION.**

Even if opening Plaintiffs' mail from courts or attorneys (without control numbers) outside Plaintiffs' presence adversely affects their constitutionally

---

[10] In *Poole v. Family Court of New Castle County,* 368 F.3d 263 (3d Cir. 2004), the Court held that in a civil case, prison delay does not displace the statement in Fed.R.Civ.P. 77(d) that the clerk's failure to notify a party of entry of a judgment does not affect the time to appeal that judgment.  However, the Court observed that prison delay will likely provide grounds for a motion under Fed.R.App.P. 4(a)(6) to reopen the time to appeal.  Fed.R.App.P. 4(a)(5) could also permit additional time.

protected interests to some degree, the procedures are constitutionally valid because they are rationally related to legitimate governmental interests, particularly interests in prison security, safety, and administration.  Mail sent to a prisoner by family, friends, religious advisors, financial institutions, and others can contain very personal information more private than anything found in court documents.  Yet prisons unquestionably may, consistent with the Constitution, open and inspect that mail outside the receiving inmate's presence.

Prison regulations that infringe First Amendment, privacy, or access to court interests remain valid if (1) they are rationally related to a legitimate governmental interest, (2) inmates still have sufficient means of exercising the constitutional right, (3) accommodation of the right would burden staff or other inmates, and (4) corrections officials have no obvious, easy alternative to the regulation that accommodates the inmates' right at *de minimis* cost. *Thornburgh v. Abbott,* 490 U.S. 401, 414-419 (1989); *Turner v. Safley,* 482 U.S. 78 (1987) (both upholding restrictions on inmate mail).  One circuit court has said summarily that in light of this test, opening and inspecting a prisoner's incoming legal mail outside his presence "is not a violation of a prisoner's constitutional rights." *Brewer v. Wilkinson,* 3 F.3d 816, 825 (5th Cir. 1993); *see also Altizer v. Deeds,* 191 F.3d 540, 547-549 (4th Cir. 1999) (prison may open and inspect *outgoing* inmate mail).  The Third Circuit has upheld the Department of Corrections' prohibition of all mail between an inmate and a former inmate. *Nasir v. Morgan,* 350 F.3d 366 (3d Cir. 2003).

29

The Supreme Court recently reiterated the standards for prison regulation of inmate communications with persons outside the prison and clarified the burden of proof when inmates challenge the regulations. *Overton v. Bazzetta,* 539 U.S. 126 (2003). The Court unanimously upheld limitations on the kind and number of visitors a state prison inmate may have. The Court emphasized that prison administrators do not have the burden of proving such regulations valid; instead, prisoners have the burden of proving their invalidity. 539 U.S. at 132. The Court said that it "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means for accomplishing them." *Id* at 132. The Court recognized that internal security is the most legitimate penologic goal. It recognized that restrictions on contacts with the outside world reduce the flow of drugs into the prison. It also recognized valid prison interests in facilitating management of inmate activities and minimizing disruption in those activities. *Id.* at 133. It held that alternative forms of communication for inmates need not necessarily be available at all, and certainly need not be ideal. *Id* at 135.

Plaintiffs cannot disprove the rational relationship between the current Department of Corrections incoming mail procedures and security, safety, and administrative interests. Secretary of Corrections Beard, with over 32 years of experience as a corrections administrator, described the relationship. Opening and inspecting all mail in a mail room away from inmates and other staff

assures that items that might endanger staff or inmates or security or effective operations do not get inside the secure inmate areas of the prison, such as the heavily used corridors or the inmate housing and work areas. Beard Dep. pp. 9-12. The procedure assures that inspection for the dangerous items is done promptly in a controlled, safe area away from inmates and other staff, an area where mail inspectors can concentrate on mail inspection without distraction. Beard Dep. pp. 14, 15, 69. Mail from attorneys and courts presents particular concern because it can contain thick documents like transcripts and briefs where items can easily be hidden. Ulisny Dep. pp. 70, 71.

Opening and inspecting mail inside the secure area of the prison is much more dangerous. There, large numbers of inmates live, work, and congregate. There, staff try to maintain order among an inherently difficult population. When correctional officers must do the mail inspections in front of the inmates on the housing units (some units at Graterford and all units at most other State prisons), they will likely be less thorough because they are surrounded by inmates and have many tasks that easily distract them. Beard Dep. p. 30; Murray Dep. pp. 46, 47. They are facing inmates with whom they have daily interactions, which may scare the officers into haste, lull them into laxity, or even breed complicity. No matter who does the inspection, inmate accusations about the staff inspection methods can create immediate disturbance. Ulisny Dep. pp. 62-64. Most troubling is that the dangerous items get inside the secure areas and near inmates where, even if inspecting staff find them, they can cause harm. Inmates can snatch them or they may be inherently harmful.

