IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DERRICK DALE FONTROY, et al.,        :        CIVIL ACTION

                    Plaintiffs        :

       v.                              :

GOVERNOR MARK SCHWEIKER, et al.,     :

             Defendants        :        NO.  02-CV-2949

**DEFENDANTS' RESPONSE IN OPPOSITION TO
THE MOTION FOR EVIDENTIARY HEARING, TEMPORARY
RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION**

**STATEMENT OF THE CASE**

Two of the plaintiffs, Wheeler and Fontroy, have filed a Motion for

Evidentiary Hearing, Temporary Retraining Order and/or Preliminary

Injunction asking that the Court enjoin application of a recent amendment to

the Pennsylvania Department of Corrections policy on Inmate Mail and

Incoming Publications, DC-ADM 803.  The Motion also appears to request an

injunction against Department confiscation of materials resulting from

application of the amendment. [1]

The amendment requires corrections staff to take precautions with

certain specified kinds of material found in mail addressed to inmates.  The

reasons for the amendment not only demonstrate its constitutional validity, but

also the validity of the policy fundamentally at issue in this case.  That policy

deals with mail to inmates appearing, from the envelopes, to be from attorneys

---

[1] Although the Motion has signature lines for all four plaintiffs, only Wheeler and Fontroy signed it.

or courts.  It requires that mail inspectors unseal and inspect this mail as they do all other incoming inmate mail -- in a mail room outside the inmates' presence -- unless the envelope bears a "control number," in which case it is unsealed in the inmate's presence.

## STATEMENT OF FACTS

The DC-ADM 803, most recently re-issued July 15, 2004, generally prohibits correspondence "containing criminal solicitations or furthering a criminal plan or misconduct offense," Sec. VI.A.3.d., as well as other mail that compromises security. [2]  The DC-ADM 803 also provides for special treatment of incoming mail when information available to prison staff suggests it contains prohibited material.  It permits reading the mail when staff have reason to believe that it is being used to further criminal activity or to compromise the safety and security of the prison, so long as higher level officials have approved reading. Sec. VI.D.1.c; Sec. VI.F.1.f; Sec. VI.F.3.a.  It permits those authorized to read mail to hold apparently prohibited writings, such as criminal plans, while notifying the inmate and allowing him to appeal through the grievance process. Sec. VI.E.8; Sec. VI.F.2-4.  It also requires mailroom staff to remove and send to other offices certain documents that inmates are not allowed to possess, such as birth certificates, checks, money orders, maps, and obvious criminal plans or security threats. Sec. VI.D.1.e, f; Sec. VI.E.3; Sec. VI.F.1.f.; Sec. VI.F.3.a.

---

[2] Copies of this issue of the DC-ADM 803 are in the record at the Deposition of Kimberly J. Ulisny, Ex D-2.  This and other of the Department of Corrections administrative directives are publicly available at www.cor.state.pa.us under DOC Policies.

The amendment that Wheeler and Fontroy now challenge became effective September 6, 2005.  It adds a subsection to DC-ADM 803 VI.D.1 on Security to provide similar special treatment for documents concerning "UCC filings," "copyright" of names, or "redemption."  It states:

> g.  When any documentation concerning Uniform Commercial Code (UCC) filings, the redemptive process, or documents indicating copyright or attempted copyright of a name is received, mailroom staff shall notify the local Intelligence Captain/Security Lieutenant. An Unacceptable Correspondence/UCC Related Materials Form (Attachment D) shall be completed and sent to the inmate. The inmate shall have 10 days from the date of the notice to file a grievance, in accordance with the DC-ADM 804, "Inmate Grievance System," advising the Grievance Coordinator of the legal basis and purpose for his/her possession of UCC related material.

*See* DC-ADM 803-3, Appendix, p. 1.[3]

The need to focus staff attention on the specified documents is evidenced by cases from throughout the nation, and materials from the Anti-Defamation League Web Site, copies of which are reproduced in the Appendix to this Response, pp. 3-70.  Starting about ten years ago, anti-government extremists began a campaign of "paper terrorism" against government and public officials – *e.g.,* judges, prosecutors, Internal Revenue agents.  Convicts in the nation's prisons have more recently employed these attacks and expanded their reach to corrections officials.  The schemes have variations, but most culminate in purported liens for large sums of money filed against public officials in public filing offices. *See United States v. Martin,* 356 F.Supp.2d 621 (W.D. Va. 2005);

---

[3] The Appendix to this Response is being filed separately, on paper.

