IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DERRICK DALE FONTROY, et al., | : | CIVIL ACTION |
| Plaintiffs | : | |
| v. | : | |
| GOVERNOR MARK SCHWEIKER, et al., | : | |
| Defendants | : | NO. 02-CV-2949 |

DEFENDANTS' SUPPLEMENTAL MEMORANDUM OF LAW
REGARDING RECENT THIRD CIRCUIT AND SUPREME COURT CASES

STATEMENT OF THE CASE

Plaintiffs are challenging the Pennsylvania Department of Corrections policy on handling mail sent to inmates from attorneys and courts. The policy generally treats mail appearing (from the return addresses) to be from attorneys or courts like all other incoming mail: mail inspectors unseal and inspect it in mail rooms not in the addressee inmates' presence before delivery to the inmates on their housing units. However, the policy allows attorneys and courts to get control numbers from the Department and requires that envelopes bearing valid control numbers be unsealed only in the addressee inmates' presence. It also provides that mail apparently from courts, but without control numbers, be handed directly to the addressees by staff on the inmates' housing units (after unsealing and inspection in the mail rooms).

Plaintiffs contend that all mail addressed to them with attorney or court return addresses must be unsealed and inspected in Plaintiffs' presence and handed to them then and there, without any need for control numbers. They

appear to base their claim on the First Amendment and the right of access to the courts.

The Court has before it cross-motions for summary judgment. It has been holding the case in suspense pending decisions by the Court of Appeals in three cases: Taylor v. Oney, No. 04-2062; Jones v. Brown, No. 03-3823; Allah v. Codey, No. 04-4426. On August 24, 2006, the Court of Appeals issued its decisions in these cases.

The decision in Taylor v. Oney is of little interest. It affirmed entry of summary judgment in favor of the defendants on the ground that none of the defendants were personally involved in the violation alleged there. The joint decision in Jones and Allah (2006 WL 2441412) dealt more substantially with First Amendment issues. It held that, on the record before the court, New Jersey had not justified its current incoming legal mail procedure sufficiently to validate it in light of its likely effect on the inmates' First Amendment rights.

The Jones-Allah decision does not change Defendants' position here: the Pennsylvania DOC policy on handling of mail from attorneys and courts does not violate Plaintiffs' First Amendment rights. This position finds support not only in the Jones-Allah decision itself, but also in the recent Supreme Court decision in Beard v. Banks, 126 S.Ct. 2572 (2006).

ARGUMENT

The Pennsylvania Department of Corrections Policy on Mail from Attorneys and Courts Does Not Violate Plaintiffs' First Amendment Rights in Light of the Recent Third Circuit and U.S. Supreme Court Decisions.

      This case differs from Jones-Allah in ways that the Court of Appeals, and the Supreme Court, would find legally significant.  First, the Pennsylvania policy differs from the New Jersey policy considered in Jones-Allah.  The Pennsylvania policy has little or no adverse impact on First Amendment rights.  Second, New Jersey attempted to justify its policy with a single rationale without any record evidence to support it.  Here, the record contains substantial evidence showing that the Pennsylvania policy is both rationally and reasonably related to legitimate penological interests.  It reflects careful exercise of professional judgment by experienced corrections administrators.

      The record in Jones-Allah showed that the New Jersey Department of Corrections had, in October 2001, suspended an existing regulation requiring that "incoming legal correspondence be opened and inspected in front of the inmate to whom it is addressed."  After the suspension, New Jersey required that a correctional officer open and inspect incoming legal correspondence in a mail room not in the presence of the inmate.  New Jersey's sole justification for the suspension was to reduce the risk of anthrax contamination in the prisons.  The only basis New Jersey offered for the risk was the publicly known events of September-October 2001 when letters containing anthrax were mailed to several business and government offices in the United States.  The suspension had not been lifted since October 2001.

