IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DERRICK DALE FONTROY, et al.,            :        CIVIL ACTION

                Plaintiffs            :

     v.                                      :

GOVERNOR MARK SCHWEIKER, et al.,    :

                Defendants        :        NO.  02-CV-2949


HOUSE OF REPRESENTATIVES
COMMONWEALTH OF PENNSYLVANIA

House Judiciary Subcommittee on
Crime and Corrections

HEARING ON INMATE ESCAPE
OCTOBER 14, 1999

Testimony of Martin Horn, Secretary of Corrections
and
Robert Stewart, District Attorney of Huntingdon County


THOMAS W. CORBETT, JR.
Attorney General of Pennsylvania

By:   s/John O. J. Shellenberger
                                             

                     John O. J. Shellenberger

Office of Attorney General      Chief Deputy Attorney General
21 S. 12th Street, 3rd Floor      Attorney I.D. No. 09714
Philadelphia, PA 19107         Attorney for Defendants
Phone: (215) 560-2940
Fax:    (215) 560-1031

HOUSE OF REPRESENTATIVES
COMMONWEALTH OF PENNSYLVANIA

* * * * * * * * *

Hearing on Inmate Escape

* * * * * * * * *

House Judiciary Subcommittee
on Crime and Corrections

State Correctional Institution
1100 Pike Street
Huntingdon, Pennsylvania

Thursday, October 14, 1999 - 9:05 a.m.

--oOo--

BEFORE:

Honorable Jerry Birmelin, Majority Chairperson
Honorable James Harold, Minority Chairperson
Honorable Kathy Manderino

IN ATTENDANCE:

Honorable Larry Sather
Honorable Babette Josephs
Honorable Donald Walko



KEY REPORTERS
1300 Garrison Drive, York, PA  17404
(717) 764-7801  Fax (717) 764-6367

# C O N T E N T S

| WITNESSES | PAGE |
|---|---|
| Honorable Martin Horn<br>    Secretary of Corrections | 6 |
| Joseph Holmberg, Captain<br>    Troop Commander - Huntingdon<br>    Pennsylvania State Police | 72 |
| Henry Oleyniczak, Captain<br>    Troop Commander - Lancaster<br>    Pennsylvania State Police | 78 |
| Honorable Robert B. Stewart, III<br>    District Attorney, Huntingdon Co. | 101 |
| Michael Fox, Council Director<br>    AFSCME, District Council 89 | 114 |
| Robert Diehl, Corrections Officer<br>    SCI-Huntingdon | 126 |
| PA State Correctional Officers Assoc.<br>    Greg Griffin<br>    Ed McConnell | 169<br>172 |
| William DiMascio<br>    Pennsylvania Prison Society | 182 |

2

1        ALSO PRESENT:

2

3      Brian Preski, Esquire
         Majority Chief Counsel

4

5      Michael Rish
         Minority Executive Director

6

7      Cathy Hudson
         Minority Committee Secretary

8      Susan Thomas
         Executive Secretary for Representative Blaum

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1          CHAIRPERSON BIRMELIN:  I'd like to

2     have your attention for a minute and then we can

3     get started.  I want to welcome you this morning

4     to the Pennsylvania House of Representatives

5     Subcommittee on Crime and Correction's hearing

6     and we are today discussing and receiving

7     testimony on an event that occurred here at

8     SCI-Huntingdon on August the 2nd of this year,

9     the escape of an inmate named Norman Johnston.

10          We have a rather full agenda that's

11     going to keep us busy perhaps through 12:30 or

12     one o'clock today.  I'm going to do my best to

13     make sure that those who are testifying are

14     testifying on time and have the opportunity to

15     answer questions during their time -- If any of

16     you are interested in an agenda, we have some up

17     here on the front table and you may feel free to

18     help yourselves.  Try not to block the camera

19     angles if you would, please.

20          I'm Representative Birmelin.  I come

21     from Wayne and Pike Counties, and I'm the

22     Chairman of the Subcommittee, and I will ask the

23     members and staff who are with me today if

24     they'll introduce themselves, starting with my

25     far right.

5

1          REPRESENTATIVE MANDERINO:  Kathy

2     Manderino from Philadelphia County.

3          REPRESENTATIVE SATHER:  Larry Sather

4     from the 81st District of Huntingdon and

5     Northern Blair.

6          REPRESENTATIVE WALKO:  Don Walko,

7     Pittsburgh.

8          REPRESENTATIVE JOSEPHS:  Babette

9     Josephs, Philadelphia County.

10         MR. RISH:  I'm Mike Rish, staff for

11    the Democratic Judiciary Committee.

12         MR. PRESKI:  Good morning.  Brian

13    Preski, Chief Counsel for the committee.

14         CHAIRPERSON BIRMELIN:  We do have at

15    least one other member who will be here and

16    maybe others, and as they are arriving I will do

17    my best to introduce them so that you in the

18    audience know who everybody is.

19         Without further ado, I'll ask the

20    first testifiers to come forward and to present

21    their testimony for us.  The Secretary of

22    Corrections for Pennsylvania is Martin Horn and

23    he is going to be testifying this morning along

24    with Frederick Frank, who's the superintendent

25    here at SCI-Huntingdon.

6

1          Gentlemen, we welcome you and we

2     know that you have prepared written remarks.    I

3     would also suggest for the members of the

4     audience who are interested in the Secretary's

5     remarks, we do have some extra copies.    If

6     you'll see the gentleman waving to the right

7     over here, he can give you a copy of those

8     prepared remarks.

9          Secretary Horn, we welcome you here

10    today and Superintendent Frank.    It's my

11    understanding, Secretary Horn, you're going to

12    begin and you may do so when you're ready.

13         SECRETARY HORN:    Thank you, very

14    much, Chairman Birmelin, and members of the

15    committee.    I have a prepared statement.    I've

16    amended it from my spoken remarks, and I'll try

17    and abbreviate them for you.

18         Mr. Chairman, members of the

19    committee:    I appreciate the opportunity to

20    appear before you to review the escape of Inmate

21    Norman Johnston from SCI-Huntingdon on August 2,

22    1999.    Johnston was committed to the Department

23    to serve four consecutive life sentences and a

24    consecutive 12 and a half to 25-year sentence

25    for criminal conspiracy and aggravated assault.

1          It was the clear intention of the

2     Commonwealth that he never be allowed to walk

3     the streets again.  That he was able to escape

4     from a restricted housing unit in a maximum

5     security prison represents a substantial failure

6     of SCI-Huntingdon and my department to fulfill

7     its most fundamental responsibility to securely

8     confine the inmates committed to it.

9          He was able to succeed because

10    certain staff, in violation of clear Department

11    policy, allowed themselves to be used by this

12    inmate.  He was clever enough to organize a ring

13    of confederates who maintained strict silence

14    and aided him in securing escape implements.

15    The Department through the years had accorded

16    preferential treatment to legal mail.

17          Staff in the housing unit where he

18    was confined did not perform their duties in a

19    thorough and effective manner.  A design flaw in

20    the construction of the housing unit allowed him

21    to conceal his activities.  Changes made to the

22    construction of SCI-Huntingdon in previous years

23    had compromised the original structural

24    integrity of the facility; and, certain

25    management staff and middle management staff

1   failed to fulfill their responsibilities in

2   certain areas to ensure that department

3   procedure was being followed and that good

4   security practices were utilized.

5           For many years, until the Camp Hill

6   Special Management Unit and SCI-Greene opened,

7   Huntingdon was the end of the line in the

8   corrections system, housing the most

9   intransigent and dangerous inmates.  The

10  building from which Johnston escaped, G Block,

11  is the Restricted Housing Unit.  This unit

12  houses inmates in disciplinary custody for

13  violating institutional rules and administrative

14  custody inmates held in restricted housing for

15  protection, investigation, or other security

16  reasons.

17          When G Block was built in 1991, it

18  was deemed to be the most secure housing unit at

19  Huntingdon.  The building was believed to be

20  more than adequate security for RHU inmates

21  because the construction of the building itself

22  provides high security without secondary

23  perimeters.

24          Before G Block was built, RHU

25  inmates were confined in B Block.  B Block is

1       one of the facility's original housing units,

2       and given its age, the mortar between the blocks

3       had begun to deteriorate.  In May 1984, two

4       inmates were found to have cut their cell door

5       bars in an escape attempt.  Approximately three

6       months before that, two inmates were discovered

7       out of their cells.

8              Before 1993, inmates broke through

9       the mortar of the brick walls in D Block, a

10      similar block, and gained access to the pipe

11      chase and from there exited to the basement.

12      Consequently, the RHU was moved to G Block,

13      although B Block continued to be utilized as

14      extra restricted housing cell space when there

15      were more inmates than could be accommodated

16      in G.

17             Because RHU inmates are segregated

18      from contact with general population, are

19      searched frequently, and are always handcuffed

20      and escorted during any movement, it was

21      believed that G Block and its construction would

22      provide adequate security for them.

23             Johnston was confined to the G Block

24      RHU since August 14, 1998, when he was charged

25      with attempting to convey a legal brief, which

1    had been carved out and which contained six bags

2    of marijuana and a security screwdriver tip, to

3    another inmate in the RHU.  And I have a -- I

4    actually have that legal brief and the cutout

5    here with me today for the committee to take a

6    look at, and you can bring it up and you might

7    want to pass it around, take a look at it.  Ten

8    days later on August 24, 1998, Johnston

9    attempted to obtain four nails concealed in a

10   tube of toothpaste.  This was intercepted and he

11   received a misconduct report for this

12   contraband.

13           Johnston was able to escape because

14   he was able to defeat the physical security of

15   the G Block structure.  He did this by gaining

16   access to two implements, both of which were

17   required for this escape to be successful.

18           First, he needed to obtain a

19   screwdriver implement capable of unfastening the

20   screws which held the wire mesh security screen

21   covering the window.  Secondly, he needed to

22   obtain something with which to cut through the

23   bar that subdivided the 12-inch-wide window.

24   Without either one of these items he could not

25   have successfully escaped.

1      While there were other lapses that

2   contributed to his ability to escape, the most

3   fundamental reason why this escape occurred was

4   his access to these items.

5      These items were probably introduced

6   into the facility concealed in legal materials

7   mailed to other inmates, not to Johnston.

8   Johnston himself was found guilty of misconduct

9   a year earlier for attempting to smuggle just

10   such a legal brief with a security screwdriver

11   tip concealed in it to another inmate, perhaps

12   in an effort to begin the escape process then.

13      Our investigation indicates that

14   neither of these items were obtained from

15   facility inventory.  Facility tool control

16   practices were sound and were followed, and the

17   inventory was correct.  A piece of a blade,

18   either from a hacksaw or a mechanical saw, was

19   found near the fence through which Johnston

20   exited the facility, and it wasn't from the

21   facility inventory.  Therefore, we do not

22   believe that these items were introduced into

23   the facility by staff smuggling them in or by

24   theft from facility inventories.

