**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| **DERRICK DALE FONTROY, I.,** | : | **CIVIL ACTION** |
| **THEODORE B. SAVAGE, J.D., and** | : | |
| **AARON CHRISTOPHER WHEELER** | : | **NO. 02-2949** |
| | : | |
| **v.** | : | |
| | : | |
| **JEFFREY A. BEARD,** | : | |
| **DAVID DIGUGLIELMO, and** | : | |
| **KIM ULISNY** | : | |


**MEMORANDUM OPINION**

**Savage, J.**                                                          **May 3, 2007**

The plaintiffs, state prisoners, challenge the constitutionality of the Pennsylvania

prison mail policy that permits prison staff to open incoming legal and court mail that does

not bear a prison issued control number outside the presence of the inmates.  That

opening a prisoner's legal mail outside his presence impinges his First Amendment right

to freedom of speech is established.   Whether the Pennsylvania Department of

Corrections' ("DOC") legal and court mail policy infringes that right is the issue.  Answering

this question requires a determination of whether the policy is reasonably related to a

legitimate penological interest.   The inquiry is governed by the test set forth by the

Supreme Court in *Turner v. Safley*, 482 U.S. 78 (1987), which the Third Circuit recently

applied to New Jersey's prison legal mail policy in *Jones v. Brown*, 461 F.3d 353 (3d Cir.

2006), *cert. denied*, __ S. Ct. __ , 2007 WL 789156 (Mar. 19, 2007).

After reviewing the record and drawing all inferences in favor of the defendants, I

conclude that the DOC's current policy for processing legal and court mail does not meet

constitutional standards because the DOC has failed to demonstrate a valid reasonable

connection between the asserted legitimate penological interest and the mail regulation. Therefore, summary judgment will be entered in favor of the plaintiffs and against the defendants, and an injunction enjoining the defendants from enforcing the current legal and court mail policy will be issued.

**Procedural Background**

The defendants moved to dismiss the amended complaint[1], arguing that the current legal and court mail policy does not violate the plaintiffs' constitutional rights because it is a rational response to a legitimate governmental interest, specifically prison safety and security. After the plaintiffs filed a motion for summary judgment, the parties were notified that the defendants' motion to dismiss would be considered as a cross-motion for summary judgment.[2]

The parties, when the plaintiffs were represented by counsel,[3] engaged in discovery to develop facts necessary to disposition of the cross motions for summary judgment. Relevant documents were produced, declarations were submitted, and depositions of essential witnesses were taken. Oral argument, with the plaintiffs participating via teleconference, was heard.

---

[1] The original complaint presented a challenge to the DOC's then proposed legal mail policy, which was later revised and became effective on July 15, 2004. The amended complaint addresses the current policy.

[2] The litigation history has been lengthy and punctuated by a multitude of unrelated *pro se* filings by the plaintiffs, requiring responses from the defendants and rulings by the court. There are over 300 docket entries. The plaintiffs have gone from *pro se* litigants to represented plaintiffs and back to *pro se* status after discharging the attorneys that were appointed at their request.

[3] Stephen D. Brown and Teri B. Himebaugh, attorneys on the Prisoner Rights Panel, presented the plaintiffs' position in a professional manner at various times during this litigation. It was Ms. Himebaugh's dedicated work in discovery that developed the record, and in briefing that presented the arguments cogently and effectively. Without the *pro bono* contributions of attorneys like them, prisoners with legitimate issues would not have the opportunity to have their cases fully developed and argued. We owe our gratitude to them.

Although the parties disagree upon numerous facts, there is no disagreement as to the material facts regarding the history of the DOC's mail policy, the development of its current legal and court mail regulation, and its implementation. Thus, this action may be decided on the summary judgment record.[4]

## Current Legal Mail Policy

Prior to October 2002, all legal mail was opened in front of the inmate to whom it was addressed. The delivery practice varied throughout the prison system's twenty-six institutions. In some prisons, the mail was delivered to the inmates at their housing units. At SCI-Graterford, inmates in general population received legal mail through a window at a command center at the hub of the cell blocks, and inmates who were not in general population received their mail on their cell blocks. In every instance, it was opened in their presence.