31

*See U.S. v. Stotts,* 925 F.2d 83, 87 (4th Cir. 1991); *O'Keefe v. Van Boening,* 82

F.3d 322, 326 (9th Cir. 1996).  Inmates will take risks; like Mr. Pavlichko, many

"have nothing to lose." Pavlichko Dep. pp. 66, 67.

The contraction of the "privileged" mail definition in September 2002

most immediately resulted from a 1999 escape from another State prison.

Investigators concluded that the escape tools had come in to inmates in legal

mail and then were passed to the escaper by cooperative staff. Declaration of

Jeffrey A. Beard, with Escape Report, Huntingdon, November 1999, pp. 3, 22,

47.[11]  In the aftermath, a former mail inspector supervisor then working in the

Department's Security Division concluded that opening "privileged" mail in the

presence of inmates always presented substantial security risks and should be

abandoned. Declaration of Charles J. McKeown, with Privileged

Correspondence Inspection and Contraband Report.  The final report on the

escape concluded that too much mail was "privileged," that housing unit staff

do not inspect it thoroughly when opening it in the presence of the inmate, and

that the prison mail inspectors should be allowed to search it and do so

completely. Escape Report, pp. 59, 60, 69, 72, 73.

Both Secretary Beard and Graterford's Deputy Superintendent Murray

raised the problem of anthrax in mail, which causes harm immediately upon

opening. Beard Dep. pp. 24-27; Murray Dep. pp. 54, 55.  Anthrax has been

mailed into government institutions within the last three years, causing deaths

---

[11]  The Report noted that the escaper was in disciplinary custody because he
had been caught either sending or receiving marijuana and a screwdriver tip in
the binding of a legal brief. Escape Report, pp. 13, 23.

and closure of buildings.  Other bio-hazards can similarly emerge from envelopes upon opening.  Terrorists continue to make threats against this country, and those in our government who follow the threats continue to warn of possible terrorist attacks.  Terrorists aside, people get angry about prisons and those who either work or are incarcerated in them.  If anthrax spilled out of an envelope inside a 3,000 inmate prison, with 500 inmate housing units, it would be an unthinkable disaster.  Although it has not received a real anthrax attack, Graterford, other prisons, and other government offices have received envelopes containing loose powders that looked like, but were not, real bio-hazards. Ulisny Dep. pp. 41, 42; Beard Dep. p. 25.  If even such a "scare" envelope were unsealed inside a prison in an inmate housing or activity area, and the powder fell out, it would likely cause pandemonium. Beard Dep. pp. 26, 27.  It would require closing down large areas of the institution until the composition of the material could be determined.  Where do you put 500, or 3,000, maximum security inmates?  Prisons can avoid such terrifying crises if they open mail in a mail room outside the secure area of the prison and away from inmates and most staff.

Of course, truly official mail from real courts will not likely contain problematic items.  But mail that appears from its return address to be from a court may not really be from a court. *See* Ulisny Dep. p. 20.  Official envelopes can be stolen or reproduced.  People who work in court offices can use court envelopes for personal mailings. Beard Dep. pp. 33, 34; Ulisny Dep. pp. 71, 72. Inmates have created and forged court and other official documents and

33

attempted to use them to get out of prison. Beard Dep. p. 33; *See Spaulding v. Collins*, 867 F.Supp. 499 (S.D. Texas 1993).  Attachments to Mr. McKeown's 1999 Report demonstrate the problem of phony, created official and attorney documents and envelopes arriving in mail for inmates.  Return addresses on envelopes are easy to create for they require no signatures.  Within the last year, Graterford caught an envelope addressed to an inmate using what appeared to be a real attorney's mailing label, with the attorney's return address and even an apparent control number, but that contained pornographic magazines.  The mail room staff caught it only because the control number was not a valid number. Ulisny Dep. pp. 73-75, Exhibit D-6. Even more recently, the Commonwealth convicted a Pennsylvania inmate who had created a court order reducing his sentence, forged a judge's signature to it, and had someone mail it to the prison in an envelope that bore the court's return address. *Commonwealth v. Valdo Guilford,* Somerset County, No. 871 of 2003. *See* "Somerset Inmate's Scheme Backfires," Tribune-Democrat, October 28, 2004, copy attached.[12]  Certainly, inmates and those in cahoots with them can and will make envelopes appear to be from courts (or attorneys or miscellaneous government officials) if that will get them past a mail room inspection unopened into the secure areas of the prison into the presence of inmates.  There, just opening the envelopes can wreak havoc.  At least, they

_____

[12] To verify the authenticity of the article go to: http://tribune-democrat.com/articles/2004/10/29/news/news02.txt.  Defendants have ordered the transcript of the trial and can provide a copy to the Court after receiving it.

will get close to inmates, who will have a better chance of getting hold of the contraband inside.