*United States v. Barker,* 19 F.Supp.2d 1380 (S.D. Ga. 1998); *United States v. Orrego,* 2004 WL 1447954 (E.D. N.Y. 2004); *United States v. Speight,* 75 Fed.Appx. 802 (2d Cir. 2003); *United States v. Boos,* 1999 WL 12741 (10th Cir. 1999); *United States v. McKinley,* 53 F.3d 1170 (10th Cir. 1995).

The criminals often file financing statements under Article 9 of the Uniform Commercial Code, most likely because the financing statements are on readily available forms, require minimal information, and are easy to file. However, the criminals often refer to the UCC no matter where they try to file, for a variety of inscrutable reasons. *See Ray v. Williams,* 2005 WL 697041 (D.Oregon 2005); *United States v. Martin, supra.; United States v. Orrego, supra.; United States v. Boos, supra.; United States v. Moore,* 1994 WL 95217 (10th Cir. 1994).

Of course the liens are illegal, primarily because they are not supported by real debts sufficient to support liens. The criminals hold no legal judgments against their victims. The victims have not entered any security agreements with the criminals, as is required to file a lien under the Commercial Code. *See* 13 Pa.C.S. § 9509. Often the criminals file the liens with no pretense of an underlying debt. However, they also have several nonsensical theories for an underlying debt. Sometimes they claim that the public officials have violated duties of their offices (usually by taking some action adverse to the criminal) and this alleged violation results in a debt to the criminal. However, the claim is nothing more than a claim, never litigated to a legal judgment. *See United States v. Martin,* 356 F.Supp.2d at 626; *United States v. Barker,* 19 F.Supp.2d

at 1383; *United States v. McKinley,* 53 F.3d 1170 (10th Cir. 1995).  Another

nonsense theory is that the criminal has a copyright on his name and any time

the public official uses it in the public record, such as an indictment, judicial

opinion, sentence, prison record, etc., the public official infringes the copyright

and automatically owes the criminal money. *See United States v. Orrego,* 2004

WL 1447954, *2.  Of course, the criminals have no copyright in their names. 17

U.S.C. § 102 (copyrights only available for original works of authorship such as

literary, musical, or pictorial works); *Illinois Bell Tel. Co. v. Haines & Co.,* 905

F.2d 1081, 1085 (7th Cir. 1990) (individuals' names are not copyrightable).  And

the criminals certainly hold no legal judgment for infringement.

A related nonsense concept first employed by the free-world extremists

and now seeping into the prisons, is "redemption."  *See Ray v. Williams,* 2005

WL 697041, *5; *United States v. Getzschman,* 81 Fed.Appx. 619 (8th Cir. 2003).

It too has several confusing variations.  It has something to do with the United

States going off the gold standard in 1933 and a claim that the country then

pledged its citizens as collateral for its debt, but that it only pledged

"strawmen" not the real persons.  Somehow, supposedly, this fantasy permits

the criminals to draw on the U.S. Treasury, which they try to do with self-

created "sight drafts," which look like bank checks, and which often pass as

such.  Creation of these "sight drafts" can involve references to the UCC.  The

criminals also use the theory to support liens of various kinds. *See Ray v.

Williams,* 2005 WL 697041 *5.

Plaintiffs Wheeler and Fontroy appear to have bought into this dangerous nonsense, because the Motion they have filed states that the Department of Corrections "cannot tell a Prisoner that he/she may not copyright his/her name; nor does it have the right to prohibit him/her from filing liens against a person who have committed a civil wrong against them and/or injured them in any type of way." Motion , p. 14, fn. 5.