The Court of Appeals held that a prisoner's conviction and sentence do not forfeit his First Amendment right to communicate through the mails. The court then jumped to the conclusion that a policy of opening legal mail outside the prisoner's presence impinges on that right.[1] However, it recognized that prison administrators may restrict and regulate prisoners' retained First Amendment rights regarding legal mail, so long as the regulation is "reasonably related to legitimate penological interests," as provided in Turner v. Safley, 482 U.S. 78, 89 (1987), Overton v. Bazzetta, 539 U.S. 126 (2003) and other Supreme Court cases.

The Court of Appeals held that safety and security of the prisons are legitimate penological interests. But it concluded that by late 2004, neither common sense nor any evidence in the record supported the only rationale advanced by New Jersey connecting its legal mail inspection policy to those interests. That sole proffered rationale was reduction of the risk of anthrax attack on the prisons, and the only evidence in the record supporting it was the public information regarding the October 2001 anthrax mailings. The court concluded that neither common sense nor the evidence supported a significant risk that anthrax would be mailed into New Jersey prisons three years later, particularly in correspondence from lawyers and courts. New Jersey offered no other justification for its policy. Therefore, the court found, the policy bore no rational relationship to safety and security interests, and, consequently, no reasonable relationship.

---

[1] The court of appeals considers incoming "legal mail" to consist only of mail from attorneys and courts. Bieregu v. Reno, 59 F.3d 1445, 1449 (3d Cir. 1995).

4

The court discussed its decision in Bieregu v. Reno, 59 F.3d 1445 (3d Cir. 1995).  The plaintiff there alleged that prison staff had repeatedly opened mail from federal judges outside his presence.  The government had obtained summary judgment solely on the ground that the inmate had no First Amendment right to unsealed incoming legal mail at all.  It offered no rationale for the mail openings.  The court of appeals emphasized that "the government does not argue that the conduct alleged by the plaintiff comports with Turner." 59 F.3d at 1457.  Consequently, after finding that the inmate did have a First Amendment protected interest in receipt of unsealed legal mail, the court reversed the summary judgment.

Here, the record is quite different from that in Jones-Allah and Bieregu.  First, the Pennsylvania Department of Corrections policy differs from New Jersey's post October 2001 policy.  Second, the record here contains extensive evidence supporting the relationship between Pennsylvania's policy and its legitimate interest in prison security and safety.

The Pennsylvania policy before the Court, DC-ADM 803, impinges only minimally, if at all, on First Amendment interests.[2]  It certainly impinges far less than the New Jersey policy.  Under the New Jersey policy, a correctional officer opened all legal mail outside the inmates' presence, without exception.  Under the Pennsylvania policy, attorneys can insure that their mail will be opened only in the inmates' presence simply by obtaining a control number and placing it on the envelope. DC-ADM 803, § VI.B.2.b.  The evidence shows

---

[2] The relevant provisions on incoming mail are in the DC-ADM 803 that is Exhibit D-2 to the Deposition of Kimberly J. Ulisny.

5

that attorneys use control numbers easily. Ulisny Deposition, pp. 17-19 Exhibits D-3, D-7.

As to mail from courts, the First Amendment really does not protect it from initial unsealing outside inmate presence because it is not confidential. It consists entirely of documents readily available to the public and generally served on the parties opposing the inmate. Although the Third Circuit has not considered this point, the Seventh and Ninth Circuits have so held. Martin v. Brewer, 830 F.2d 76, 78 (7th Cir. 1987); Keenan v. Hall, 83 F.3d 1083, 1094 (9th Cir. 1996); see also, McCain v. Reno, 98 F.Supp.2d 5, 7, 8 (D.D.C. 2000). However, the Pennsylvania DOC has recognized that mail coming from the courts can be important to inmates, and the DC-ADM 803 provides extra protection for it. The policy requires that staff hand court mail directly to the receiving inmates (not leave it in their cells or with other inmates). DC-ADM 803, § VI.B.3. This procedure reduces risk of loss, delay, and misdelivery. The DC-ADM 803 also allows courts to get and use control numbers that will assure that their mail is unsealed only in the inmates' presence. DC-ADM 803, § VI.B.2.b.