25      Once these items were inside the

1    facility, Johnston utilized one of several
2    methods to get them delivered to him in RHU.  It
3    is possible that other inmates carried these
4    items into the RHU on their persons or concealed
5    in body cavities when they themselves were
6    placed in the RHU.  In addition, other inmates
7    could have delivered items when they entered the
8    RHU to perform work such as cleaning or
9    barbering.
10          More likely, however, Johnston
11   relied on staff.  Officer Ezequiel Ruiz admitted
12   to us that he has been delivering items to
13   inmates in the RHU from general population and
14   between RHU inmates for more than three years.
15   Inmates involved in the delivery of this
16   contraband have corroborated his statement.
17          Office Ruiz admitted that he made
18   numerous deliveries, 12 to 18 of which were made
19   to Johnston while he was confined within the
20   RHU.  He told us he believed that he was
21   delivering coffee, cigarettes or tobacco,
22   written and oral messages, magazines and loose
23   papers, but he admits he never checked.  An
24   inmate from whom he obtained these items has
25   told us that when Johnston's associates wanted

1    to get contraband to Johnston in the RHU they

2    would give it to this inmate, and he gave it to

3    Ruiz for delivery.

4              Officer Ruiz was regularly assigned

5    to work in the RHU.  He often visited even when

6    it was not his assignment.  He denies receiving

7    payments for the delivery, but an inmate has

8    told us that Johnston would give Ruiz 50 dollar

9    bills, quote, just to keep him happy, closed

10   quote.  We have also been told that Ruiz would

11   occasionally provide Johnston with notice of

12   cell searches and remove contraband from

13   Johnston's cell prior to the search.

14             Nurse Wendy Randolph admitted to our

15   investigators that she delivered items from

16   general population inmates to the inmates in the

17   RHU on seven occasions since December 1997,

18   including at least one delivery to Johnston.

19   She told us the deliveries were made in antacid

20   bottles given to her by inmates.  Those bottles

21   contained an inmate number written on the top of

22   the bottle.  She then gave the bottles to the

23   designated RHU inmates.  She believed that these

24   bottles contained coffee, tobacco, or messages.

25   She, too, never checked.

14

1            Inmates in population would approach

2       Nurse Randolph and ask her to deliver items to

3       RHU inmates.  An inmate involved in these

4       deliveries has told us that marijuana was

5       frequently packaged in the antacid bottles given

6       to Nurse Randolph for delivery.  We have been

7       unable to prove conclusively that the specific

8       items used in this escape were conveyed to

9       Johnston by Officer Ruiz or Nurse Randolph.

10           The statute regarding prison

11      contraband and the statute addressing

12      facilitation of escape require that we be able

13      to prove beyond a reasonable doubt that the

14      items were delivered to Johnston by the

15      employee.  For that reason, while we believe

16      this is how Johnston obtained these materials,

17      it may not be possible to obtain a criminal

18      conviction in this matter because we cannot

19      prove which employee actually delivered escape

20      implements to Johnston.

21           A design flaw in the RHU cell window

22      is that the safety mesh window screens, which

23      are designed to prevent the inmates from

24      actually breaking the glass, prevent cell block

25      officers from adequately checking the window bar

15

1    which is behind it and separated from the

2    outside by glass.  The frame of the mesh screen

3    concealed from the view of the officer the

4    uppermost and bottom-most portions of the

5    vertical tubular impost that enabled Johnston to

6    conceal the cuts he made.

7                  We believe that because he had

8    access to a security screwdriver implement,

9    Johnston was able to remove the security screws.

10   This allowed him to take the screen off at

11   night, do his cutting and then return the wire

12   mesh screen to its proper location before

13   daylight.  The security screwdriver implement

14   which we believe he used has never been found.

15                  A small piece of hacksaw blade,

16   approximately two inches in length, was found at

17   the exterior perimeter fence through which

18   Johnston was able to escape by making some 22

19   cuts.  It was a carbide blade different from

20   those used in the facility, but similar to

21   blades that had been found in a typewriter in

22   the chaplain's office in June of this year.

23   Another inmate has been criminally charged with

24   possession of this contraband.  However, prior

25   to the escape no connection was made between

16

1    Inmate Romansky's possession of these blades

2    outside the RHU and Johnston.

3         We believe that by using the

4    security screwdriver implement to remove the

5    wire mesh screen and the hacksaw blade to cut

6    through the seven-eighth inch diameter

7    tool-resistant steel bar in the window, Johnston

8    was able to exit his cell and defeat the

9    physical security of the building.  You can give

10   this to them.  This is a bar that he cut.  He

11   was able to accomplish this because staff

12   allowed themselves to be used by Johnston in

13   violation of Department policy and gave him

14   access to these two necessary items.

15        His cutting of the bars should have

16   been detected during security cell inspections.

17   Department policy mandates that inmate cells be

18   checked weekly and that all security devices

19   such as bars, locks, windows, doors, and alarms

20   be inspected.  The inspections are to be logged

21   and the staff member who conducted the

22   inspection are to be identified in the log.

23   Huntingdon's RHU manual mandates that all cells

24   in the RHU are to be inspected every three days

25   on a regular basis.

17

1          Although the log indicated that the

2      cells were checked for security on a daily basis

3      during the exercise period or every three days

4      when an inmate refused yard, no record was kept

5      regarding who checked the cell.  Huntingdon's

6      records indicate that Johnston's cell was

7      checked on July 19th, 22nd, 23rd, 26th, 29th and

8      30th.  However, the cutting of the bars was not

9      detected.  Although the mesh screen made

10     checking the bar difficult, it was not

11     impossible.  More importantly, a good inspection

12     might have revealed that the screen had been

13     tampered with.

14          Once he exited the building,

15     Johnston gained access to the area containing

16     the individual exercise units formerly utilized

17     for RHU inmates.  The layer upon layer of wire

18     mesh fabric which made up these individual

19     exercise units served to partially obscure the

20     observation of the officer in Tower 3, who

21     should have otherwise been able to observe the

22     building line along which Johnston would have

23     had to move once he exited his cell.

24          Johnston, presumably using the

25     hacksaw blade, was able to cut the interior

18

1    fence on the back of the first individual

2    exercise unit closest to his cell and unravel

3    the fencing.  This gave him access to an area

4    between that inside perimeter fence and the

5    second perimeter fence.  He first turned right

6    and attempted to cut through the exterior

7    perimeter fence, which is 14 feet high and made

8    of higher gauge metal, in an area just under the

9    windows of the RHU.  We found a single cut in

10   this area.  We believe that he moved away from

11   this area because he feared being discovered

12   either by officers making rounds and looking

13   through the windows of the RHU, or by officers

14   in the adjacent parking lot area.

15                    (Power outage occurred)

16                    CHAIRPERSON BIRMELIN:  Recess time

17   is over.  Come on back in off the playground and

18   we'll get started again with the hearing.  I

19   apologize for this.  I guess we have not

20   appropriated enough money to DOC so they could

21   have adequate wiring for their visitor rooms.

22   We're going to do the best we can here.

23                    SECRETARY HORN:  Mr. Chairman, thank

24   you.  I apologize for that, but it is an old

25   facility and was not equipped for this purpose.

19

1    We'll hopefully have full power restored

2    shortly.

3              Following the 1997 escape from SCI

4    Pittsburgh, the Department evaluated all of its

5    perimeters.  As a result of that evaluation, we

6    identified the perimeter here at Huntingdon as

7    vulnerable.  Consequently, in October 1997, a

8    capital budget project in the amount of

9    $7.9 million was requested for security

10   improvements at Huntingdon.  This included the

11   addition of a dual technology perimeter

12   intrusion system on the RHU fence.  Other

13   security enhancements included a perimeter

14   intrusion detection system on the perimeter

15   wall, additional fencing with razor wire, and

16   closed circuit television video surveillance

17   monitoring.

18             An additional $1.6 million was added

19   to the capital project for fiscal '99-2000.  To

20   expedite the project, the Department allocated

21   197,000 in fiscal '98-99 operating funds for

22   perimeter  intrusion  detection  system

23   enhancements and $76,000 for video surveillance.

24   We did this because we felt that the upgrades

25   were too important to wait for the capital

1    budget project.

2            Prior to the escape, Huntingdon had

3    already ordered $197,000 worth of perimeter

4    intrusion detection system enhancements,

5    including a dual detection system around the

6    original wall, the yard and E, F, and G blocks.

7    The contract was awarded prior to the escape,

8    and completion of that project is expected

9    before the end of the year.

10           To attempt this escape Johnston not

11   only had to believe that he could cut through

12   the bars undetected, but also that he could

13   absent himself from the cell for a period of

14   time without detection.

15           Huntingdon's RHU manual requires

16   that all tiers and quadrants be patrolled in

17   such a manner that all inmates in the RHU are

18   personally observed by a correctional officer at

19   least every 30 minutes, but on an irregular

20   schedule.  During the required tier checks, the

21   corrections officers use a Morse watchman punch

22   station system.  This is used to punch in the

23   time an officer performs a tier check.  A record

24   of the punch is maintained.

25           A review of the records of this

1  system revealed disparity among the various

2  officers making the required tours.  Some took

3  as long as 45 minutes to complete the check and

4  another was completed within seven minutes.

5  Despite the fact that policy requires that these

6  tours be conducted at least every 30 minutes,

7  there were several officers who did not meet

8  this standard, and in one case the interval was

9  70 minutes.

10            Department of Corrections' policy

11  requires that officers see flesh or movement for

12  an inmate to be recorded as present during a

13  count.  Huntingdon's local policy requires

14  inmate counts at 1 a.m., 5 a.m., 10 a.m., 4 p.m.

15  and 9:15 p.m. daily.  And while facility policy

16  and the Department policy require inmates to

17  stand for the 10 a.m., 4 p.m. and 9:15 p.m.

18  counts, Huntingdon's RHU manual only requires

19  the inmates to stand for the 10 a.m. count.

20  More importantly, we have subsequently learned

21  that it was the practice of officers in the RHU

22  not to require inmates to stand even for the

23  10 a.m. count.

24            It is clear from the events of

25  August 2, 1999 that the 5 a.m. and 10 a.m.

22

1    counts were faulty.  No flesh or movement could

2    have been observed from Johnston.  Yet, Officer

3    Corley recorded him as present for the 5 a.m.

4    count and Officer Tress recorded him as present

5    for the 10 a.m. count.

6              Subsequent investigation also

7    revealed that, despite facility policy

8    prohibiting inmates from affixing anything to

9    lights, cell walls or windows, numerous lights

10   had been altered by the inmates by covering the

11   lights, resulting in dark cells, making

12   inspection difficult.  Security inspections

13   should have addressed this violation and

14   required maintenance to make repairs.  However,

15   this was not done.