Currently, mail from attorneys may be delivered to the prison either by hand delivery during normal business hours or through the United States Postal Service. The former, which is presented unsealed, is inspected outside the inmate's presence but in the presence of the courier, resealed, and personally delivered to the inmate addressee.[5] This practice is not challenged.

Posted mail is treated differently, depending on whether the sending attorney affixes

---

[4] Summary judgment is appropriate if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Emory v. AstraZeneca Pharms. LP.*, 401 F.3d 174, 179 (3d Cir. 2005). This standard does not change when the issue is presented in the context of cross-motions for summary judgment. *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987). Here, there is no dispute as to the relevant facts. It is the application of the law to those facts that is at issue.

[5] DC-ADM 803, *Inmate Mail and Incoming Publications Policy*, § VI.B.2.a.

a registered control number on the envelope or package.  Mail bearing a control number,[6] which is assigned by the DOC to attorneys who certify that they will not transmit contraband or anything other than "essential, confidential, attorney-client communication" through the mail, is opened and inspected only in the presence of the inmate.[7]  Without a control number, mail from an attorney is processed as regular mail.  It is opened and checked for contraband in the prison mail room before delivery to the inmate inside the prison.

Later, in July of 2004, the policy was modified to include court mail in the control number procedure.  Prior to that time, court mail had been opened only in the inmate's presence.  Now, mail received from courts bearing a control number is processed the same as legal mail having a control number; and, court mail without a control number is treated like regular mail and opened in the mail room outside the inmate's presence.

## The *Turner* Analysis

Prison regulations, when challenged on constitutional grounds, are reviewed under the standard established by the Supreme Court in *Turner v. Safley*, 482 U.S. 78 (1987).  The *Turner* Court set out a two-part test for considering a challenge to a prison regulation.  A court must first determine whether there is a valid, rational connection between the prison regulation and a legitimate governmental interest.  If the connection is established, the court then evaluates three factors:  (1) whether alternative means of exercising the right

---

[6] Attorneys may receive a control number by sending an application to the DOC via facsimile. The number is assigned to the attorney for all future legal communication with any client who is then or in the future in the custody of DOC.  The number may not be disclosed to the inmate and is obliterated from the envelope by DOC mail room staff before delivery.  DC-ADM 803, § VI.B.2.b.

[7] *Id.*, § VI.B.2.

remain open to inmates; (2) the impact accommodation of the asserted prison right will have on the prison generally; and (3) whether there is an absence of ready alternatives. *Turner*, 482 U.S. at 89-90.   Only if the regulation passes the first step, the rational connection standard, are the remaining three factors reached.

In examining a prison regulation, a court must be cognizant of the "delicate balance" that prison administrators must reach "between the order and security of the internal prison environment and the legitimate demands of those on the 'outside' who seek to enter that environment." *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989).   Accordingly, courts afford prison administrators "considerable" deference in regulating interactions between prisoners and the outside world. *Id.* at 408.

The *Turner* analysis begins with determining whether there is a rational connection between the prison regulation and the asserted legitimate governmental interest.   This requirement guards against arbitrary and irrational policies, and exaggerated responses to valid concerns. *Jones*, 461 F.3d at 360 (*quoting Turner*, 482 U.S. at 89-90).

The burden of coming forward with the legitimate governmental interest is on the DOC. *See Turner,* 482 U.S. at 89.   The DOC must demonstrate the rational connection between the regulation and that interest.   At the same time, substantial deference is given to those running the prison in determining the means of accomplishing the legitimate goals of the corrections system, especially where security is implicated. *Overton v. Bazzetta*, 539 U.S. 126, 132-33 (2003); *Fraise v. Terhune*, 283 F.3d 506, 516 (3d Cir. 2002).