The Department's, and Graterford's, incoming mail procedures are also rationally related to legitimate administrative efficiency needs.  As Ms. Ulisny's and Deputy Murray's testimony shows, processing of incoming and outgoing mail at a 3,000 inmate prison is a huge task.  Opening and inspecting as much of it as possible in a separate mail room by people who focus only on mail helps the move the mail quickly to its destination.  Every additional task, every deviation adds more time and effort and conflict with other activities. Savage Dep. p. 29 (yard); Wheeler Dep. p. 33 (work); Pavlichko Dep. p. 31; Fontroy Dep. p. 36.  Before October 2002, when all mail that appeared to be from attorneys and courts was opened in the inmates' presence, the lines at the window where it was done could get very long, two mail inspectors had to go to the window to open that mail, and the process could take an hour. Ulisny Dep. pp. 61, 144, 145; Fontroy Dep. pp. 30-33, 35.  It could conflict with other services performed at the same location. Ulisny Dep. 60, 61; Fontroy Dep. p. 36; Pavlichko Dep. p. 40; Wheeler Dep. p. 31.

While the control number procedure protects confidentiality, it also serves security and administrative needs not served if all mail that in any way appears to be from an attorney, or court, is treated as privileged.  Before issuing the control number, the Department can verify that a requester really is a member of the bar, or a court, and has not abused the use of the mails before.  If some problem is found with the mail, the Department has recourse

35

against a known person or limited group of people.  If the control number becomes known to others, the Department can give the attorney or court a new number and cancel the compromised number.  The control number procedure also makes mail handling easier.  It makes clear what mail gets the special treatment – mail inspectors do not have to interpret a return address.  *See U.S. v. Stotts,* 925 F.2d at 87, 89.  It reduces the amount of mail that needs special treatment because only mail that is really from attorneys or courts, and that the attorneys or courts really want the inmate to see still sealed, will need that treatment.  *Id.* at 88; Beard Dep. p. 38.  The Supreme Court approved a similar, but more onerous, procedure when it said that prison officials could "require that a lawyer desiring to correspond with a prisoner, first identify himself and his client to the prison officials, to assure that the letters marked privileged are actually from members of the bar." *Wolff v. McDonnell,* 418 U.S. at 576, 577.

Inmates do have a reasonable alternative to having mail appearing to be from courts or attorneys unsealed in their presence.  They can receive mail after it has been unsealed and inspected in the mail room then stapled or taped shut and delivered to them, as they do for personal mail.  They can rely on attorneys and courts to use control numbers for truly confidential mail.  These alternatives are reasonable under *Overton v. Bazzetta* standards in light of their minimal effect on inmates' constitutional interests. *See O'Keefe v. Van Boening,* 82 F.3d 322, 326 (9th Cir. 1996); *U.S. v. Stotts,* 925 F.2d at 88; *Waterman v. Farmer,* 183 F.3d 208, 218 (3d Cir. 1999) (when considering the ability of inmates to exercise the right despite the regulation, the possible

means of exercise must be viewed expansively, such that it can be exercised in many ways).[13]

Three years ago, in response to the September 11, 2001 attack on the World Trade Center and the initial anthrax attacks, the New Jersey Department of Corrections directed its institutions to have corrections officers open all incoming "legal correspondence" in a mail room outside the receiving inmates' presence. The officers were to inspect each piece of mail for contraband, but not to read it. If a piece of mail was free of contraband, the officers were then to tape the envelope shut and send it on for delivery to the inmate. This policy remains in effect. New Jersey inmates have challenged it in federal court twice. In the first case, Judge Garrett E. Brown, Jr. upheld the policy as rationally related to security interests and granted summary judgment in favor of the Corrections administrators. *Jones v. Brown,* No. 02-3045 (GEB), Memorandum Opinion, August 22, 2003, pp. 15-19 (*See* Recent Unreported Decisions). The inmate appealed and the case is now pending in the Court of Appeals at No. 03-3823. In the second case, a different judge, Judge Walls, rejected the policy and granted the plaintiffs' motion for judgment on the pleadings for prospective relief. *Allah v. Brown,* No. 02-5298 (WHW), Opinion, October 26, 2004. The Corrections administrators have appealed, and the case is pending in the Third Circuit at No. 04-4426. Defendants here contend that Judge Walls gave too much weight to the inmates' alleged interests, insufficient weight to the prisons' safety and security needs, and