These schemes are illegal.  Those who employ them commit one or more of at least the following state crimes: theft by deception, 18 Pa.C.S. § 3922(a)(1); forgery, 18 Pa.C.S. § 4101; deceptive business practices, 18 Pa.C.S. § 4107(6); false swearing, 18 Pa.C.S. § 4903; unsworn falsification to authorities, 18 Pa.C.S. § 4904; tampering with public records or information, 18 Pa.C.S. § 4911; obstructing the administration of law or other government function, 18 Pa.C.S. § 5101.  When inmates mail liens and financing statements from prison, they surely commit federal mail fraud, 18 U.S.C. § 1341.  If the criminals employ these tactics against federal government officials, they commit other federal crimes, such as obstruction of justice, 18 U.S.C. § 1503 and fictitious claims against the United States, 18 U.S.C. § 287. When used against federal officials, they violate the federal False Claims Act, 31 U.S.C. § 3729.

The United States government has successfully prosecuted perpetrators criminally. *United States v. Getzschman,* 81 Fed.Appx. 619 (8th Cir. 2003) (phony sight drafts based on "redemption"); *United States v. Boos,* 1999 WL 12741 (10th Cir. 1999) (phony UCC financing statements against IRS agents);

*United States v. Speight,* 75 Fed.Appx. 802 (2d Cir. 2003) (phony liens against federal prosecutor and federal judge). It has also obtained civil injunctions, damages, and penalties against them. *United States v. Martin,* 356 F.Supp.2d 621 (W.D. Va. 2005) (phony UCC liens against Bureau of Prisons employees and the clerk and judges of the Fourth Circuit Court of Appeals); *United States v. Barker,* 19 F.Supp.2d 1380 (S.D. Ga. 1998) (phony "commercial" liens against judges, prosecutors, other federal officials); *United States v. Orrego,* 2004 WL 1447954 (E.D. N.Y. 2004) (phony UCC liens against judge, prosecutor, warden); *United States v. Anderson,* 1998 WL 704357 (N.D. Ill. 1998) (phony "commercial" liens against judge, prosecutor, other federal officials); *United States v. Moore,* 1994 WL 95217 (10th Cir. 1994) (phony UCC liens against IRS agents).

This criminal activity has arrived in Pennsylvania's prisons. Recently, officers at SCI-Graterford, where Plaintiffs are housed, have found publications describing the schemes and materials used to carry them out in over 55 cells. Declaration of John Moyer, Appendix, p. 71; Supplemental Declaration of John Moyer, Appendix, p. 82.[4] In March 2005, an inmate filed UCC financing statements against Secretary of Corrections Beard and a prison superintendent based on their alleged use of the inmate's allegedly "copyrighted" name.

---

[4] Lt. Moyer's initial Declaration was filed in the case of *Davis v. Pryal,* No. 04-cv-2859. Inmate Davis filed a motion for return of materials seized from his cell. Judge Schiller denied the motion insofar as it requested return of UCC materials. Appendix, p. 99. In his reply to the Moyer Declaration, Davis claimed that inmates have the right to participate in this illegal activity. Response to Defendant's Response to Plaintiff's Motion, Appendix, pp. 84-88.

Declaration of William E. Fairall, Jr., Appendix, p. 100; Pennsylvania

Department of State UCC Filing Chain for a Debtor (Jeffrey A. Beard),

Appendix, p. 104; Financing Statement of John Anthony Gruff, Appendix,

p. 105.[5]  The same inmate threatens to file additional liens against Department

of Corrections officials unless they release him from prison and give him

money. Appendix, pp. 101, 102.  He has recently predicted, "Soon the D.O.C.

will have 100's of people filing. It's coming, and it can't be stopped." *Id.*  He

adds, "I'm coming after everyone, bet on it!" *Id.*  Again, Wheeler and Fontroy

also appear interested in joining the fray.

**ARGUMENT**

I.    **PLAINTIFFS HAVE NO LIKELIHOOD OF SUCCESS ON THE MERITS, THE AMENDMENT WILL CAUSE NO HARM TO ANY OF THEIR CONSTITUTIONALLY PROTECTED INTERESTS, AND AN INJUNCTION AGAINST THE AMENDMENT WOULD RISK SUBSTANTIAL HARM TO DEFENDANTS, OTHER PERSONS, AND EFFECTIVE GOVERNMENT OPERATIONS.**

Of course, the Court cannot enter a preliminary injunction unless the

moving party has shown a reasonable likelihood of success on the merits of the

claim and irreparable harm in the absence of an injunction. *Child Evangelism

Fellowship of N.J., Inc. v. Stafford Twp. School Dist.,* 386 F.3d 514, 524 (3d Cir.