To the extent that the DC-ADM 803 does impinge on inmates' First Amendment rights in legal mail, the record here contains extensive evidence of the strong relationship between the policy and the undeniably legitimate interest in prison security and safety, evidence that New Jersey did not offer or even argue. Security and safety includes safety within the prison and external safety through prevention of escapes. The testimony of the Secretary of

Corrections, reports of investigators, and testimony of staff involved in mail handling at SCI-Graterford show the rational and reasonable relationship between the policy's procedures and these important governmental interests. Deposition of Jeffrey A. Beard, Declaration of Jeffrey A. Beard (with Escape Report, Huntingdon, November 1999), Declaration of Charles J. McKeown (with Privileged Correspondence Inspection and Contraband Report, September 20, 1999), Deposition of Kimberly J. Ulisny.

Secretary Beard testified to the obvious when he said that anything that enters the prisons can compromise safety and security, particularly when it is hidden inside sealed envelopes and packages. Beard Dep. at 8, 9. Mail can contain cash, drugs, escape tools, maps, weapons (or items that can be fashioned into weapons), explosives, bio-hazards (chemicals); faux bio-hazards (e.g. loose powders), pornography, even body fluids, and it has. Beard Dep. at 9-12, 25-27; Ulisny Dep. at 30, 41, 42.[3] Mail that appears from the return address to be from an attorney or court can contain dangerous material. Ulisny Dep. at 129. That return address does not mean that the mail actually came from an attorney or court. See Beard Dep. at 33, 34, 38, 39; Ulisny Dep. at 20, 71-75; Information, Testimony, and Exhibits in From the Trial of

---

[3] The recent opinion in United States v. Davila, 2006 WL 501459 (2d Cir. Aug. 30, 2006) describes how a prisoner mailed powder in an envelope with a phony return address and marked as "legal mail" to a States' Attorneys' Office, causing fear, havoc, and closure of the Office for 2 ½ days. This kind of mailing could just as easily be made to a prison.

7

Commonwealth v. Valdo Guilford.[4] The thick documents (briefs, transcripts) often found in legal (or apparently legal) mail provide ideal hiding places for contraband. Ulisny Dep. at 70, 72; Escape Report, Huntingdon, November 1999, p. 23.

The impetus for the attorney and court mail policy changes implemented in October 2002 was the conclusion of DOC investigators that escape tools used by an escaped murderer had been smuggled into his prison in legal materials, which at the time were opened in the inmates' presence. Beard Dep. at 18-21; Escape Report, pp. 3, 22, 23, 47.[5] The investigators concluded that opening legal mail in inmates' presence created substantial security risks not incurred when that mail is opened and inspected by mail inspectors outside inmates' presence. Escape Report, pp. 59, 60, 69, 72, 73. A DOC staffer experienced in both mail handling and security wrote a report concluding that opening all mail from attorneys and courts in the presence of inmates presented security risks, and he included documents from several of the prisons showing security breaches, or near-breaches, through purported legal mail. Beard Dep. at 41, 42; Declaration of Charles J. McKeown, with Privileged Correspondence Inspection and Contraband Report. He recommended that

---

[4] At pp. 226, 227 of the Commonwealth v. Guilford transcript an inmate describes how he created phony court correspondence, including an envelope with the court's return address.

[5] Inmates have done the same elsewhere. See U.S. v. Young, 146 Fed.Appx. 824, 2005 WL 2173773 (6th Cir. 2005) where an inmate received a hacksaw blade in a legal pad sent in an envelope with his attorney's return address. The inmate used the blade to saw through window bars. The court noted that the inmate used the legal mail because guards opened legal mail in the inmates' presence, and, consequently, less closely scrutinized it.

mail appearing to be from attorneys and courts be opened and inspected outside of inmate presence, like all other incoming mail. Id.