16              RHU staff also breached RHU

17   in-processing policies.  Huntingdon's RHU manual

18   requires a thorough search of every cell prior

19   to placing an inmate in that cell, and further

20   requires that the condition of the cells be

21   recorded on a cell condition form.  RHU staff

22   failed to follow this policy.  Inmates were

23   placed into cells without the cells being

24   searched in advance, and there was poor

25   documentation.  Consequently, it cannot be

23

1    determined exactly when the last search of

2    Johnston's cell was conducted.

3                Following the escape, we determined

4    that Johnston possessed an excessive number of

5    items in clear violation of policy.  This

6    occurred despite the fact that there was a

7    search of the entire facility, including the

8    RHU, on December 21, 1998, and an RHU shakedown

9    conducted on March 13, 1999.

10               Had these inspections and searches

11   been conducted as required, and had the staff

12   performing them performed them in an adequate

13   fashion, the compromise of the wire mesh screen

14   and cell bar should have been detected prior to

15   the escape.

16               More importantly, however, without

17   the ability to import the hacksaw blade and

18   security screw implement into the RHU, Johnston

19   would not have been able to escape.  Had the

20   officers on the block been making tier checks in

21   an acceptable fashion and conducting the count

22   in accordance with Department policy, his escape

23   certainly would have been discovered far earlier

24   than it was.  Had his cell been properly

25   searched and inspected, this escape could have

24

1      been prevented.  That these practices were

2      allowed to erode is the responsibility of middle

3      and upper management.

4                 We must accept the physical

5      realities of the facility in which we inherit.

6      The Department recognized the weaknesses in the

7      Huntingdon perimeter and took reasonable and

8      prudent steps to correct them.  Could the

9      Department have moved more quickly?  Certainly,

10     in hindsight, I believe we should have.

11     Nonetheless, our decision to use operating funds

12     rather than capital monies indicates the urgency

13     which we assign to improving the Huntingdon

14     perimeter.

15                 No doubt there was also an

16     intelligence failure of major proportions at

17     Huntingdon which allowed this escape to occur.

18     No connection was made between the discovery of

19     hacksaw blades in the facility chapel several

20     months earlier and the August 1998 discovery of

21     a security screwdriver tip in a legal brief and

22     concerns raised by the union at labor management

23     meetings about screws on security screens being

24     tampered with in the RHU.

25                 Moreover, staff admitted passing

25

1    items to inmates on perhaps as many as 300

2    occasions, 18 of them to Johnston, and at least

3    half a dozen other inmates knew of and

4    participated in this network.  This should have

5    been revealed through good investigation by the

6    facility security office.  We must, however,

7    acknowledge that in the last several years the

8    workload of facility security offices has

9    increased substantially.  We are reevaluating

10   the staffing in these units.

11             Escapes occur when multiple systems

12   break down and multiple members of staff fail to

13   perform their duties in the prescribed fashion.

14   This is what happened here.  No single system

15   effectively guards against escape and no

16   multiple systems are entirely foolproof.  The

17   escape-proof prison has yet to be built.

18             While we cannot prevent all escapes,

19   our Department is in the business of reducing

20   the possibility that an escape will occur, and

21   we do that by layer upon layer of redundancy.

22   The perimeter is our last line of defense.  Good

23   prison security begins inside the facility.

24   This escape occurred primarily because staff

25   compromised their integrity, but it also

1    occurred because of the failure of physical

2    barriers and lax attitudes and complacency on

3    the part of staff beginning well inside the

4    perimeter.  This was exploited by a dangerous,

5    devious and intelligent inmate.

6            We have expedited the installation

7    of video surveillance cameras.  We have posted

8    additional foot patrols around the RHU.  We are

9    spending substantial overtime here and elsewhere

10   to address all physical plant shortcomings, and,

11   while cost should not be determinative where

12   public safety is concerned, the total cost of

13   operating a corrections system is a matter of

14   concern to all of us.  We must consider other

15   solutions.

16           Our systems are only as good as the

17   people who observe the inmates, the people who

18   maintain the facility, and the people who

19   supervise the staff within these prisons.  We

20   have a sound training program, but we have to

21   recognize that these jobs are tedious and

22   oftentimes unpleasant.  Staff sometimes lose

23   their focus.  The challenge to prison

24   administrators is to continually energize our

25   staff, to help them to understand the importance

1    of what they do no matter how repetitive and

2    mundane it may seem.

3    The public should recognize that

4    escape happens rarely.  The statistics are

5    clear.  This was the first successful escape

6    from this prison in ten years.  Compared to

7    comparable states, Pennsylvania has far fewer

8    escapes.  Our goal is to have no escapes.  The

9    public should be confident that the system is

10   overwhelmingly operated by conscientious men and

11   women who are alert and vigilant and have public

12   safety first in their minds.

13   Throughout this last year I have

14   said repeatedly, including before this body, how

15   proud I am of the 13,000 men and women of the

16   Department of Corrections.  Most of them perform

17   extraordinary tasks under trying circumstances

18   for little recognition day in and day out.

19   It is not my purpose here today to

20   make excuses.  Rather, I have tried to lay out

21   the facts to you as we know them, to share with

22   you my conclusions about why this escape

23   occurred, and to outline steps we have already

24   taken to prevent future escapes.

25   On behalf of the 13,000 men and

28

1    women of the Department of Corrections, I

2    apologize to the citizens of Huntingdon, as well

3    as to the communities in southeastern

4    Pennsylvania who were traumatized by Johnston's

5    return to their communities.  With the support

6    of the Governor and the General Assembly, we

7    will continue to strive to improve the security

8    of our prisons and prevent events such as this

9    from occurring again.  Thank you.

10        CHAIRPERSON BIRMELIN:  Thank you,

11   Secretary Horn.  I have a few questions for you.

12   And before I ask my questions, I want to share

13   with the committee members who are seated here

14   with me a couple of ground rules, if I could.

15   We've lost 20 minutes because of the power

16   outage, so I'll certainly keep that in mind as

17   we try to keep to the schedule that we have.

18        I would ask the members to make sure

19   that the questions that they ask are questions

20   that were not in writing and presented to them

21   so that we're not asking for information we've

22   already received.  I'll also ask the members to

23   indicate to me ahead of time whether or not they

24   have any questions so that I don't have to ask

25   each of you if you have questions.

29

1          And thirdly, I would ask the members

2     to make sure that their questions are to the

3     point and to the issues that are before us and

4     not straying off into subjects that may have

5     very little to do with this particular subject

6     at hand.  All that having been said, let me ask

7     you a couple questions, if I could, Secretary

8     Horn.

9          In the opening page of your

10    statement, your first sub-point says that

11    certain staff in violation of clear Department

12    policy allowed themselves to be used by this

13    inmate.  Are you referring only to the two who

14    are mentioned, Ruiz and the Randolph woman, or

15    are you referring to others?

16          SECRETARY HORN:  Yes, just those two

17    at this point.

18          CHAIRPERSON BIRMELIN:  The people

19    who normally occupy RHU, is that a

20    representative sample of the prison population

21    as a whole in terms of what level prisoners they

22    are and/or their racial makeup?

23          SECRETARY HORN:  Yes.

24          CHAIRPERSON BIRMELIN:  In this

25    prison I believe it's somewhere in the

30

1      neighborhood of

2      60 percent minorities; is that correct?

3                SECRETARY HORN:  Yes.

4                CHAIRPERSON BIRMELIN:  One of the

5      suggestions that was made to me was that part of

6      the problem may have been that the -- And I'm

7      not giving this any credence and I'm not denying

8      it.  I'm saying that part of the problem may be

9      that the RHU COs are primarily white and you

10     have a 60 percent or higher RHU population that

11     is black.  And that sometimes the officers are

12     more suspicious of and more carefully watching

13     those who are black as opposed to those who are

14     white, who they may feel some more infinity or

15     kinship to.

16                Is that a credible, at least a

17     factor in why Johnston may not have been given

18     the scrutiny that he should have been given?

19                SECRETARY HORN:  I don't think that

20     there's evidence to indicate that that's the

21     case.

22                CHAIRPERSON BIRMELIN:  Okay.  One of

23     the things that you did not comment on is the

24     fact that, I believe it's you and the Governor,

25     have agreed to formulate a committee outside of

31

1    DOC, people from other states, as a matter of

2    fact, who are doing an intensive evaluation of

3    all of our security in all of our prisons in

4    Pennsylvania.

5         Could you just give us a brief

6    comment as to where we are in that process, and

7    if it's true that -- what you're looking for

8    from them?

9         SECRETARY HORN:  Yes.  I asked that

10   the president of the American Correctional

11   Association, Richard Stalder, who is the

12   Secretary of Public Safety for the State of

13   Louisiana, name the panel so that it would not

14   be named by myself.  The panel is made up of

15   Lane McCotter, who has a distinguished career.

16   He was the warden of the United States Military

17   Disciplinary Barracks at Fort Lebanworth,

18   Kansas; Director of Corrections in New Mexico,

19   Texas, Utah.  He's chairing the panel.

20        . The other members are Larry Dubois,

21   the former Director of Corrections in the State

22   of Massachusetts, and previous to that, a career

23   employee of the Federal Bureau of Prisons; Bob

24   Brown, who for six years was the Director of

25   Corrections in Michigan; and Steve Puckett, who

32

1    was previously Commissioner of Corrections in

2    the State of Mississippi and before that the

3    warden at Parchment Prison.

4              They will be visiting 12 of our 24

5    prisons.  They will visit all of the maximum

6    security prisons.  They will visit several of

7    the prototypicals.  They have been asked, first

8    of all, to look at these two escapes, the

9    Huntingdon escape and the Daniel McCloskey

10   escape from Dallas, and determine whether they

11   occurred because of substantial systemic

12   problems in the Department or isolated

13   occurrences.  They've also been asked to look at

14   the fundamental security practices of our

15   Department and evaluate them.

16             They are visiting these facilities.

17   They are meeting individually, with no Central

18   Office staff present, with the superintendent,

19   the staff of those facilities, union

20   representatives and at each facility five

21   inmates chosen at random in private.  They are

22   inspecting those facilities.  They are reviewing

23   our policies.  They're going to be reviewing our

24   staff training.

25             They will be submitting a report to

1    me and to the Governor not later than January

2    31st.  Their contract does provide that at the

3    direction of the Governor they will appear

4    before or meet with legislative committees once

5    the Governor has had a chance to review their

6    findings, so we hope to have that process

7    complete.

8            They're in their second week of

9    visits.  They completed one week in which they

10   visited, I believe four facilities.  They're

11   visiting four additional facilities this week,

12   and then they're coming back in November to

13   visit four other facilities.