Addressing the first step, the defendants have presented a history of the DOC's privileged mail policy which has changed over time in response to security concerns,  two investigative reports prepared by the DOC, and the testimony of the Secretary of

Corrections and those involved in mail handling at Graterford.  They contend that this evidence justifies the DOC's legal and court mail policy.

The penological interest put forth by the defendants is protecting the safety and security of the prisons.  In its recent decision, *Jones v. Brown*, 461 F.3d 353 (3d Cir. 2006), the Third Circuit reiterated its holding in *Bieregu v. Reno*, 59 F.3d 1445 (3d Cir. 1995), and confirmed that prison safety and security is a legitimate and valid penological interest. *Jones*, 461 F.3d at 361, 364.  Thus, if there is a valid threat to safety and security, the inquiry turns to the rationality of the DOC's response to the perceived threat to that penological interest.

Experience has shown that mail can be used to introduce contraband into the prisons and into the hands of inmates.  Contraband making its way through the mails includes the harmless - such as greeting cards and personal letters - and the dangerous - such as escape tools, drugs and weapons.  According to Jeffrey A. Beard, Secretary of Corrections, and Kim Ulisny, Mail Room Supervisor at Graterford, prison officials have confiscated cash, drugs, items that could be fashioned into weapons or implements of escape, explosives, bio-hazards, pornography and other items that compromise security from the mail.[8]  Some contraband has been found in mail that appeared to have been sent by an attorney or a court, the sender using a phony letterhead and envelope.[9]  The DOC has not quantified these instances.  Instead, it has presented only a few incidents occurring throughout the state system over a period of thirteen years.

---

[8] *Beard Dep.* at 9-10; *Ulisny Dep.* at 40-42, 73-74.

[9] *Beard Dep.* at 33-35, 37-39; *Ulisny Dep.* at 20, 71-75.

6

The two studies cited by the defendants, the *Escape Report*, issued by the DOC in November 1999, and the *Pennsylvania Department of Corrections Privileged Correspondence Inspection and Contraband Report*, dated September 20, 1999, ("*September 1999 Report*") reported that contraband had been smuggled into the prison through mail that had been designated as legal mail. These internal reports drew on evidence developed over the years in Pennsylvania prisons. The studies recommended that legal mail be opened and inspected, not read, outside the presence of the inmates in a secure setting by trained inspectors to minimize the undefined security risk attending the opening of mail in the presence of inmates.

The Escape Report was a product of the DOC's investigation of an inmate's escape from SCI Huntingdon on August 2, 1999. The study was not of the DOC's mail policy. It was an evaluation of the entire security package at that prison. The investigators focused on the means of escape, the roles of staff and other inmates in the escape, the prison's security policies and procedures, and potential preventive measures. They concluded that the inmate had cut through a steel bar in his cell window using a hacksaw blade and a security tip screwdriver which had been supplied by other inmates and delivered to him by staff.

The authors of the report admitted that "the exact method of delivery for the suspected hacksaw blade and security screwdriver tip implement cannot be determined."[10] Nevertheless, they speculated, "it is believed that the items were delivered into the institution in legal mail, and then delivered to [the inmate] by staff in an antacid bottle, bag

---

[10] *Escape Report* at 22.

of instant coffee or chewing tobacco."[11]  Despite this uncertainty, the report makes the bold conclusion that "[s]ubstantial evidence shows that [the inmate] was able to introduce contraband into the institution through 'legal mail'."[12]  Nowhere in the report is there any discussion of what that evidence was.  In fact, the report failed to produce any evidence, let alone substantial evidence, linking the inmate's escape tools to legal mail.

Secretary Beard, who acknowledged that the impetus for the change in the policy was the 1999 escape, conceded that he was not sure where the inmate's legal brief, which contained a hollowed portion, originated or where it had been modified.[13]  Nor was he able to say whether it came from an attorney, a court, or a third party.[14]  He further conceded that he did not know whether any contraband had been secreted in that document.[15]  Moreover, the DOC concluded that SCI Huntington's local legal mail policy, which directed that all legal materials be searched and inspected using a metal detector, was not followed.[16]  Yet, even though the DOC determined that its legal mail policy had not been

---

[11] *Id.*

[12] *Id.* at 23.