---

[13] Attorneys can also visit inmates. Savage Dep. p. 116; Pavlichko Dep. p. 58.

insufficient deference to the corrections administrators.  His decision runs

against the grain of the Supreme Court's thinking expressed in *Overton v.*

*Bazzetta.*

    With cases from Delaware and New Jersey, the Third Circuit will soon be

deciding the constitutional issues presented here.  Defendants believe that

court will affirm the Delaware Court and Judge Brown.  They urge this court to

reach the same conclusion.

### III.   PLAINTIFFS CANNOT PURSUE COMPENSATORY DAMAGES BECAUSE THEY ALLEGE NO PHYSICAL INJURY.

    Although Plaintiffs primarily seek prospective declaratory and injunctive

relief, the Amended Complaint does request compensatory and punitive money

damages. However, prisoners cannot assert claims for compensatory damages

where the damages are only for mental or emotional distress absent physical

injury. 42 U.S.C. § 1997e(e); *Malik Allah v. Al-Hafeez,* 226 F.3d 247 (3d Cir.

2000).  Plaintiffs' claim here is that since September 2002, mail to them from

attorneys, courts, and others has been opened outside their presence and the

prison has not had inmates sign a log when receiving mail.  The mail

procedures have caused Plaintiffs no actual loss of any non-frivolous legal

claim.  Their only basis for compensatory damages could be some sort of

emotional distress.  However, the nature of the claim involves no physical

injury.  Therefore, Plaintiffs cannot pursue compensatory damages.

## IV.    DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES HAVE QUALIFIED IMMUNITY FROM PLAINTIFFS' DAMAGE CLAIMS.

Although the Court should enter judgment in favor of Defendants on the merits, if it does not, it should at least grant the defendants qualified immunity from any damage claims it allows to proceed against them.  Because Defendants have immunity, judgment should still be entered in their favor on these claims.

State officials are immune from damage claims brought under 42 U.S.C. § 1983 if reasonable officials in their positions could have believed that their actions or decisions were lawful in light of existing law and the information they possessed at the times they acted. *Hunter v. Bryant,* 502 U.S. 224 (1991); *Anderson v. Creighton,* 483 U.S. 635 (1987).  They are immune unless a reasonable official would have believed that their action violated clearly established law. *Id.*

The Court must evaluate both the prevailing law and the facts known to each defendant at the time that each defendant acted. *Saucier v. Katz,* 533 U.S. 194, 201, 202 (2001); *Anderson v. Creighton,* 483 U.S. at 641; *Grant v. City of Pittsburgh,* 98 F.3d 116, 121, 122 (3d Cir. 1996).  An official does not lose his immunity unless, based on the facts known to him, the law existing at the time clearly and obviously proscribed the action that he took.  "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. at 640. An officer loses immunity only if "it is obvious that no reasonably competent officer would have [taken the action in question]." *Malley v. Briggs,* 475 U.S.

335, 341 (1986).  Officials are immune unless "the law clearly proscribed the actions" that they took. *Mitchell v. Forsyth,* 472 U.S. 511, 528 (1985).

The qualified immunity test is objective.  Even if the defendant actually believed that he was violating the Constitution, he is immune if an objectively reasonable person could have believed that his actions were lawful. *Grant v. City of Pittsburgh,* 98 F.3d at 116, 123, 124.

Qualified immunity is an issue of law to be decided by the court. *Hunter v. Bryant, supra,* at 228; *Sharrar v. Felsing,* 128 F.3d 810, 826-828 (3d Cir. 1997).  The only issues to be examined for a genuine fact issue are the basic facts -- what defendants did and the facts that they knew.  If those facts are not in dispute, the court decides whether reasonable officials could have believed their actions lawful.  Moreover, qualified immunity should be determined as early as possible because the immunity is an immunity from suit, not just a defense to liability. *Saucier v. Katz,* 533 U.S. at 200, 201.