2004).  The Court must also consider the effect of an injunction on other

parties, persons not before the court, and the public interest and should refuse

the injunction if it would significantly injure them. *Id.*  Here, Plaintiffs cannot

show any likelihood of successfully attacking the amendment to DC-ADM 803.

---

[5] The Appendix served on Plaintiffs does not contain a copy of the actual financing statement, because they are not allowed to possess it.

The reasons why they cannot succeed also show that Plaintiffs are not at any risk of harm to their legitimate interests, but that an injunction would be of great harm to others and to government more generally.

### A.    The Amendment has virtually no adverse impact on any of Plaintiffs' constitutionally protected interests.

At the outset, the amendment has virtually no impact on any of the Plaintiffs' constitutionally protected interests because Plaintiffs have virtually no constitutionally protected interests in the mail covered by the amendment. Like their attack on the incoming mail procedures generally, Plaintiffs appear to base their current Motion on alleged First Amendment rights, including the right to communicate with and have access to courts, a right which in some contexts the Fourteenth Amendment also supports. Indeed, these are the only federal constitutional rights arguably relevant.[6]  However, neither the First Amendment nor the "access to court" right protect mail that implements or furthers crimes. Nor does the First Amendment or "access to courts" protect baseless, false, sham petitions and communications to the courts or other public offices. *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 743 (1983); *San Filippo v. Bongiovanni,* 30 F.3d 424, 435-438 (3d Cir. 1994). The access to court right for prisoners does not protect access to pursue frivolous claims. *Lewis v. Casey,* 518 U.S. 343, 352, 352, n. 2, 3 (1996). Certainly, the liens and claims that the amendment to DC-ADM 803 seeks to stop have no First Amendment protection. *United States v. Barker,* 19 F.Supp.2d at 1384, 85

---

[6] The Motion also refers to state law. However, the Eleventh Amendment precludes this Court from considering any injunction based on state law. *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89 (1984).

(First Amendment does not protect these "terror tactics").  The Constitution likewise does not protect material that facilitates or is ancillary to or connected with the pursuit of such claims and filings. *See United States v. Ambort,* 405 F.3d 1109 (10th Cir. 2005) (communications and materials assisting the filing of false tax returns have no First Amendment protection).  The criminal nature of the filings alone justifies seizure of the materials.  They are instruments of crime.

Plaintiffs seem to allege that some documents mailed to them and defined by the amendment might be related to lawful legal matters, such as legitimate claims involving the Commercial Code.  They suggest claims against the Department of Corrections for goods it sells to them.  Not only does the Department sell very little to inmates, but any lawsuits based on such sales would be frivolous because they would be barred by the State's sovereign immunity. 1 Pa.C.S. § 2301.[7]

Even if the Plaintiffs might have claims under the UCC against some private party, the Constitution provides little, if any, protection to incoming mail related to them.  By committing crimes and being convicted and sentenced for them, Plaintiffs have forfeited many of their constitutional rights, and those that they retain are limited. *Shaw v. Murphy,* 532 U.S. at 228-230 (2001); *Hudson v. Palmer,* 468 U.S. 517, 523, 524, 526 (1984) (Fourth Amendment does not protect inmate's cell).  "Freedom of association is among the rights

---

[7] Although not really relevant, the Department's sale of some items to inmates does not make it a "market participant," as Judge Yohn has recently held in one of Plaintiffs' other cases. *Wheeler v. Beard,* 2005 WL 1217191 (E.D. Pa. May 19, 2005).  Prisons are not markets.

least compatible with incarceration." *Overton v. Bazzetta,* 539 U.S. 126, 131 (2003). The Supreme Court has never actually held that imprisoned convicts have a constitutional right to receive mail from outside the prison.[8] While prisoners have a limited access to court right, it covers no more than non-frivolous claims regarding the inmates' convictions and basic rights regarding prison conditions. *Lewis v. Casey,* 518 U.S. at 354, 355. The right does not "guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims." 518 U.S. at 355. The right does not include claims under the Commercial Code or copyright claims.