Secretary Beard, a corrections professional for over 32 years (Dep. at 4-8), agreed that opening and inspecting mail in the presence of inmates increases risks that dangerous material will get inside the prison and altercations will arise inside the prison. Beard Dep. at 29-32. Primarily, the opening and inspection will take place inside the secure prison, usually in inmate housing units, with many inmates and staff nearby. Beard Dep. at 16-18, 29-32, 73-75. It will usually be done by corrections officers who have many other tasks to perform. Id.; Murray Dep. at 46, 47. Of course, the receiving inmate is present, and can grab or protest on the spot. Ulisny Dep. at 62, 63. Even at Graterford, where mail inspectors take the "privileged" mail to a place inside the prison, they are inside the prison, and the receiving inmate is present, with other inmates and staff nearby. Ulisny Dep. at 55-58, 61, Exhibits D-4, D-5 (photographs). Experienced professionals have concluded that security and safety are best served when mail inspectors, whose job is to inspect mail, inspect all of it in their own work areas, away from the prison housing and activity areas, out of the presence of the receiving inmates. Beard Dep. at 13-15, 26, 27, 32, 34, 69. The Court must accept these judgments and find at least a rational relationship between security and opening mail with attorney and court return addresses in the mail rooms, out of inmate presence, unless the envelope bears a registered control number, which assures that the item is from a legitimate attorney or court.

The Pennsylvania policy scores well on the remaining three Turner factors: alternative means of inmate communication, burden of acceding to plaintiffs, and ready availability of alternative means of protecting security.

Inmates do have an alternative way to have mail from attorneys opened only in their presence. They can rely on the attorneys to get and use control numbers. The evidence shows that attorneys use them. While courts are less likely to use control numbers, the policy does assure that inmates will get court mail more safely than if it were treated as regular mail. In sum, inmates will get their legal mail. Any First Amendment impingement effected by the DC-ADM 803 will be quite small. See Overton v. Bazzetta, 539 U.S. 126, 135 (2003)(alternatives need not be the ideal); Thornburgh v. Abbott, 490 U.S. 401, 417, 418 (1989)(when considering the ability of inmates to exercise the right despite the regulation, the possible means of exercise must be viewed expansively).

Opening all mail apparently from courts and attorneys in the presence of inmates would cause burdens on the prisons in addition to the security risks already discussed. Corrections officers, who have other duties, would have to spend more time opening and inspecting mail. Beard Dep. at 38; Ulisny Dep. at 25-27, 61, 86-92, 144, 145, Exhibits D-7, D-8. If mail inspectors are to take all apparently legal mail to a separate location inside the prison, each prison would have to find such a location, the inspectors would have to carry the mail to it each day, and the inspectors would have to wait there for the inmates rather than working on other mail tasks, like the outgoing mail. Ulisny Dep. at

51, 57-61, 76-85.  Inmates too would have to forego other activities to get their mail.

The procedures now in the DC-ADM 803 already are alternatives that carefully balance inmates' First Amendment rights and institution security. They were selected after consideration of other alternatives. Beard Dep. at 21-23, 27, 28, 46.  They reflect compromises made (principally the provision for control numbers and the special delivery of court mail) to least impinge First Amendment interests while protecting security. Id.  No other ready alternatives come to mind that would not tip the scale into excessive security risks.

In sum, the record here shows that the Pennsylvania DOC's policy regarding mail to inmates from attorneys and courts is reasonably related to legitimate penological objectives.  By emphasizing the meager justification and record that New Jersey had produced, the Court of Appeals in Jones-Allah was distinguishing that case from a case like this one.  The court may also have been trying to distinguish the case from recent Supreme Court decisions, although Defendants question whether it successfully did so.