14           CHAIRPERSON BIRMELIN:  Thank you.

15   We are currently in the House District of

16   Representative Larry Sather, who is not on the

17   Judiciary Committee but who we have invited and

18   asked to be a part of the hearings that we have

19   here because it resides in his district.  I'm

20   going to begin the questioning with letting

21   Representative Sather ask his.

22           REPRESENTATIVE SATHER:  Thank you,

23   Mr. Chairman.  I have many questions, but I'm

24   not going to due to the good panel here.

25           The most common asked question of me

34

1    from my constituents, the period of time from

2    the escape until that was acknowledged by this

3    prison community, you have testified here about

4    some of that.  But again, this flesh or

5    movement, is that prescribed or is that designed

6    because of concerns others have raised about

7    unfair treatment of actually walking into a cell

8    and making sure somebody is there?

9              What's driving this?  And can you

10    elaborate in a few words why, in your opinion

11    and others' opinions, what you have been able to

12    gather thus far, why it took so long?

13              SECRETARY HORN:  That is an issue in

14    which we are always attempting to strike a

15    balance.  It is not ever our purpose to do

16    things for the purpose of inconveniencing

17    inmates or going out of our way to make life

18    miserable, and over the years accommodations get

19    made.

20              So, for example, since 1989 the

21    Department had a policy that there would be --

22    You can do a count by requiring the inmate to

23    stand up or sit up so that you can see for sure

24    that it's him or her and that they're there.

25    Or, if the inmate is lying down, you say the

35

1    officer has to at least see flesh or movement.

2    And for years the policy of the Department was

3    not to require a standing count prior to 7 a.m.

4    in the morning to allow the inmates to sleep in.

5    An argument could be made that that's a

6    reasonable thing to do.

7              We have since changed the policy, so

8    now there is a count prior to the facility

9    opening up to serve its breakfast meal, which

10   means we're doing a count at around six in the

11   morning.

12             REPRESENTATIVE SATHER:  When did

13   that take place?  When did you --

14             SECRETARY HORN:  We instituted that

15   -- we changed that policy after this escape

16   because we were basically going from 10 o'clock

17   at night until sometime after 7 a.m. without a

18   standing count.

19             The requirement for flesh or

20   movement has been Department policy of long

21   duration.  Officers are trained when they come

22   to our training academy that that is the

23   requirement when doing a count, and it's part of

24   the ongoing training which they receive as part

25   of their in-service training program each year.

1          In this case, and I can pass around

2    for you copies of the officers' -- The two

3    counts that are in question here are the 5 a.m.

4    count.  Prior to 5 a.m. there were supposed to

5    have been tier checks, and those are not

6    technically counts.  While I believe that had

7    they been done properly, that the officers

8    should have seen Johnston playing around with

9    the security mesh screen, trying to get through

10   the window -- This didn't just happen in the

11   blink of an eye, and had they been made, I think

12   it would have been more difficult.  He counted

13   on the fact that those tier checks were not

14   being made or the intervals were longer than

15   they should have been.

16          But, the 5 a.m. count, I believe,

17   should have been a flesh or movement count.  By

18   policy it was a flesh or movement count.  It

19   should have seen Johnston there.  Now, while

20   Johnston had a dummy, and it was a good dummy,

21   it was not flesh or movement.  Had that count

22   been done properly, we would have known that he

23   was gone a good five, five and a half hours

24   sooner than we did.

25          And even the 10 a.m. count, which

37

1  was supposed to be a standing count, was not

2  done properly. The reason for that was that,

3  historically, the inmates in the RHU refuse to

4  stand for the count, and once the inmate's in

5  the RHU, there's not a whole lot more you can

6  do. You can keep giving him paper, you can put

7  misconducts on him. For many of the inmates

8  they prefer to be in the RHU. For some inmates

9  it's a safer place to be. So, what do you do if

10 they don't stand?

11        And I think that over time, and with

12 the knowledge of middle management certainly,

13 the practice had become that they weren't

14 requiring the inmates to stand for the 10 a.m.

15 counts. So, again, we would have discovered his

16 absence sooner than we did. We discovered it at

17 about 10:30 a.m, but it should have clearly have

18 been discovered at 5 a.m.

19        I can pass around for the

20 committee's view, pictures looking into the cell

21 and a picture of the dummy. It was a good

22 dummy. There was human hair on it. The

23 officers believed that they saw a live human

24 being in that cell. It was not flesh. There

25 was no movement.

1          REPRESENTATIVE SATHER:   Thank you in

2     that regard.   This one I hope we can shorten the

3     answer because I know how tied we are, but I

4     have heard from individuals inside who are COs

5     here that Johnston was to be moved by you or the

6     superintendent and he refused to be moved, and

7     had that taken place maybe this would not have

8     gone down.

9          SECRETARY HORN:   Several weeks prior

10    to the escape, Johnston's status was to be

11    changed and he was scheduled not to be moved

12    from the facility, but he was supposed to be

13    moved to a different cell.

14          Occasionally, inmates refuse to move

15    and when they do that we use force.   As I

16    understand the situation, the RHU lieutenant

17    made a judgment call.   Rather than using force

18    and running the risk that Johnston would be

19    injured or that staff would be injured  -- Now,

20    I don't think the likelihood of staff being

21    injured is great because we do equip our staff

22    well.   We use a sufficient number of staff, and

23    we're pretty good at doing these cell

24    extractions.

25          But, nonetheless, the lieutenant

1    made a discretionary decision not to move

2    Johnston from the cell since the change would

3    have not resulted in him moving to a different

4    section.  He was moving from administrative

5    custody to disciplinary custody.  He was going

6    to remain in the RHU anyway.

7                I think that, certainly, he would

8    have made an appropriate decision if he had

9    chosen to move him, but I can't fault him for

10   choosing not to move him and avoiding the risk

11   of injury.  However, having made the decision

12   not to move him, I believe that common sense and

13   good judgment should have caused an alarm to go

14   off in his head to say, why isn't this inmate

15   willing to move, and caused him to force the

16   issue of at least searching the cell more

17   thoroughly, and I think there was a failure of

18   judgment in that case.

19                REPRESENTATIVE SATHER:  Thank you.

20                CHAIRPERSON BIRMELIN:  My

21   counterpart on the Democratic side of this

22   committee is Representative Harold James from

23   Philadelphia.  He was a little bit late in

24   arriving and did not get a chance to introduce

25   himself.  So I'll introduce him and also give

1    him the opportunity to ask questions at this

2    time.

3             REPRESENTATIVE JAMES:  Thank, Mr.

4    Chairman, and thank you, Commissioner, for

5    testifying.  Commissioner, I just want to

6    commend you for -- I think that you acted

7    properly in terms of responding to this

8    situation.  I know that either -- I think right

9    after we were going to visit another institution

10    and you were right there, and we thought that

11    you would not be able to make it but you were

12    there and you -- I think that you took the

13    responsibility that was needed and addressed it

14    in a manner which I think was appropriate.

15             One of the things that came out of

16    the escape, and I had indicated that I thought

17    that staff might have been involved, and I know

18    during these investigations you found that to be

19    true.  I just think that from what I've seen

20    that it probably involves more than just the two

21    staff people that have been identified, and

22    that, of course, will come out in the

23    investigation.  It just appears that it has to

24    be more people involved in this kind of a

25    situation.

41

1        Do you think in terms of addressing

2    that, that there is a possibility of when

3    certain people work in the same area, the same

4    place over a certain length of time, that either

5    transferring or assignments could be -- help in

6    term of alleviating some of this or transferring

7    from other institutions?  Has that been

8    considered?

9        SECRETARY HORN:  We've certainly

10    considered that.  I think certainly with respect

11    to some posts there is definitely a good

12    argument to be made for rotation at least within

13    the facility.  The jobs do become tedious.  I

14    think standing in a tower eight hours a day, day

15    after day, after awhile one loses one's focus.

16        I think that with respect to the

17    officers who work in cell blocks, there are two

18    sides to that argument.  There are those who

19    would argue that what you lose is, officers get

20    to know their inmates and they know whose who

21    and what's what.  They get to know -- they know

22    what the life of the organism is, so they know

23    when something's amiss, so there are two sides.

24        I also think that it's probably

25    unrealistic and impractical to talk about

1    transferring officers around from institution to

2    institution.  The distances are great.  It would

3    be terribly unfair to families and would make

4    the job even more unattractive than it is.

5            REPRESENTATIVE JAMES:  Well, I

6    wouldn't go that far, you know, like from

7    Pittsburgh to Philadelphia, but I'll just say

8    like you have Smithfield and you have here, you

9    know, officers back and forth to institutions

10   with that kind of closeness.

11           SECRETARY HORN:  That's something we

12   would certainly have to negotiate.  I think that

13   would be covered under the collective bargaining

14   agreement.  That would be a term and condition

15   of employment that I think would have to be

16   negotiated by the state, and I suspect that it

17   would not be something easily accomplished.

18           REPRESENTATIVE JAMES:  Probably not.

19   I mean, change is always hard to take until you

20   do it and find out that it works out or it

21   doesn't work out.  But anyway, thanks for the

22   response.

23           The other response, I noticed that

24   in the escape here it always seems that the

25   inmate becomes real -- or that the staff becomes

43

1      real satisfied with the inmate.  They become

2      cozy and it seems that then something happens

3      and that seemed to happen like in the Pittsburgh

4      escape; you know, that the staff became -- you

5      know, it became routine.  They trusted with a

6      certain gain and then something happened.

7                  I would just -- And I appreciate the

8      question that the Chairman asked earlier.  It

9      seems that minorities are not in enough

10     policy-making positions within the institution.

11     I notice I don't see any here, and I just wonder

12     if there's any kind of effort on the part of the

13     administration to try to increase minority

14     policy makers in the institutions?

15                 SECRETARY HORN:  Yes.  And let me

16     just say that, I think that while we believe

17     clearly Ruiz and Randolph were too close or

18     over-identified with the inmate, in fact, others

19     within the facility clearly were not close to

20     Johnston and were doing everything to keep their

21     thumb on him.

22                 I think that we need to have a

23     diverse work force at all levels of the

24     Department, and we have tried very hard to do

25     that.  The facilities are where the facilities

1    are.  They are in communities where there are

2    not large representations of minority group

3    members in the general population, and it is

4    very difficult for us to recruit people from

5    cultural minorities and ethnic minorities to

6    relocate from the state's urban centers to these

7    areas.

8           Our Department has tried very hard

9    to increase minority representation at all

10   levels.  We've expanded our recruiting.  We've

11   changed the way we do testing.  It used to be

12   that if we had openings for positions here in

13   Huntingdon, we would give the test in the

14   Huntingdon area.  We now give the test statewide

15   in Philadelphia, in Harrisburg, in Pittsburgh,

16   in Altoona, throughout the state, and we

17   advertise that there are openings in Huntingdon,

18   and we encourage people to try to relocate where

19   these jobs are.