[13] *Beard Dep.* at 44-45.  Like his successor, Martin Horn, former Secretary of Corrections, speculated that the escape tools had been delivered in legal mail.  Testifying before the State House Judiciary Subcommittee on Crime and Corrections, he stated that the "items were probably introduced into the facility concealed in legal materials mailed to other inmates."  *Hearing on Inmate Escape Before the H. Judiciary Subcommittee on Crime and Corrections*, House of Representatives of the Commonwealth of Pennsylvania, Oct. 14, 1999 (statement of Martin Horn, Secretary of Corrections) (Doc. No. 300, Ex. 1 at 11).  He based his supposition on the escaping inmate having been previously disciplined for attempting to transmit a security screwdriver tip concealed in a legal brief.  The earlier infraction was for intra prison transmissions and not for receiving contraband from outside the prison.  Thus, this prior misconduct does not establish that any contraband had ever come through legal mail.

[14] *Beard Dep.* at 44-45.

[15] *Id.* at 43-44.

[16] *Escape Report* at 59.

followed at Huntingdon in the 1999 escape case and may not have been implicated, it questioned the policy anyway.

Despite the absence of a verifiable connection between the escape and legal mail, the DOC concluded that the DOC's legal mail policy had to be changed.  It announced a review of the policy; and, without awaiting the outcome of that evaluation, it promised  that the policy would be "revised to ensure proper searches of legal mail."[17]  At the same time, foreseeing a challenge, the authors of the Escape Report suggested that by "providing other means of confidential attorney-client communications through visits and unmonitored phone conversations, such search requirements should withstand legal challenge."[18]

The *September 1999 Report*, prepared shortly after the 1999 escape, compiled evidence of incidents throughout Pennsylvania prisons related to the use of legal or court mail to circumvent the inspection process to introduce contraband into the prisons.  The report detailed less than a dozen instances where contraband had been found in court or legal mail dating back to 1986.  The contraband included personal letters, a greeting card, a tube of hydrocortisone cream, a letter from a former inmate encouraging inmates to call a strike, and drugs in stamps, legal briefs and legal folders.[19]  None of the incidents involved implements of escape.  Significantly, in all cases involving legal mail, the mail presumably had been opened in the intended recipients' presence.  Beard was unable to cite any security incident related to the opening of legal or court mail in the presence of an

---

[17] *Escape Report* at 69.

[18] *Id*.

[19] *DOC September 1999 Report*.

inmate.[20]

The reports concluded that contraband can be smuggled into the prison through legal mail.  They do not distinguish between prohibited harmless materials and dangerous materials that threaten safety and security.  It is only the latter that can reasonably be related to a legitimate penological interest justifying infringing an inmate's First Amendment right.  That prohibited materials entered the prison through legal mail is insufficient.  In other words, not all contraband, as defined by the DOC,[21] poses a significant security and safety risk.  The defendants have not demonstrated that there has been any instance of a serious breach of security or risk to safety that was caused by the introduction of contraband through legal mail that was opened in the presence of an inmate.

Acting on the reports' findings and recommendations, the DOC instituted the current legal and court mail policy.  The mail policy is not directed at privileged mail from attorneys but rather mail from others posing as attorneys.  Nevertheless, legitimate legal mail sent by attorneys is treated the same as non-privileged mail unless it bears an authorized control number.

The defendants argue that the new procedure was the result of negotiations between the DOC and representatives of inmates, taking into consideration the constitutional and privacy concerns of the inmates.  Those participating in the negotiations included the American Civil Liberties Union, the Pennsylvania Institutional Law Project, and

---

[20] *Beard Dep.* at 78.