From September 30, 2002 to present, each defendant here could reasonably have believed that the DC-ADM 803, and its application at Graterford, was constitutional as to mail to Plaintiffs from attorneys and courts in light of the law cited in the previous sections of this Brief, especially *Oliver v. Fauver,* 118 F.3d 175 (3d Cir. 1997); *Keenan v. Hall,* 83 F.3d 1083, 1094 (9th Cir. 1996); *Brewer v. Wilkenson,* 3 F.3d 816, 825 (5th Cir. 1993); *Altizer v. Deeds,* 191 F.3d 540, 547-549 (4th Cir. 1999); and *Overton v. Bazzetta,* 539 U.S. 126 (2003).  Even if the Court now finds that the Constitution required prison staff to open only in Plaintiffs' presence all mail that looked like it might

40

have been from attorneys or courts, that requirement would not have been clear to reasonable prison officials from September 2002 to present. Defendants could reasonably have believed that the policy did not adversely affect any protected inmate speech rights or privacy rights or inmate ability to access the courts. The Defendants could also have reasonably believed that even if the policy and procedure did restrain inmate speech or access to courts to some small degree, it was reasonably related to legitimate interests in maintenance of safety, security, and efficiency of operations, especially in light of the 1999 escape experience and the anthrax, and spoofed anthrax, attacks on government facilities.

The Third Circuit has given prison officials qualified immunity from damages where it has found that inmates retain constitutionally protected privacy rights in their medical records. *Doe v. Delie,* 257 F.3d 309, 318-323 (3d Cir. 2001). Here too, if the Court holds that the Constitution requires more protection of mail to inmates from attorneys or courts than that provided by Department of Corrections DC-ADM 803, as implemented at Graterford, such a holding was not clear in the previous law. Even Judge Walls in the recent New Jersey case of *Allah v. Brown,* No. 02-5298 (WHW), October 26, 2004, granted the corrections administrators' qualified immunity as to damage claims.

**CONCLUSION**

The Court should enter summary judgment in favor of the Defendants.

> GERALD J. PAPPERT
> Attorney General of Pennsylvania

By:  s/John O. J. Shellenberger

> John O. J. Shellenberger
> Chief Deputy Attorney General
> Attorney I.D. No. 09714
> Attorney for Defendants

Office of Attorney General
21 S. 12th Street, 3rd Floor
Philadelphia, PA 19107
Phone: (215) 560-2940
Fax:     (215) 560-1031

Somerset inmate's scheme backfires

*Posted-Thursday, October 28, 2004 11:50 PM EDT*
*By KIRK SWAUGER*
*TRIBUNE-DEMOCRAT SOMERSET BUREAU*

SOMERSET - Valdo Guilford found out he can't write his own ticket out of prison.

Guilford, 41, an inmate at State Correctional Institution - Somerset, was convicted of forging release documents late Wednesday following a three-day trial in Somerset County Court.

The jury deliberated for about three hours before reaching its verdict.

Guilford will be sentenced Jan. 7 by Judge John Cascio on two counts each of tampering with public records, forgery and unsworn falsification to authorities, and one count of attempted escape.

On Nov. 22, 2002, Guilford had a forged court order sent to the prison, indicating that his seven- to 14-year sentence for robbery in Delaware County had been reduced, making him eligible for immediate release.

Guilford's original sentence was imposed Nov. 7, 1994.

But after receiving a copy of the order from the prison, the Delaware County District Attorney's Office soon discovered it was fake.

The order contained the purported signature of Joseph Dorsey, former judicial support director in the county.

That was the red flag officials needed, considering that Dorsey had been dead for several years.

A security officer at SCI-Somerset told state police Guilford's cellmate had tried a similar, unsuccessful release tactic before.

Guilford originally sent the letter to an aunt, telling her it was a "matter of life and death" that she get the envelope meter-stamped in Philadelphia before forwarding it to the prison, court documents revealed.

State police added that soon after the letter was sent, Guilford began telling others at the prison that he would be "going home soon."

Guilford never was released, but officials said that after the verdict was read Wednesday, he faked a seizure. The ruse was discovered.

## **CERTIFICATE OF SERVICE**

I, John O. J. Shellenberger, hereby certify that Defendants' Supplemental Brief in Support of their Motion for Summary Judgment has been filed electronically and is available for viewing and downloading from the Court's Electronic Case Filing System.  I further certify that a true and correct copy of Defendants' Supplemental Brief in Support of their Motion for Summary Judgment was mailed on December 8, 2004, by first class mail, postage prepaid to:

Teri B. Himebaugh, Esquire
220 Stallion Lane
Schwenksville PA 19473

s/John O. J. Shellenberger

John O. J. Shellenberger
Chief Deputy Attorney General
Attorney I.D. No. 09714

Office of Attorney General
21 S. 12th Street, 3rd Floor
Philadelphia, PA 19107
Phone: (215) 560-2940
Fax:     (215) 560-1031