Furthermore, the amendment that Plaintiffs challenge has little or no impact on Plaintiffs' constitutionally protected interests because it so little impedes receipt of legitimate mail or possession of legitimate legal material. Relatively little mail will be diverted to security staff. For the mail that is diverted, the amendment requires notice of it to the addressee inmate. The inmate may then submit a grievance to explain why that mail is legitimate, and, if the explanation hangs together, the inmate will receive it. To be sure, security staff will have read this mail, but simple reading of a few pieces of incoming mail does not interfere with the ability of the inmate to communicate with the court or any other correspondent, particularly considering that any legitimate mail referencing the UCC will most likely not involve the State or State officials.

---

[8] The Court's prison mail cases have considered the rights of the persons outside prison who send mail to or receive mail from inmates.

Plaintiffs also seem to allege that the amendment requires, or allows, prison staff to read *all* incoming mail. It doesn't. Mail inspectors need, and can, only hold out what on its face has the questionable references to the UCC, redemption, or copyright of names, much as they recognize and hold out birth certificates, checks, and maps. As the record in this case shows, the volume of mail precludes mail inspectors from reading the mail any more than seeing what appears obvious on the face of the document. Informed mail inspectors will recognize without reading mail the kinds of publications and documents the Graterford officers have recently found in cells. Supplemental Declaration of Lt. John Moyer, Appendix, p. 82. Again, security staff will read the suspicious material given them by the mail inspectors, but little of this material will have constitutional protection, and reading alone does not interfere with the communication.

### B. The amendment to DC-ADM 803 is reasonably related to important government interests.

As defendants have argued in briefs already filed in this case, prison administrators may regulate most of those constitutional rights that convicts do retain, including First Amendment rights and access to court rights, so long as the regulation is reasonably related to a legitimate state interest. *Overton v. Bazzetta,* 539 U.S. at 132 (2003); *Thornburgh v. Abbott,* 490 U.S. 401, 413, 419 (1989).[9] This test looks to four considerations: (1) whether the regulation is

_____

[9] The Eighth Amendment, which applies to "punishments," has its own standards. Plaintiffs do not, and cannot, claim that the recent DC-ADM 803 amendment violates the Eighth Amendment. Non-receipt, or delayed receipt, of

rationally related to a legitimate governmental interest, (2) whether inmates still have sufficient means of exercising the constitutional right, (3) whether accommodation of the right would burden staff or other inmates, and (4) whether corrections officials have no obvious, easy alternative to the regulation that accommodates the inmates' right at *de minimis* cost. *Overton v. Bazzetta,* 539 U.S. at 132; *Thornburgh v. Abbott,* 490 U.S. at 414-419 (1989); *Turner v. Safley,* 482 U.S. 78, 90, 91 (1987). The amendment that Plaintiffs challenge here easily meets the test.

The first consideration is most important. The amendment under consideration here bears a tight relationship to important state interests. The state has a compelling interest in safe, secure operation of its prisons. Internal security is the most legitimate penologic goal. *Overton v. Bazzetta,* 539 U.S. at 133; *Turner v. Safley,* 482 U.S. at 86, 87, 92 (1987). Security includes safety of the public and implementation of lawful punishment by keeping the sentenced convicts securely incarcerated; it includes safety of persons working in and for the prisons; it includes safety of inmates housed in the prison. The state also has a compelling interest in protecting all its citizens from crime and injury. It has a compelling interest in deterring convicts from further crime. *Hudson v. Palmer,* 468 U.S. at 524. It has a compelling interest in rehabilitating convicts into law-abiding citizens. It has a compelling interest in protecting governments' financial resources.

---

certain mail neither deprives inmates of life's basic necessities nor inflicts physical pain. *Overton v. Bazzetta,* 539 U.S. at 137.