In June of this year, the Supreme Court reversed the Third Circuit, affirmed summary judgment in favor of Secretary Beard, and upheld against First Amendment challenge a Pennsylvania DOC rule that prohibited a certain category of inmates from receiving any newspapers or magazines. Beard v. Banks, 126 S.Ct. 2572 (2006).  A four justice plurality acknowledged the inmates' First Amendment interest in the publications and considered the rule under the Turner test.  It started by repeating the admonition the Court had

recently made in Overton v. Bazzetta, 539 U.S. 126, 132 (2003): "courts owe substantial deference to the professional judgment of prison administrators." 126 S.Ct. at 2578.  It held that with regard to matters of professional judgment, "our inferences must accord deference to the views of prison authorities." Id.  It accepted the views of a prison deputy superintendent, stated in a deposition, that the rule served the legitimate objective proffered (motivating better behavior by the inmates affected). 126 S.Ct. at 2579.  The plurality conceded that the inmates had no alternative means of exercising their First Amendment right to newspapers and magazines (they had no televisions, radios, or even telephone calls). 126 S.Ct. at 2579, 2580.  It noted that the burden on the prison of accommodating the inmates' rights was simply that the objective of the rule would be less well served. 126 S.Ct. at 2580.  Still, it found that the rule was reasonably related to the objective, accepting the prison officials' "professional judgment" and "experience-based conclusion that the policies help to further legitimate prison objectives." 126 S.Ct. at 2580.  The plurality criticized the court of appeals for "placing too high an evidentiary burden upon the Secretary" and for offering "too little deference to the judgment of prison officials about such matters." 126 S.Ct. at 2581.

     The plurality opinion in Beard v. Banks was the more moderate view of the majority.  The two concurring justices argued that the inmates' convictions and sentences forfeited their First Amendment rights and delegated the inmates' supervision to the state, subject only to the Eighth Amendment. 126 S.Ct. at 2583, 2584.

The Third Circuit's approach in Jones-Allah seems inconsistent with the Supreme Court's holding and admonitions in Beard v. Banks. However, as the court of appeals emphasized, New Jersey offered very little. Here, Secretary Beard himself has explained on the record the reasons for the Pennsylvania DOC's attorney and court mail policy, and they are backed by studies and experience also in the record. The Court must substantially defer to the DOC staff's professional judgment and enter summary judgment in favor of the Defendants.

CONCLUSION

The Court should deny Plaintiffs' Motion for Summary Judgment and grant Defendants' Motion for Summary Judgment. It should enter judgment in favor of the Defendants.

                                  THOMAS W. CORBETT, JR.
                                  Attorney General of Pennsylvania

                        By:  s/ John O. J. Shellenberger

| | |
|---|---|
| Office of Attorney General | John O. J. Shellenberger |
| 21 S. 12th Street, 3rd Floor | Chief Deputy Attorney General |
| Philadelphia, PA 19107 | Attorney I.D. No. 09714 |
| Phone: (215) 560-2940 | Attorney for Defendants |
| Fax:    (215) 560-1031 | |

13

CERTIFICATE OF SERVICE

I, John O. J. Shellenberger, hereby certify that Defendants' Supplemental Memorandum Of Law Regarding Recent Third Circuit And Supreme Court Cases has been filed electronically and is available for viewing and downloading from the Court's Electronic Case Filing System. I further certify that a true and correct copy of Defendants' Supplemental Memorandum Of Law Regarding Recent Third Circuit And Supreme Court Cases was mailed on September 22, 2006, by first class mail, postage prepaid to:

| | |
|---|---|
| Derrick Dale Fontroy, AY-7513<br>State Correctional Institution<br>at Forest<br>P.O. Box 307<br>Marienville, PA 16239-0307 | Aaron Christopher Wheeler, BZ-2590<br>State Correctional Institution<br>at Graterford<br>P.O. Box 244<br>Graterford, PA 19426-0244 |
| Theodore B. Savage, CB-2674<br>State Correctional Institution<br>at Cresson<br>Drawer A, Old Route 22<br>Cresson, PA 16699-0001 | |

 

| | |
|---|---|
| | s/ John O. J. Shellenberger |
| | John O. J. Shellenberger |
| Office of Attorney General | Chief Deputy Attorney General |
| 21 S. 12th Street, 3rd Floor | Attorney I.D. No. 09714 |
| Philadelphia, PA 19107 | |
| Phone: (215) 560-2940 | |
| Fax:    (215) 560-1031 | |