20           Additionally, we recruit in

21   predominantly minority colleges.  We attend job

22   fairs in minority areas.  More importantly, as

23   you know, we have provided recruiting material

24   to every member of the Black Caucus and asked

25   them to distribute it to their constituents in

45

their neighborhoods.  We advertise in the
Philadelphia Tribune and in the Sun and in the
Courier in Pittsburgh.  We advertise in
Hispanic, in Spanish-language newspapers.  We
are doing everything that we know how to do
within the state's system to recruit minorities.
It is a struggle and we need help.

REPRESENTATIVE JAMES:  Well, we
would like to offer you the help and I would
hope that you would talk to some of us
legislators in terms of trying to extend that
outreach, but I think that we can help on that
if we work together at it.

The final question is that, Johnston
going into the RHU unit, it appears that you
think that he possibly may have known of the
fact that you were getting this equipment
because of his relationship with some of the
staff people and that this was ordered?  Then
all of a sudden he had to do this by a certain
time or period.  Has that been checked?

SECRETARY HORN:  Well, I think, in
fact, it was public knowledge that we were
installing the perimeter system enhancements.
As you know, it's not uncommon when an

1    appropriation gets made in a legislative

2    district for a press release to be issued and

3    for it to appear in the local newspapers and on

4    the local TV.  So the fact that there was a nine

5    million dollar appropriation for perimeter

6    security enhancements at SCI-Huntingdon was

7    public knowledge.

8            REPRESENTATIVE JAMES:  All right.

9    Thank you.  And for the sake of time I'm not

10    going to ask you anymore questions.  I'd just

11    like to ask the Chairman's permission that we

12    can, you know, continue our communications if

13    any questions arise that we can share.

14            SECRETARY HORN:  Certainly, sir.

15            CHAIRPERSON BIRMELIN:

16    Representative Josephs.

17            REPRESENTATIVE JOSEPHS:  Thank you,

18    Mr. Chairman.  Thank you, Mr. Secretary.

19            We just had a power outage here.

20    We're in the prison, we're in the visitors'

21    room.  Can you tell us what happened -- and it

22    was for about 20 minutes, as our Chairman just

23    indicated.  Can you tell us what happened in the

24    rest of the prison?  It concerns me because, I

25    understand that all of this perimeter security

47

1      and other security you're talking about is

2      electrically powered; is it not?

3                    SECRETARY HORN:  That's correct.

4      What happened was that a single breaker that

5      affects this side of this room burnt out because

6      it's not built for all the circuitry, all the

7      drain that the cameras and the microphones and

8      so on require.  The rest of the facility

9      continued to operate.  So it was just like

10     blowing a fuse in a section of your own home.

11                   The facility -- In fact, all of our

12     facilities have back-up generators that are

13     interconnected to the facility's electrical

14     system and geared to kick in automatically if

15     there is a power outage, and those generators

16     are supposed to be checked, I believe, every

17     week and every month under load; that is, to try

18     and run the facility fully.

19                   But, it's absolutely true, and among

20     our capital project requests, not at Huntingdon

21     but at other facilities, our requests to

22     upgrade electrical systems because, unless you

23     invest in that electrical infrastructure what

24     good are all these technological systems?

25                   REPRESENTATIVE JOSEPHS:  Speaking of

48

1    the technology, I was surprised coming here to

2    see how close homes are to the prison.  None of

3    the other places that I have been in

4    Pennsylvania have we had this set up.  Are any

5    of these systems every tripped by civilians or

6    by, for instance, by kids, teenagers or other

7    kids running around in this area close to the

8    perimeters?

9              SECRETARY HORN:  They're more often

10    tripped by animals, birds, sometimes by strong

11    winds.  I think that members of the community by

12    and large know to stay away.

13              Also, the intrusion systems

14    typically are on the interior perimeter fencing;

15    not on the exterior perimeter fencing, so it

16    would not -- Although some of the systems that

17    we're putting in, we're going to have systems on

18    both in some of the new systems that we're

19    putting in.

20              REPRESENTATIVE JOSEPHS:  If the

21    system is tripped by some wildlife, let's say,

22    or perhaps some nuisance animals that live here,

23    I'm sure they do because they live every place,

24    what's the response?  Is there a policy on how

25    you respond to that?

49

1              SECRETARY HORN:  Where we have

2    electronic intrusion systems we respond to every

3    alarm and investigate it and reset the system.

4    So, where we have these systems there is a

5    mobile perimeter vehicle that travels around.

6    Typically, that vehicle has what we refer to as

7    an annunciator board in it that has a map of the

8    facility and a light that shows up showing the

9    zone where the intrusion occurs and they respond

10    to that zone, and they investigate and try and

11    determine the reason for it.

12              One of the things that you try to

13    balance in these systems is the sensitivity.

14    You don't want it to be so sensitive that every

15    sparrow that lands on it sets it off.  But on

16    the other hand, you want it to be sensitive

17    enough that if a small inmate tries to climb it

18    that it will go off.

19              The more false alarms you have, the

20    more staff become themselves desensitized.  They

21    say, oh, it's a sparrow again.  So you're always

22    trying to achieve that balance.

23              Electronic systems will never

24    substitute for the human element.  I also think

25    one of the things we've learned is that, you --

50

 1        and this is something we've started to do, you

 2        need to integrate video surveillance.  If you

 3        have a camera system, a video camera you can

 4        very quickly focus that video camera, they move

 5        around, and focus right in on the area where the

 6        intrusion is and immediately determine whether

 7        it's a true intrusion.  And typically, you can

 8        respond with a camera far faster than a vehicle

 9        can respond.

10                    REPRESENTATIVE JOSEPHS:  I take your

11        more true -- the mark that I respond to more

12        than the talk of video camera is the fact that

13        systems don't really create the security.  It's

14        the personnel and the policy and the way people

15        respond to it.  We looked into a cell.  I mean,

16        it could have been an eye or a video camera and

17        we still had a problem.  So I agree with you

18        entirely that it has to do with the human

19        element, and that you could have a system that

20        was not safe at all with all of this electronic.

21                    I'm interested in policy that has to

22        do with the fact that, according to your

23        testimony, about a year before this present

24        escape, Johnston was found twice within the

25        month of August with implements which would

1    indicate clearly to anybody that he was well

2    into planning some kind of escape.

3              What policy is there with treating

4    such a person like that, and if there is policy,

5    how was that followed or not followed?

6              SECRETARY HORN:  Well, where we have

7    an inmate who is an escape risk, our response is

8    to place him in administrative custody,

9    irrespective of whether he's committed a

10   misconduct violation, which puts him in what you

11   refer to as the hole or solitary confinement,

12   which we've heard so many complaints about, and

13   we keep him there as long as we consider him to

14   be an escape risk.  And that was one of the

15   reasons why Johnston, in fact, spent 900 days

16   total in RHU throughout the time he's been with

17   us, nearly three years; not consecutively.

18             When in RHU status, his cell is

19   supposed to be checked every three days.  He is

20   not taken out of his cell except in handcuffs,

21   always under escort by two officers.  He

22   exercises individually.  He only gets visits

23   through  noncontact  visiting.  So,  his

24   opportunities to escape are very, very severely

25   limited in that situation, and that was the case

1    here.

2              What no one anticipates or expects

3    is that, he can actually defeat the physical

4    security of a poured concrete building with

5    steel bars and go undetected.  He didn't achieve

6    that compromise of the physical security in that

7    cell block overnight.  It happened over a period

8    of weeks.

9              REPRESENTATIVE JOSEPHS:  Clearly.

10   He had a car.  He left here in a car.  The car,

11   as I remember from press reports, it almost

12   sounded to me as if it was sitting there waiting

13   for him.  Are we -- Is anybody investigating

14   that part of this escape?  Do we have any

15   conclusions you can make public?

16             SECRETARY HORN:  I don't investigate

17   what happens after he gets out.  You'll be

18   hearing from the State Police and from the

19   District Attorney, and I'm sure they have

20   investigated that and I think they're in a

21   better position to comment on that.

22             REPRESENTATIVE JOSEPHS:  Okay.  I

23   have one -- just one more question.  We saw here

24   this elaborate device to bring an illegal drug

25   into the system.  It's a drug that has a pretty

1    distinctive odor if it's used.  If it was used

2    in this system, how is it that nobody smelled

3    it, do you think?

4                    SECRETARY HORN:  Oh, well.  Listen,

5    we find drugs lots of times.  Remember, we found

6    that one.  The one you saw was the one that we

7    found and intercepted.  The one that may have

8    gotten into Johnston might not have contained

9    the drugs.  It might have only contained the

10   screwdriver implement or the hacksaw.

11                   We use K-9 teams.  We use the Ion

12   (phonetic) scan, but I only have eight or nine

13   dogs for the whole system of 24 prisons.

14                   REPRESENTATIVE JOSEPHS:  People can

15   smell this drug when it's used.

16                   SECRETARY HORN:  Yes, and our

17   officers are trained in drug identification.

18   But again -- And you were in the cell block

19   yesterday.  At night when the inmates are locked

20   in their cells and the officers are in the

21   patrol room, there's no officer in that area and

22   the smell can dissipate.  But certainly,

23   marijuana has a distinct smell.

24                   I will tell you, however, that in

25   our Department we do more testing and searching

54

1 for drugs than just about any corrections

2 department in the country.  We did a study in

3 1995 with the National Institute of Justice that

4 found that on a random testing basis, using hair

5 samples, nearly eight percent of the inmates who

6 were tested tested positive.

7    We replicated that study in 1997 and

8 found that we had reduced that through our drug

9 interdiction efforts to almost one percent.  We

10 now do nearly 6,000 random urine samples every

11 month on inmates.  Over a hundred thousand tests

12 a year are performed, both random and targeted.

13    On the random testing, which is a

14 very good measure of the extent of drug use

15 among inmates, in the last year there has never

16 been more than eight-tenths of one percent

17 testing positive, and the most recent month only

18 fourth-tenths of one percent tested positive.

19 And everyone that I have heard from and every

20 person who has talked to inmates will tell you

21 that we have made it very, very -- much more

22 difficult for inmates to obtain drugs in our

23 prisons, but I've always said, there will always

24 be a certain amount leaking in.

25    But I think that in Pennsylvania we

1    should feel very good, and you've given us the

2    tools.   The General Assembly has given us the

3    tools with telephone monitoring, statutes in

4    increasing the penalty for people who bring

5    contraband drugs into prisons, to wage that

6    fight and it is that one we have waged

7    successfully.

8                    REPRESENTATIVE JOSEPHS:   Thank you.

9    Thank you, Mr. Chairman.

10                   CHAIRPERSON BIRMELIN:

11   Representative Walko.

12                   REPRESENTATIVE WALKO:   Thank you,

13   Mr. Chairman.   Secretary Horn, in the -- For the

14   report on capacity in the prisons and crowding

15   as of September 30, 1999 indicates that our

16   system is at 145 percent of capacity.   I

17   understand there are 1800 inmates here and I was

18   wondering about the capacity level here.