[21] The DOC's objective is to intercept all contraband, not only items that pose a threat to security and safety.  The DOC defines contraband as "[a]ny item not issued by the DOC, purchased through the commissary or otherwise authorized by the institution."  *Escape Report* at 22, n.9.

the Defenders Association of Philadelphia.[22]   The inmates were not represented in the negotiations nor had any inmate or group of inmates authorized those groups to speak for them.  The input from these groups was not from the prisoners' perspective.  It took into consideration the attorneys' concerns.  As Secretary Beard put it, the accommodations were for the benefit of the attorneys to make their job easier.[23]

Beard acknowledged the motivation for the policy change was the 1999 escape by an inmate who presumably obtained escape tools - a hacksaw blade and screwdriver tip - through legal mail.  Yet, no evidence established that these items entered the prison that way.  At the time, all legal mail was being opened in the inmate's presence.  The investigation does not explain how, if at all, the tools were overlooked during the inspection.  On the contrary, the report points to sources other than legal mail.  It implicated other inmates and prison staff in the hand delivery of the tools to the inmate.

More than three years passed from the 1999 escape to the implementation of the new legal mail policy.  There is no evidence of contraband that presented a significant security or safety risk having been introduced into the prison through legal mail during that time.

Another concern that Beard gave for changing the policy was the possibility of a contaminant, like anthrax, being introduced through legal or court mail.[24]  Yet, he could not identify a single incident of powder having been contained in any legal or court mail.[25]

---

[22] *Second Declaration of Michael A. Farnan* (Doc. No. 69).

[23] *Beard Dep.* at 22-23, 56.

[24] *Id.* at 24.

[25] *Id.* at 49-50.

The concerns articulated now by the DOC were not the reasons given for the policy change at the time.  The only rationale for the revision then was the prevention of escape. Now, the DOC contends that the risk of mail containing contaminant powder and the risk to staff attendant to opening the mail in the inmate's presence are additional reasons for the policy.  Yet, there has not been a single incident of suspicious powder or assaults of staff surrounding the opening of legal or court mail in front of an inmate.  These post-policy change reasons are not supported by any evidence.

The policy and its purported rationale overlook the obvious.  All legal and court mail, with or without a control number, is still opened and inspected by the staff.  If there is contraband, it will be discovered.  The difference is where - in the mail room if there is no control number, or on the housing units if there is a control number.  In either event, a proper inspection is conducted.  The risk of any dangerous contraband, such as escape tools or drugs, eluding the inspection process is minimal compared to the significant infringement of the inmate's constitutional rights resulting from opening the inmate's mail elsewhere.

Court mail is not opened in the presence of the inmate unless it has a court control number.  However, unlike legal mail, it is specially handled in the delivery process.  After it is opened, inspected and resealed by the mail room staff, court mail is placed in a separate container on a mail cart for delivery to the housing units.  Once the court mail is delivered to unit managers, the inmates are summoned to accept delivery of the opened mail.  To avoid any misdelivery or lost mail, court mail is not delivered to anyone other than the addressee personally.

The defendants contend that court mail is not privileged because the contents of

pleadings and orders are docketed in the court and available for public inspection.  This position directly contradicts the Third Circuit's treatment of court mail as privileged.  *Jones*, 461 F.3d at 358-59.  Court mail, like legal mail, is constitutionally protected.  Accordingly, prison officials cannot legally open court mail outside an inmate's presence.

The current procedure as applied to court mail is even more onerous than as applied to legal mail.  The inmate has no relationship with the sender and cannot require the sender to apply for and use a control number.  Nor can the DOC or a court.

Of the two reports the DOC relied upon, only one contained scant evidence of demonstrable safety and security threats associated with court mail.  Indeed, Beard acknowledged that the DOC "didn't necessarily do an exhaustive study" and did not do a survey of all institutions.[26]  He claimed there were "probably" reports of incidents.  However, he could not cite any.[27]

Justification for infringing an inmate's constitutional right requires more than an assumption.  It requires a fact.  The DOC has not demonstrated a sufficient factual basis for concluding that legal and court mail opened in the presence of an inmate presents a risk substantial enough to warrant circumscribing inmates' First Amendment rights.