The amendment under consideration protects corrections staff, other persons (usually public servants of other kinds), and government operations from crimes and injuries. It prevents convicts from receiving instructions and materials used illegally and unjustifiably to attack peoples' and governments' property and credit and used to attack the operation of the criminal justice systems. It prevents theft of the victims' property. It protects the criminal justice system's officials and officers from harassment and extortion that impede the system's necessary, safe, and just operation. *United States v. Barker,* 19 F.Supp.2d 1380, 1384 (S.D. Ga. 1998); *Ray v. Williams,* 2005 WL 697041, *7.[10] It prevents outright crimes. Like strong prison walls and gates, it prevents convicts from making criminal attacks on persons outside the prison (*e.g.* judges, prosecutors). It reduces enticements to criminal activities. In *Thornburgh v. Abbott, supra.,* the Court upheld a federal prison regulation that authorized prison officials to reject incoming publications that might facilitate criminal activity or be detrimental to the security, good order, or discipline of the institution. In *Ray v. Williams,* 2005 WL 697041, *5, *6, *approved and adopted,* 2005 WL 1429907 (D. Oregon 2005), the court applied *Thornburgh* and held that a state prison could refuse to let inmates receive two

---

[10] "American citizens at large suffer when our public officials are not able to perform their duties free of harassment and attempts at extortion." *Barker,* 19 F.Supp.2d at 1384.

publications describing schemes involving UCC liens, copyrighted names, and redemption.  The refusal rationally served legitimate government interests.[11]

The second factor, available alternatives for inmates to exercise the right, really asks how severely the regulation restrains particular constitutionally protected activity, viewed expansively.  *See Overton v. Bazzetta,* 539 U.S. at 135 (alternatives need not be ideal); *Thornburgh v. Abbott,* 490 U.S. at 417, 418 (when considering the ability of inmates to exercise the right despite the regulation, the possible means of exercise must be viewed expansively, such that it can be exercised in many ways).  Here, the regulation hardly affects legitimate and constitutionally protected activity at all.  It will affect very little, if any, mail or court access that has constitutional protection.  It will affect that small amount of mail only minimally and temporarily, only delaying its delivery.[12]  The fact that security staff will read it can have no significant effect on the inmates.  Plaintiffs will be able to receive all of their mail so long as it does not further illegal acts.

Permitting inmates to receive mail regarding the UCC, liens, redemption, or copyrighting names would put prison staff and operations at serious risk.  It would risk damage to employees' property and credit.  It would impede

_____

[11] Graterford officers have found both of the publications discussed in *Ray* ("Cracking the Code" and "One Man Out") in cells at Graterford. Supplemental Declaration of John Moyer, Appendix, p. 82.

[12] The amendment's provision for notice to the inmate and opportunity to grieve the seizure of the mail not only assures minimal interference with legitimate mail, but satisfies any Fourteenth Amendment procedural due process requirement imposed by *Procunier v. Martinez,* 416 U.S. 396, 417-19 (1974).

operations through extortion and harassment of staff. *Ray v. Williams,* 2005 WL 697041, *7.  The extortion and harassment of staff could cow them to act in ways that compromise safety of staff, inmates, and even the public at large. Certainly, inmate John Anthony Gruff is trying to use phony liens to extort his release from prison. Appendix, pp. 101, 102.

No obvious, easy alternative to mail review and seizure of offending material will really control the criminal schemes that the amendment in question seeks to control.  The amendment focuses on the offending material, and assures that legitimate mail gets to the inmate.  Any other alternative would be more restrictive of inmate privileges or less effective in controlling the evil.  While government can successfully pursue civil suits and criminal prosecutions against the inmates after they have perpetrated their criminal acts, those are neither adequate nor inexpensive remedies.

In sum, the recent amendment to DC-ADM 803 prevents inmates, including the Plaintiffs, from receiving materials used illegally and unjustifiably to harm innocent people and government operations.  It prevents criminal acts. Even if it adversely affects some of the Plaintiffs' constitutionally protected activity, it does not violate their constitutional rights.

## II.    THE REASONS FOR THE AMENDMENT TO DC-ADM 803 SHOW WHY THE COURT SHOULD ENTER SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS ON THE UNDERLYING ISSUES.

Not only is the recent amendment to DC-ADM 803 constitutionally valid, the reasons for it constitutionally justify the policy already under attack in this case.  That policy requires mail inspectors outside the presence of the inmates

to unseal and inspect all incoming mail with apparent court or attorney return addresses, unless it bears a valid "control number." Plaintiffs claim that mail with court return addresses will never contain contraband because courts don't send inmates contraband. However, the recent amendment was issued because inmates make phony documents – phony liens, phony financing statements, phony sight drafts. They, or their outside co-conspirators, will as readily create envelopes with court return addresses, if that will get them past a thorough inspection.