19                   And the larger question is, is the

20   fact that by those statistics our prison system

21   is overcrowded, is that causing -- is that

22   leading to tension and problems relating to

23   these escapes; this escape, and perhaps, the

24   other one at Dallas?

25                   SECRETARY HORN:   On the day of the

56

1       escape there were 1,868 inmates here and the

2       prison capacity is 1,274.  The prison was

3       46.6 percent over its designed capacity.

4       Obviously, every prison administrator would like

5       to run a system that is operating at less than a

6       hundred percent.  You'd always like to have a

7       little bit of margin.  And clearly, the number

8       of inmates creates strains.

9              It reduces our options for moving

10      inmates.  It requires us to house two inmates in

11      a cell.  It causes the state, the Commonwealth

12      to do things as it had to do in 1991, such as

13      building a housing unit like G Block and there

14      was no place to put it inside so it got built

15      outside.  It causes us to make some of the

16      changes that we've made at the other prisons.

17      Clearly, I would prefer to run a system that was

18      less crowded.

19             REPRESENTATIVE WALKO:  And also

20      relating to that issue and also tension in the

21      prison system, do you believe that the current

22      policy regarding parole is hurting or adding too

23      much tension to our system and even giving more

24      incentive to inmates to attempt escapes, and

25      Lord knows how many escapes are attempted that

don't occur.  Do you think that our policy on

pardons; in other words, slamming the door shut,

is affecting your ability to run this system?

          SECRETARY HORN:  That's a difficult

question to answer, Mr. Walko.  One way of

looking at it is that, the inmates who escape

have hope.  Johnston was a guy who had a lot of

hope.

          But I think, you know -- One of the

things you need to keep in mind, Pennsylvania

has the largest number of inmates serving a

sentence of life without parole of any state in

the union.  I think that's a very little known

fact.  We've got more -- You know, everybody

thinks that the southern states, Texas, Florida

have these -- In fact, the numeric number -- I'm

not talking about a percentage.  The absolute

number, we have the largest number of lifers.

Now, that's been true in Pennsylvania for many

years.  That didn't start today.  That's always

been the case.

          And even before the frequency with

which pardons were granted changed, it was not

something that happened frequently.  I mean,

even in the best year, maybe eight inmates got a

1      pardon.  So there were always -- and there were

2      always inmates who knew that it was never going

3      to be them who got those pardons.

4                  An inmate serving a life term, and

5      in this case, and in the case of at least one of

6      the two inmates at Dallas and in the case at

7      Pittsburgh, the inmates are often lifers.  When

8      a lifer escapes, he doesn't have a whole lot to

9      lose.  As long as he doesn't kill someone,

10     however long he's out, ten days, two weeks,

11     three days, he's got a little vacation, comes

12     back, goes back to serving life.

13                  REPRESENTATIVE WALKO:  Regarding the

14     count, what happened here it seems like there

15     were a number of policies and procedures not

16     being followed it's clear.  I was wondering on a

17     system-wide level from the perspective of the

18     central administration at Camp Hill, what is

19     being done to ensure that the systems are

20     operating?  In other words, ensure that people

21     are looking at flesh or movement; ensure that

22     they're looking at bars, and ensure that if

23     there are screens with broken screws that there

24     is some follow-up.  And I believe there are 23

25     institutions in Pennsylvania or 24.

59

1          SECRETARY HORN:  Twenty-four.

2          REPRESENTATIVE WALKO:  And I just

3    wonder from the central administration point of

4    view on down to the prison floor, what is being

5    done to make sure that these procedures are

6    being followed?  It seems like it's their

7    failure to be -- the lack of them being followed

8    that has led to this escape and, perhaps, to

9    some degree at Pittsburgh and others.

10         SECRETARY HORN:  Mr. Walko, you no

11   doubt have heard of the so-called Hawthorne

12   effect, that when workers are on a production

13   line are observed they tend to work better and

14   you don't get a good sample.

15         In fact, in Pennsylvania we do a

16   great deal of auditing and checking and

17   inspecting of our facilities far more in recent

18   years.  Let me give you some examples.

19         First of all, I receive every week a

20   report from every institution from every

21   superintendent, and I brought along a copy of it

22   and it's summarized.  You can just pass this

23   around and you can page through that first

24   thing.  Certification from every facility

25   superintendent every week that they are in

1    compliance with every policy, with Megan's Law,

2    with the DNA rules.  They report on the number

3    of searches that are performed.  They report on

4    the number of telephone calls that are

5    monitored.  That is received and reviewed by

6    myself and my deputies weekly.

7            My deputy secretaries are required

8    to visit each of the facilities in their region

9    on a quarterly basis.  And since the Pittsburgh

10   escape in 1997, we have given each of them what

11   we refer to as an inspection lieutenant who goes

12   out and checks on those policies and appends

13   their report each quarter, and I review those

14   reports.  In addition, each year we do

15   operations inspections which inspect all of our

16   facilities.

17           But, it is in the nature of audits

18   that, first of all, you spot check a

19   representative sample.  Secondly, you're

20   checking records.  And as in this case, if you

21   check the log at Huntingdon, it shows that the

22   cells were checked.  But, unless on each day

23   you're in the cell with the officers, and I've

24   gone into cells and I've asked officers, show me

25   how you do a cell check.  I've stood there while

1    they do a cell inspection.  I've stood on a cell

2    block while the count is being done.  And I will

3    tell you that, when I stand there, it is done by

4    the book.  But I can't tell you how it's done at

5    five in the morning when I'm not there day after

6    day after day.

7            I think in the final analysis, we

8    are dependent upon the assiduousness with which

9    our staff perform their duties, and our biggest

10   challenge is to help our staff to understand how

11   important it is to do that job conscientiously

12   every time they do it, even --

13           You know, every day, every night an

14   officer working on a cell block walks around,

15   does his tier checks and nothing happens.  After

16   awhile they say, well, so what if I don't do it

17   tonight?

18           REPRESENTATIVE WALKO:  Thank you,

19   Mr. Secretary, Mr. Chairman.

20           CHAIRPERSON BIRMELIN:

21   Representative Manderino.

22           REPRESENTATIVE MANDERINO:  Thank

23   you.  Representative Walko actually asked some

24   of my questions, but let me just be a little bit

25   more specific because I'm mostly interested in

1    the human systems and not the technological or

2    equipment systems.

3                    But, in the case here at Huntingdon

4    where you told us that the Morse watchman punch

5    station system that was being used showed such

6    variations that it could be done in seven

7    minutes or in 45 minutes, that is something that

8    could have or couldn't have been picked up by

9    the audits you are doing?  Question number 1.

10                   And more importantly, what changes

11    have been made in terms of retraining,

12    reeducation, reorientation to proper

13    departmental procedure since this discovery?

14                   SECRETARY HORN:  The facility staff

15    here have been instructed to monitor -- I think

16    one of the problems -- and this gets partly to

17    the overcrowding question that we were asked,

18    and I think I mentioned in my testimony the

19    workload on our facility security offices.

20                   The reports that are generated from

21    this system, and I believe the system operates

22    not just in the RHU, but in other cell blocks as

23    well, the volume of data that is generated from

24    this system each night, all the officers in the

25    facility make their punches, comes out on some

1    sort of a computerized printout that goes to the

2    security office, the facility's security office

3    each day and is supposed to be reviewed there.

4    Somebody is supposed to go through it and,

5    arguably, somebody should say, gee, here's an

6    officer who's not doing his check every 30

7    minutes.  It's not being done on a regular

8    basis.

9           The fact is that, the facility's

10   security office consists of a captain and a

11   lieutenant.  Over the years, particularly as a

12   result -- We are the victims of our own success

13   to a certain extent.  We've placed so much

14   workload on these facility's security officers

15   in terms of drug testing and the eye on scan,

16   the searching that we're doing, and a lot of

17   paperwork and documentation that, quite frankly,

18   they were not capable of going through these

19   voluminous reports in an efficient way and

20   checking on it.

21          We are reevaluating the staffing in

22   those security offices.  We are also looking

23   at -- One of the things we have not done is

24   provide clerical staff, and we found captains

25   and lieutenants who were spending an enormous

64

1    amount of time doing clerical work rather than

2    getting out and around.

3              You know, typically, in a

4    correctional institution, at night on the 10 to

5    6 shift, it is staffed with a captain and a

6    lieutenant, and everybody else are corrections

7    officers and sergeants.  One of those, either

8    the captain or the lieutenant, is supposed to

9    stay in the control center at all times while

10   the other one goes around.  That means that

11   there's really one supervisor walking around

12   this entire facility.  And the reality is, you

13   have to supervise people on the job, and we are

14   thin on supervision.  We are attempting to

15   correct that.

16             REPRESENTATIVE MANDERINO:  But on my

17   tour not only yesterday, but this summer we did

18   lots of different institution tours, not only

19   are there correction officers on each cell block

20   several, but there is always, is it a sergeant,

21   one person who's in charge of that block.  Do

22   they have any responsibility in terms of how the

23   counts and watches on their station were done

24   before that data even gets submitted to a

25   central guy who is overloaded?

1          SECRETARY HORN:  No, no.  In our

2     system, the sergeant is a lead worker, but is

3     technically not a supervisor and has really no

4     supervisory authority over these corrections

5     officers.  He or she is supposed to be the more

6     experienced officer.  The lead worker is the

7     term that we use.

8          REPRESENTATIVE MANDERINO:  On the

9     issue of the count and the flesh movement and

10    also the watch, if I understood your testimony

11    correctly, there were policies at Huntingdon

12    that were different and not as strict as

13    policies coming out of the Central Office.  How

14    does something like that happen and what changes

15    have been made in that regard?

16          SECRETARY HORN:  Well, some of it

17    happens sub rosa.  I mean, the fact that -- It

18    happens at lots of levels.  The one thing that

19    was the matter of greatest concern to us was

20    that they were not requiring the inmates to

21    stand for the 10 a.m. count in the RHU.  Even

22    though, if you look at the papers and the

23    policies, it was required, but as a matter of

24    practice it wasn't being done because people,

25    including middle-level supervisors had just

66

1    given giving up on forcing the issue with the

2    inmates.  The inmates had worn us down.

3            REPRESENTATIVE MANDERINO:  I

4    understood that.  Maybe I misunderstood the

5    testimony.  I thought that on the flesh and

6    movement, or maybe it was on the watchman, that

7    what was in your books in terms of standard

8    operating procedure and what was in Huntingdon's

9    books in terms of standard operating procedure,

10    regardless of whether they were followed or not,

11    were different.

12            SECRETARY HORN:  That was true with

13    respect to the count.  The Department policy and

14    the overall Huntingdon policy requires that the

15    counts between 7 a.m. and 10 p.m. be standing

16    counts.  Huntingdon's written RHU manual only

17    required that the 10 a.m. count be a standing

18    count.