Contrary to the defendants' argument, this case is not significantly different from *Jones*.  There, too, the prison administrators had little evidence that the perceived threat presented a significant risk.  The New Jersey prison officials had based their policy decision to open legal mail outside of an inmate's presence on a possible mailing

---

[26] *Beard Dep*. at 52-53.

[27] *Id*.

containing anthrax, and they offered no evidence that such a threat actually existed. Here, the Pennsylvania policymakers appeared to develop a more extensive record to justify the impingement of inmates' First Amendment rights. However, a closer look reveals that the record does not support the DOC's response to the single escape in 1999 and the few incidents of contraband found in legal mail over thirteen years throughout the state prison system.

The connection between the policy change and the rationale for it is tenuous and remote. The policy was an overreaction to a single escape incident and a few isolated violations of the contraband policy involving legal mail that may or may not have occurred. Therefore, because the defendants have not established a reasonable connection between the penological interest in safety and security, and the current legal and court mail regulation, the mail policy does not pass the first step of the *Turner* analysis.

Even assuming there is a rational relationship between the prison regulation and the legitimate governmental interest, the legal and court mail policy does not satisfy the remaining three *Turner* factors. They are: (1) alternative ways of protecting security while preserving the circumscribed right; (2) the burden in accommodating the prisoners' rights; and (3) any available alternatives that can fully accommodate the prisoners' rights with a *de minimus* cost to the prison. *Jones*, 461 F.3d at 360.

The inmate's alternative to prison staff opening his posted legal mail outside his presence is to request that his attorney obtain a control number to be used to identify communications as privileged. He cannot demand it. He has no power to require it. If the inmate requests and the attorney fails or refuses to apply for a control number, it is not the attorney who is affected. It is the inmate whose constitutional right is infringed through

nothing he has or has not done.  This method is not a reasonable alternative to opening the mail in the inmate's presence.

If someone working in an attorney's office or a court was determined to use the guise of legal or court mail to introduce contraband into the prison, the control number procedure would not be an impediment.  That person has access to the employer's control number and could use it on legitimate legal or court envelopes.  Thus, even at the cost of infringing inmates' constitutional rights, the regulation would not accomplish its stated goals of preventing the attempted introduction of contraband into the prisons.

The burden of prison staff hand delivering each piece of legal mail to the inmate and then opening it in his presence is insubstantial.  Based upon estimates provided by Kim Ulisny, the Mail Room Supervisor, Graterford receives 2,000 to 3,000 pieces of mail each week day and about twice that on Monday.[28]  Among them are only thirty-five to forty mailings from courts and twenty-five from attorneys on a daily basis.[29] Consequently, court and legal mail each constitute slightly more or less than one percent of all of the daily mail. A portion of the legal mail is already being delivered and opened in the presence of inmates who are not housed in general population.  Mail room staff now must check the control number on the envelope against a master list to verify authenticity - a step that is unnecessary when all legal mail is opened in the inmate's presence.  Court mail without a control number is opened in the mail room but hand delivered personally to each addressee on his cell block.  In light of these facts, there is no real burden placed upon the

---

[28] *Ulisny Dep.* at 11-12, 103.

[29] *Id.* at 25-26, 91.

prison staff in requiring the opening of all legal and court mail in the inmate's presence.

Any cost involved in opening the mail in the inmate's presence is *de minimus*. According to Ulisny, it takes fifteen seconds to open a piece of mail, fan through the pages, reinsert it in the envelope and reseal the envelope.[30]  There is no reallocation of personnel and financial resources required.  Correctional officers are opening mail on housing units now.  Hence, there is no real impact on other inmates and staff by accommodating the inmates' First Amendment rights.

Even if the DOC had established the requisite connection to a legitimate penological interest, its current legal and court mail policy does not pass the remaining part of the *Turner* test.  Therefore, the policy is unconstitutional.