Moreover, the reasons for the amendment show that mail inspectors should open and inspect mail to inmates. Only trained inspectors will identify quickly the kind of material that the amendment seeks to root out. They will learn and recognize the publications and red-flag words that suggest the criminal activity and will hold these items without further reading them or other mail. The corrections system can train a limited number of mail inspectors who focus on mail inspection to do this. It cannot expect hundreds of corrections officers who might open the mail on the cell blocks in the inmates' presence to do it.

Furthermore, the reasons underlying the amendment show that the inspectors should open and inspect mail to inmates outside the presence of inmates. If inspectors find UCC, copyrighted name, or redemption material, in the presence of inmates and refuse to let them have it, angry disputes will likely arise, no matter who opens and inspects. Inmates receiving this material likely espouse the extreme anti-authority, anti-government attitude the

17

material promotes.  Also, the illegal material can look like valid legal material.
*See Ray v. Williams,* 2005 WL 697041, *7 (publications regarding liens,
redemption could establish context for disputes over legitimacy of tactics
advocated).  The prisons will operate more safely if these disputes are aired
through the established grievance process rather than in person at the point of
inspection.

**CONCLUSION**

The Court should deny the Motion for Evidentiary Hearing, Temporary
Restraining Order and/or Preliminary Injunction filed by plaintiffs Wheeler and
Fontroy.  The Court should also now grant Defendants' Motion for Summary
Judgment.  The inmate conduct that has led to the amendment to DC-ADM
803 now before the court, along with the other evidence in the record (*e.g.,* the
escape tools that entered in legal mail to facilitate the Norman Johnston
escape, the Valdo Guilford conviction for falsifying court documents, including
an envelope), and a realistic sense of current affairs (terrorism, both physical
and paper) show powerfully why the DC-ADM 803 is constitutionally valid in all
respects.

This Court has understandably been waiting for the Court of Appeals to
decide several cases.  However, briefing in those appellate cases has been
complete for some time, and the court has not scheduled any of them for
disposition.  The Court of Appeals may be waiting for this Court to decide this
case.  Now it should, and it should argue forcefully that our nations'
correctional systems may protect themselves, the public in general, public

servants, and inmates interested in bettering themselves by as completely and

safely as possible removing instruments of injury and escape from the conduits

to the convicts.

<div style="margin-left:40%">

THOMAS W. CORBETT, JR.
Attorney General of Pennsylvania

</div>

By:   s/ John O. J. Shellenberger
      _____

<table>
<tr>
<td>

Office of Attorney General
21 S. 12th Street, 3rd Floor
Philadelphia, PA 19107
Phone: (215) 560-2940
Fax:    (215) 560-1031

</td>
<td>

John O. J. Shellenberger
Chief Deputy Attorney General
Attorney I.D. No. 09714
Attorney for Defendants

</td>
</tr>
</table>

## CERTIFICATE OF SERVICE

I, John O. J. Shellenberger, hereby certify that DEFENDANTS'

RESPONSE IN OPPOSITION TO THE MOTION FOR EVIDENTIARY HEARING,

TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION has

been filed electronically and is available for viewing and downloading from the

Court's Electronic Case Filing System.  I further certify that a true and correct

copy of DEFENDANTS' RESPONSE IN OPPOSITION TO THE MOTION FOR

EVIDENTIARY HEARING, TEMPORARY RESTRAINING ORDER AND/OR

PRELIMINARY INJUNCTION was mailed on October 11, 2005 by first class

mail, postage prepaid to:

Derrick Dale Fontroy, AY-7513
Theodore B. Savage, CB-2674
Aaron Christopher Wheeler, BZ-2590
James S. Pavlichko, DK-0199
State Correctional Institution at Graterford
P.O. Box 244
Graterford, PA 19426-0244


s/ John O. J. Shellenberger
_____
John O. J. Shellenberger
Chief Deputy Attorney General
Attorney I.D. No. 09714

Office of Attorney General
21 S. 12th Street, 3rd Floor
Philadelphia, PA 19107
Phone: (215) 560-2940
Fax:     (215) 560-1031