19            REPRESENTATIVE MANDERINO:  So if I'm

20    an officer, CO at Huntingdon, I'm trained on

21    what Huntingdon's, in their books and not what's

22    in your books.

23            SECRETARY HORN:  Right.  And what

24    I'm saying is, it goes down to level of that

25    specific housing unit, that specific RHU manual

1   is out of compliance.  That is something that we

2   failed to pick up, no question.  We should have

3   picked that up.  We have since changed that and

4   they are in conformance, and we are making

5   inmates stand for the count in accordance with

6   Department policy.

7           REPRESENTATIVE MANDERINO:  I heard

8   you refer to the training at the academy that

9   officers get in the beginning and then I heard

10  you refer to ongoing training, but I don't have

11  a sense of what that ongoing training is about.

12  Is it done on the institution level?  Is it done

13  as a result of audits that we've done of this

14  institution so that they may --

15          You know, this institution, we

16  discovered, as in human systems it's apt to

17  happen, is having more problems with how they're

18  doing their count than some other institution,

19  so at this institution this year's retraining is

20  going to be on the count and at some other

21  institution it may be on some other issue.  Can

22  you give me some insight?

23          SECRETARY HORN:  Each institution is

24  required to provide on-site in-service training

25  each year.  That training includes for every

68

1    corrections officer fundamentals of security and

2    inmate accountability.  These courses require

3    the staff be able to comprehend the inmate count

4    system, including the fact that flesh and

5    movement must be viewed during non-standing

6    counts.

7            They also receive training on drug

8    awareness.  One of the course objectives

9    includes the analysis of men to smuggle and

10   conceal drugs within an institution.  They also

11   receive a mandatory annual course on

12   professionalism and ethics, which includes a

13   discussion of inappropriate relationships

14   between staff and inmates.  Also, they receive

15   training on contraband and searches, instruction

16   on the nine methods in which contraband is

17   commonly introduced as well as ways to conduct

18   personal and cell searches.  That is given to

19   every staff person all the time.

20           REPRESENTATIVE MANDERINO:  My last

21   question--and I have concerns on both ends--

22   deals with the contraband issue and in this

23   particular case, treatment of legal mail.  On

24   the one hand, we see how that can be compromised

25   in terms of smuggling in contraband.  On the

69

1    other hand, I'm also equally concerned that we

2    don't institute a policy that then does not

3    allow people access to the legal system and

4    their legal mail.

5              What changes, if any, are you

6    contemplating or have you already made with

7    regard to how legal mail is treated within our

8    institutions?

9              SECRETARY HORN:  The District

10   Attorney who is going to testify I think has his

11   own observations on this issue, and as an

12   attorney I'll defer that to him.  But typically,

13   over the years the courts have required that we

14   give deference to correspondence between an

15   inmate and his or her attorney, that we not

16   interfere with their access to the courts.

17             But, when we stop to think about it

18   in the wake of this, we said, why do we give

19   such a great -- You know, there's lots of

20   privileges.  There's a marital privilege.

21   There's a clerical privilege, and yet, we think

22   nothing of reading an inmate's mail between

23   himself and his spouse.  Yet, we attach a higher

24   privilege to what we consider to be legal mail.

25             Additionally, one of the things that

70

1    occurred to us is, anything that comes in from

2    an attorney we treat as legal mail and,

3    therefore, privileged.  And we treat it very

4    gingerly and go out of our way to make sure that

5    we're not reading it.  So we just kind of page

6    through it to make sure that there's nothing

7    concealed.  But as you saw from the example,

8    when you do that, if you hold it by the binding

9    and sort of just flip through it you're not

10   going to find the contraband.

11            As Mr. Stewart has pointed out to

12   me, this kind of an item, a legal brief, is

13   something that's been entered into the court

14   record.  It's not even privileged.  It's public

15   record.  It's different from a letter from an

16   attorney that explains legal strategy that says

17   here's what we're going to do, here's the

18   evidence, or whatever, here's what our witnesses

19   are going to say.

20            We have done several things.  We've

21   instructed our staff, of course now, to more

22   thoroughly examine all legal mail without

23   compromising the attorney-client privilege.

24   Secondly, included in a supplemental budget

25   request that we hope to be submitting to the

1    legislature will be funding for X-ray machines

2    and additional metal detectors so that we can

3    look at this stuff on a mass basis.

4         One of the problems we have is the

5    shear volume of mail. We've got 37,000 inmates.

6    That's a lot of mail coming into our prisons, so

7    we're going to need those sort of conveyor

8    belts, X-ray machines, such as they have at

9    airports, which we've never done before. Also,

10   we are considering requiring that when attorneys

11   mail things into inmates that they not be bound;

12   that they be held together with a rubber band so

13   that they can easily be inspected.

14        Also, we're going to provide inmates

15   with alternative means for their privileged

16   conversations. They can do it through telephone

17   calls. Our policy already allows collect phone

18   calls to the attorneys, or also conversations,

19   private conversations in the visiting room. We

20   give attorneys private areas to speak to their

21   clients in the visiting room, so it doesn't all

22   have to be conducted through the mail.

23        REPRESENTATIVE MANDERINO:  Thank

24   you, Mr. Chairman.  Thank you.

25        CHAIRPERSON BIRMELIN:  I want to

72

1    thank you, Secretary Horn and Superintendent

2    Frank, for being here this morning with your

3    testimony.

4              SECRETARY HORN:   Thank you.

5              CHAIRPERSON BIRMELIN:   Our next

6    testifier is Captain Henry Oleyniczak, who is

7    the Troop Commander of the Lancaster State

8    Police barracks, and Captain Joseph Holmberg,

9    who is the Troop Commander here in Huntingdon.

10   Gentlemen, if you would please come forward at

11   this time.

12              I'm going to ask Captain Holmberg if

13   he would present his testimony first.  As I just

14   indicated, he's the Troop Commander for the

15   Huntingdon Pennsylvania State Police.

16              CAPTAIN HOLMBERG:   Good morning.   On

17   August 2, 1999, at approximately 10:45 a.m, the

18   State Police, Troop G, Huntingdon received a

19   telephone call from personnel at the State

20   Correctional Institution at Huntingdon advising

21   a possible escape had occurred as one inmate was

22   not in his cell in the Restrictive Housing Unit.

23   Investigators from the Huntingdon Station were

24   dispatched to SCI-Huntingdon, with the primary

25   investigator arriving at 11:00 a.m.

1    At this time I'm going to ask

2  Subcommittee Chairman Harold James to conduct

3  the meeting.  I'll be busy with some other

4  business for just a few minutes.  Representative

5  James, would you call our next witness, please?

6    ACTING CHAIRPERSON JAMES:  Thank

7  you, Mr. Chairman.  Can we call the Huntingdon

8  County District Attorney, Robert Stewart?

9    MR. STEWART:  Mr. Chairman, members

10  of the committee, colleagues and guests, I'm

11  Robert B. Stewart, Third, District Attorney of

12  Huntingdon County.

13    My testimony touches and concerns

14  the probable manner, whereby, Inmate Johnston

15  received the implements used by him in making

16  this escape.

17    Following Inmate Johnston's escape,

18  I consulted extensively with the Pennsylvania

19  State Police at Huntingdon, the State Police

20  Fugitive Task Force, and present and former law

21  enforcement personnel in Chester County,

22  Pennsylvania.  Because of my prior service as an

23  Assistant District Attorney in Chester County, I

24  knew of the Johnstons and I know the police

25  officers and former prosecutors who worked on

102

1    the cases against the Johnstons in the late

2    1970's and early 1980's.

3              As a result of discussions with

4    Chester County Detective Ted Schneider and PSP

5    Corporal Doug Grimes of the Fugitive Task Force,

6    I secured letters written from Norman Johnston

7    at SCI-Huntingdon to his brother, David, at

8    another prison.  Several readings of those

9    letters convinced me that they were written in

10   code.  Various pieces of information I received

11   from DOC personnel, the State Police and Chester

12   County authorities were helpful and assisted me

13   in partially deciphering Johnston's code.

14             In those letters he refers to

15   various DOC employees by noncomplimentary

16   nicknames and writes about wanting to file his

17   quote, habeas corpus, unquote, before certain

18   DOC personnel retire.  He also writes about

19   certain, quote, research, unquote, and quote,

20   research material, unquote, being provided by

21   the lawyer, and that's in quotes, or lawyer

22   company, also in quotations.

23             From the vantage of 20-20 hindsight

24   and information provided by DOC investigators

25   who were familiar with Johnston's behaviors in

103

1    prison, I came to the conclusion that the term

2    habeas corpus in those letters actually meant a

3    breakout escape.  Research material meant

4    implements of escape, and lawyer or lawyer

5    company meant someone on the outside who was

6    sending escape tools into the prison.

7                I then personally searched the

8    property of Inmate Johnston and some of his

9    associates to see if I could find additional

10   clues as to how the escape implements got into

11   SCI-Huntingdon, or once inside, how they got to

12   Inmate Johnston.

13               The investigations of the State

14   Police, the DOC investigators, along with my own

15   work have convinced me that there were a group

16   of inmates who, along with Inmate Johnston,

17   arranged to move various implements from various

18   locations inside SCI-Huntingdon and ultimately

19   to Inmate Johnston.

20               SCI employees do not appear to have

21   been the manner in which these implements got

22   inside.  One of Johnston's associates received

23   legal mail from one of the Johnston's lawyers on

24   the same day that Norman Johnston wrote to his

25   brother that he received research from the

104

1    lawyer company.  This particular inmate received

2    legal mail supposedly from this lawyer on two

3    occasions.

4            I personally checked the logs of

5    legal mail that go into the institution.  There

6    is no way, looking at those records, that you

7    can determine whether or not the legal mail is

8    actually from a lawyer.  What happens is, the

9    items are written down on a form as to where

10   they are from.  The envelopes are not kept, but

11   then that probably wouldn't be possible.  But in

12   these days of computers, when you can do

13   envelopes from anyone, there is no way that a

14   corrections officer or a mail room staff person

15   receiving that mail can know that that's real

16   legal mail.

17           I personally know the lawyer from

18   whose office this legal mail was purportedly to

19   have been sent.  I checked with the Attorney

20   General's office and the DA's office which

21   convicted this inmate associate of Johnston, and

22   I was not able to find any connection between

23   this lawyer and this particular inmate, and

24   that caused me to be suspicious of these pieces

25   of legal mail.

1           Inmate Johnston had previously used

2    a legal brief as a method of smuggling drugs and

3    escape tools last year, and you've seen that.   A

4    search conducted by me of this associate's

5    property revealed 36 pages of paper, supposedly

6    legal materials which were hot glued together

7    and were ripped out of a plastic binder.   Those

8    36 pages contained the same material that

9    Johnston used in smuggling -- in his smuggling

10   the year before.