### Mail Log

The DOC had a practice of maintaining a log for recording the delivery of court mail. The log allowed an inmate to sign for and date receipt of mail from courts.  It gave the inmate verification of delayed delivery for purposes of justifying missing a court-imposed deadline.  For some unexplained reason, the DOC ceased using the mail log system.

The plaintiffs request that the DOC be ordered to resume the log system.  I decline to do so.

There is no constitutional right to have the prison keep a log of court mail.  A court has no power to order that the prison maintain a log.  Nevertheless, I encourage the DOC to reinstitute the recording procedure if it can do so without expending significant

---

[30] *Id*. at 113.

resources.[31]

## Qualified Immunity

For the same reasons that the defendants in the *Jones* case were entitled to qualified immunity, so are the defendants in this action.  *See Jones,* 461 F.3d at 364-65. The DOC officials reasonably believed that they were not violating inmates' rights but rather were acting in the interest of the safety and security of the inmates and staff.  The DOC had a reasonable belief that its evaluation and revision of the legal and court mail policy was constitutional.  Indeed, another judge of this court has found the same policy constitutional.  *See Robinson v. Pennsylvania Dep't of Corrections*, Civ. A. No. 03-05180, 2007 WL 210096 (E.D. Pa. Jan. 23, 2007) (Stengel, J.).  Therefore, the defendants are entitled to qualified immunity with respect to plaintiffs' damages claims.

## Conclusion

Because the undisputed evidence fails to establish a reasonable connection between the current legal and court mail regulation and prison security and safety, the regulation does not pass the *Turner* test.  Based upon the regulation and the rationale given for its implementation, the plaintiffs have established that the policy infringes their First Amendment right to be present when their legal and court mail is opened.  Therefore, they are entitled to injunctive relief.

---

[31] The Federal Bureau of Prisons ("BOP") has a record keeping procedure for mail that is neither cumbersome nor time consuming.  BOP policy provides that staff processing legal and court mail date, by time-stamp or handwriting, and sign the envelopes before opening them in front of the inmate.  *Federal Bureau of Prisons, Program Statement 5800.10, Mail Management Manual* (11/3/95), Chapter 3 at 6.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

DERRICK DALE FONTROY, I.,          :      CIVIL ACTION
THEODORE B. SAVAGE, J.D., and      :
AARON CHRISTOPHER WHEELER          :      NO. 02-2949
                                   :
        v.                         :
                                   :
JEFFREY A. BEARD,                  :
DAVID DIGUGLIELMO, and             :
KIM ULISNY                         :

<u>**ORDER**</u>

**AND NOW**, this 3rd day of May, 2007, upon consideration of the defendants' Motion to Dismiss the Amended Complaint (Document No. 46), Plaintiffs' Motion for Summary Judgment (Document No. 74), and the submissions of the parties, and after oral argument, it is **ORDERED** as follows:

1.      The defendants' Motion to Dismiss the Amended Complaint, treated as a motion for summary judgment, is **GRANTED IN PART** and **DENIED IN PART**.

2.      The defendants' motion is **GRANTED** with respect to plaintiffs' damages claims, and **JUDGMENT IS ENTERED** in favor of the defendants and against the plaintiffs on the plaintiffs' claims for damages.

3.      The plaintiffs' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

4.      The plaintiffs' motion for summary judgment is **GRANTED** with respect to the claim for injunctive relief.

5.      In all other respects, the parties' motions are **DENIED**.

**IT IS FURTHER ORDERED** that the defendants Jeffrey A. Beard, David DiGuglielmo and Kim Ulisny are enjoined from enforcing the current Department of

Corrections' mail policy insofar as it permits prison officials to open legal and court mail outside the inmates' presence, and all legal and court mail shall be opened in the presence of the inmate to whom it is addressed.

/s/ Timothy J. Savage
TIMOTHY J. SAVAGE,  J.