11           Although I do not have sufficient

12   evidence to take into a courtroom against other

13   persons at this time, I am convinced that some

14   of the escape implements used by Inmate Johnston

15   were mailed into SCI-Huntingdon by someone

16   probably using or making an attorney's envelope,

17   and mailing a fictitious brief.   The brief

18   containing these implements was handed over to

19   the associate with the contraband hidden inside

20   the pages which were bound and glued together.

21   Once inside the prison, this material was moved

22   by inmates or possibly staff, or both, until it

23   reached its destination, Inmate Johnston.

24           Under the present regulations,

25   inmate legal mail can be opened in the presence

106

1    of the inmate recipient and examined for

2    contraband, then handed over to that inmate.

3    Legal mail cannot be read by DOC personnel.   In

4    my opinion, if that mail had been read, even in

5    a cursory fashion, almost anyone would have seen

6    that this brief was legal nonsense, and upon

7    further investigation, these escape tools might

8    have been discovered.

9              I have included with my testimony

10   copies of pages from Johnston's associate's

11   property and copies of pages from the brief

12   Johnston used in 1998, and you can see when you

13   examine these pages that they are legal

14   nonsense.   They do not flow together.   They are

15   not a part of a legal argument.   It is simply

16   miscellaneous papers put together in no

17   particular order.

18             Because I am continuing to

19   investigate, along with the Pennsylvania State

20   Police, the involvement of other persons in

21   Inmate Johnston's acquisition of escape

22   materials, I am not willing today to identify

23   further the subjects of my investigation.

24             I do recommend that the regulations

25   governing legal mail be amended to assure that

107

1    legal mail for inmates is coming from legitimate

2    legal sources and that inmates' proper access to

3    lawyers and legal materials is not being used as

4    a method of smuggling contraband.

5              Briefs and transcripts, which are

6    not confidential and are matters of public

7    record, should be able to be read by

8    appropriately trained staff.  No legal material

9    sent to any inmate needs to be bound.   Inmate

10   mail should be able to be x-rayed or

11   fluoroscoped.

12             After my service in the Chester

13   County DA's office, I came home to Huntingdon

14   and was a defense attorney here for 16 years,

15   including 10 years in the Public Defender's

16   Office in service as Chief Public Defender.

17   During that time I represented many inmates

18   charged with crimes at SCI-Huntingdon and

19   Smithfield and handled many parole cases at both

20   institutions.

21             I recite this experience so that you

22   will understand that lawyers would not send

23   confidential materials into inmates in briefs or

24   transcripts.  These types of things are filed in

25   courts of record and are available for

108

1    prosecutors and the public, in general, to read.

2    The changes that I support will not diminish the

3    procedural and substantive rights that any of

4    our citizens, including inmates, have.

5              This escape occurred as a result of

6    a serious and concerted effort by a group of

7    inmates.  To the extent that law enforcement in

8    this county can secure credible evidence against

9    all persons involved, all legally appropriate

10   prosecution will be filed and brought to

11   completion.

12             To the extent that your committee

13   has oversight over the statutes and regulations

14   that govern state prisons, I recommend that you

15   consider the changes that I have proposed, as

16   well as the changes in the law recommended by

17   Secretary Horn.

18             Once Johnston effected his escape,

19   the response of state, local, and federal law

20   enforcement was immediate and direct.  Although

21   Johnston got away from two park police officers,

22   the relentless pressure put on both him and his

23   associates led directly to his apprehension.  I

24   became personally aware of a great volume of

25   information which went to the Fugitive Task

109

1    Force first at Huntingdon, then in southern

2    Chester County, including information developed

3    by the state police here, by my office and by

4    DOC investigators.

5            In my opinion, SCI-Huntingdon has

6    been and generally is a well-run, well-

7    administered prison. The people who work here

8    take great pride in their professionalism and

9    sincerely regret the combination of factors

10   which led to this escape, some of those factors

11   such as the inmate legal mail rules being beyond

12   their ability to control. No prison is escape

13   proof. When escapes have occurred, the response

14   of law enforcement in Huntingdon County has been

15   swift and usually effective. It will continue

16   to be so.

17           In conclusion, I wish to thank you

18   for this opportunity to testify, and I will

19   answer questions to the extent that I can.

20           ACTING CHAIRPERSON JAMES:   Thank

21   you, District Attorney. You have an extensive

22   background in terms of practice that I think is

23   very good.

24           In your review, as we get the

25   questions together, in your review so far, have

110

1    you made or submitted any suggestions as it

2    relates to legal mail yet to any DOC officials?

3            MR. STEWART:  I've discussed the

4    recommendations that I brought to you with

5    Secretary Horn.

6            ACTING CHAIRPERSON JAMES:  Thank

7    you.  Representative Walko.

8            REPRESENTATIVE WALKO:  Thank you,

9    Mr. Chairman.  Mr. Stewart, at what stage is the

10   escape prosecution?  I'm a little confused about

11   that.

12           MR. STEWART:  The escape charges

13   have gone to a preliminary hearing, prima facie

14   case was held.  Mr. Johnston is on a regular

15   schedule for formal arraignment, which will take

16   place probably within 45 days.  When the actual

17   trial will be is another story altogether.  That

18   will depend on what my colleague on the defense

19   side does in terms of pretrial motions and that

20   sort of thing.

21           REPRESENTATIVE WALKO:  Is there any

22   evidence of complicity of anyone owning or

23   having access to the automobile that was taken?

24   Is there any indication --

25           MR. STEWART:  Are you asking me if

111

1    the victim of the theft was involved?

2                REPRESENTATIVE WALKO:   Yes.

3                MR. STEWART:   No.  No, he was not.

4                REPRESENTATIVE WALKO:   That's all.

5    Thank you.

6                ACTING CHAIRPERSON JAMES:   Thank

7    you.   Representative Josephs.

8                REPRESENTATIVE JOSEPHS:   I think

9    that my questions were covered.   Thank you.

10   Thank you, Mr. Chairman.

11               ACTING CHAIRPERSON JAMES:   Chief

12   Counsel Preski.

13               MR. PRESKI:   Mr. Stewart, my

14   questions just simply go back to your proposal,

15   I guess, for the legal briefs.   It's my

16   understanding that the reason why DOC has the

17   regulations all come out of court cases where

18   they've been sued for either looking at the

19   legal mail or they've done other things and then

20   there's been a lawsuit, and you get an order

21   from a judge that now says you can't read it.

22               I saw that you were here for the

23   Commissioner's testimony.   Do you think

24   something like the X-ray machine will provide

25   the adequate security?   I just seem to think it

112

1    might be hard to be able to train a corrections

2    officer to be able to look at a brief and say,

3    okay, this is nonsense, this is good, when

4    they're looking at what the Commissioner says

5    are thousands of pieces of mail a day.

6              MR. STEWART:  I agree that it may be

7    difficult.  I don't think you actually have to

8    sit down and read every legal brief.  When you

9    look at the excerpts that I provided to you, and

10   these are representatives, and you see that

11   there is no connection between one page and the

12   next.  You'll see that this was not a real

13   brief.  It doesn't take a rocket scientist to

14   understand that.

15             Now, do I think the fluoroscope or

16   an X-ray machine will help?  Sure it will help.

17   Do I think that not putting these things in

18   binders will help?  Sure I think it will help.

19   But, I don't think there's any machine or

20   technology that takes the place of a sensible

21   human being taking a look at this stuff.

22             When you rely on the toys, when you

23   rely on the gadgets, you stop using your brain,

24   and the best piece of security, the best

25   security instrument we have at this institution

113

1    is the lump of brain matter between every

2    officer's ears.  Now that's what I think people

3    ought to be doing instead of relying on

4    technology.  I think they ought to be using

5    their brains.

6              MR. PRESKI:  Thank you.

7              ACTING CHAIRPERSON JAMES:  Did they

8    determine--and maybe I missed it--that when the

9    report of -- the report of the car theft was

10   reported to the State Police prior to the report

11   of the prison escape; is that correct?

12             MR. STEWART:  That's right.  The car

13   theft was reported at 6 o'clock, or thereabouts.

14   The prison escape wasn't determined, as I

15   understand it, until somewhere around 10:40.

16             ACTING CHAIRPERSON JAMES:  And there

17   was no -- Was there any discussion from the

18   police or to the police to the prison as to, is

19   there anything wrong that you may be aware of?

20             MR. STEWART:  With the car theft?

21             ACTING CHAIRPERSON JAMES:  Yes.

22             MR. STEWART:  I don't believe that

23   there was.  I don't believe that the car theft

24   in the immediate area of the prison triggered a

25   police response to say, did somebody escape?  We

114

1    have car thefts in Smithfield on occasions other

2    than when prisoners escape from SCI-Huntingdon

3    or Smithfield.

4                ACTING CHAIRPERSON JAMES:  Any other

5    questions from the committee?  (No response).

6    Thank you, Mr. District Attorney.

7                Next witness is Michael Fox, Council

8    Director of AFSCME, District Council 89.

9                MR. FOX:  My name is Michael Fox.

10   I'm AFSCME's Council Director of District

11   Counsel 89.

12                MR. DIEHL:  I'm Robert Diehl.  I'm

13   the president here of SCI-Huntingdon for the

14   local union.

15                MR. FOX:  Good afternoon.  As I said

16   my name is Michael Fox.  I'm the Council

17   Director of AFSCME District Council 89.  I'm

18   here on behalf of approximately 10,000 AFSCME

19   members who work in the Department of

20   Corrections and the Department of Public Welfare

21   Forensic Units across Pennsylvania.

22                I'll begin by addressing a question

23   that was asked to me by a reporter following the

24   escape at Dallas.  He asked me if I believe that

25   the recent escapes at Dallas and Huntingdon

<u>CERTIFICATE OF SERVICE</u>

I, John O. J. Shellenberger, hereby certify that Testimony from Hearing on Inmate Escape has been filed electronically and is available for viewing and downloading from the Court's Electronic Case Filing System.  I further certify that a true and correct copy of Testimony on Inmate Escape was mailed on March 30, 2007, by first class mail, postage prepaid to:

Derrick Dale Fontroy, AY-7513
State Correctional Institution
at Forest
P.O. Box 307
Marienville, PA 16239-0307

Aaron Christopher Wheeler, BZ-2590
State Correctional Institution
at Graterford
P.O. Box 244
Graterford, PA 19426-0244

Theodore B. Savage, CB-2674
State Correctional Institution
at Cresson
Drawer A, Old Route 22
Cresson, PA 16699-0001

s/ John O. J. Shellenberger
_____

John O. J. Shellenberger
Chief Deputy Attorney General
Attorney I.D. No. 09714

Office of Attorney General
21 S. 12th Street, 3rd Floor
Philadelphia, PA 19107
Phone: (215) 560-2940
Fax:    (215) 560-1031